1

2

3

4

5

6

7

8

9

10

11

12

13

14

15
16

17

18
19

20

21

22

23

24

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF TEXAS**

Case No.  17 cv 1649

KATHLEEN THOMAS,

PLAINTIFF,

    v.

BANK OF AMERICA CORP.

BANK OF AMERICA, N.A.,

SETERUS, INC.,

and

Corporate Does, 1-15,

And John/Jane Does, 1-25,

DEFENDANTS

United State Court
Southern District of Texas
FILED

JUN 0 1 2017

David J. Bradley, Clerk of Court

JURY DEMAND

Complaint

Injunctive Relief

Declarative Judgment

Quiet Title

and for Damages

## VERIFIED PETITION FOR REDRESS, COMPLAINT,

## AND REQUEST FOR EMERGENCY INJUNCTIVE RELIEF

1.    **COMES NOW PLAINTIFF** KATHLEEN THOMAS, as a person with

disabilities seeking meaningful access to the judicial system, with clean hands filing this

PETITION FOR REDRESS AND COMPLAINT AND REQUEST FOR EMERGENCY

INJUNCTIVE RELIEF pursuant to the U.S. Constitution, federal and state laws and

regulations, and common law, against DEFENDANTS BANK OF AMERICA CORP

("BOAC")/BANK OF AMERICA N.A.("BANA"), together hereinafter "BOA,"

1   DEFENDANT SETERUS, INC. (hereinafter "Seterus"), individually and jointly and

2   severally as Defendants, acting for themselves and controlling other actors as superiori,

3   and their employees, agents, contractors and assigns, together with 15 Corporate Does

4   and 25 John/Jane Does (individual defendants) whose names will be added when

5   identified, to prevent sale of Thomas' property, to undo fraudulent non-judicial

6   foreclosure, for quiet title, and for damages.  Plaintiff's complaints against Defendants

7   include fraud; conspiracy to defraud; mortgage fraud; creation of and attempt to exercise

8   fraudulent lien; failure to disclose material facts and material misrepresentations; refusal

9   to execute release of fraudulent lien; insurance fraud; theft/conversion; attempted theft;

10  breach of contract; tortious interference with contract; exploitation of disabled, elderly

11  individual; defamation; intentional infliction of emotional distress; engaging in a pattern

12  of practices (racketeering) in violation of  RICO  statutes; violation of the Fair Credit

13  Reporting Act (FRCA);  violations of Truth in Lending Act (TILA); securing execution

14  of documents by deception; commercial bribery; breach of fiduciary duty; misapplication

15  of fiduciary property; conspiracy to deprive of rights/deprivation of rights (Fannie Mae

16  servicers) (US Constitution, Amendments 4, 5, and 14); filing false documents with the

17  IRS; false claims. As a result of Defendants' unconscionable actions, Plaintiff has

18  suffered damages, continues to suffer damages and if Defendants are allowed to proceed

19  with foreclosure sale of property, Plaintiff will suffer further actual and imminent harm.

20                      **I.   JURISDICTION**

21  **2.**      This Court has subject-matter jurisdiction over this matter pursuant to Article III,

22  Section 1 of the U.S. Constitution, 28 U.S.C. §1331 (federal question jurisdiction) and 28

23  U.S.C. § 1367 (supplemental jurisdiction). This Court further has subject-matter

1    jurisdiction over those of Plaintiffs' claims that arise under the Racketeer Influenced and

2    Corrupt Organizations Act, 18 U.S.C. § 1962(d) according to the statute's jurisdictional

3    statement, 18 U.S.C. § 1964."National banks' business activities are controlled by the

4    National Bank Act (NBA), 12 U. S. C. §1 *et seq.*, and regulations promulgated

5    thereunder by the Office of the Comptroller of the Currency (OCC), see§§24, 93a,

6    371(a). OCC is charged with supervision of the NBA and, thus, oversees the banks'

7    operations and interactions with customers. See *NationsBank of N. C., N. A.* v. *Variable*

8    *Annuity Life Ins. Co.*, 513  U. S. 251, 254, 256. The NBA grants OCC, as part of its

9    supervisory authority, visitorial powers to audit the banks' books and records, largely to

10   the exclusion of other state or federal entities. See §484(a); 12 CFR §7.4000. The NBA

11   specifically authorizes federally chartered banks to engage in real estate lending, 12 U. S.

12   C. §371, and "[t]o exercise . . . such incidental powers as shall be necessary to carry on

13   the business of banking," §24 Seventh. Among incidental powers, national banks may

14   conduct certain activities through "operating subsidiaries," discrete entities authorized to

15   engage solely in activities the bank itself could undertake, and subject to the same terms

16   and conditions as the bank. See §24a(g)(3)(A); 12 CFR §5.34(e)." (Waters v. Wachovia

17   Bank, N.A., et al No. 05-1342, Supreme Court)  Defendants are national banks, their

18   affiliates or operating subsidiaries, and servicers of Fannie Mae mortgages. Kickbacks

19   between private contractors working under a federal contract are prosecuted under 41

20   U.S.C.A. §§ 51–58, otherwise known as the Anti-Kickback Enforcement Act of 1986.

21   See also **41 U.S.C. §§ 8701 to 8707; 48 CFR 3.502-2 et seq.** Fannie Mae is a "quasi-

22   federal" agency. While civil actions for the criminal actions are the province of federal

23   agencies, under common law, any party damaged by another may seek relief.  The right

1    of the federal government to secure financial relief reimbursement for criminal actions

2    does not preclude the right of individuals to seek relief for their separate damages. The

3    purposes of the Dodd-Frank Act include "to protect consumers from abusive financial

4    services practices, and for other purposes." Sec. 1036 prohibits commission or omission

5    of any act "in violation of a Federal consumer financial law; or to engage in any unfair,

6    deceptive, or abusive act or practice." Defendants have violated federal law and common

7    law.

8    **3.**    This Court has jurisdiction under 28 U.S.C.A. § 1343(4). A claim for which

9    relief could be granted is stated under 42 U.S.C.A. § 1983. (*Hall v. Garson*, 430 F.2d 430

10    (5th Cir. 1970), extending a federal cause of action under 42 U.S.C.A. § 1983 to

11    plaintiffs who are deprived of their civil rights **by** private persons**.**) (See also: Maine v.

12    Thiboutot and Wright v. Roanoke Redevelopment and Housing Authority.) (18 U.S.C.A.

13    § 241 (1964)). A private party may be engaged in "state action" if the act which deprived

14    federal rights could not have occurred but for the existence of a governmental framework

15    requiring government approval or action. In *North Georgia Finishing, Incorporated v.*

16    *Di-Chem, Incorporated, the Court found state action in a private party's invocation of a*

17    *court ordered attachment that failed to afford due process to the debtor. Similarly, in*

18    *Lugar v. Edmondson Oil Company, the Court held that a creditor who invokes*

19    *prejudgment attachment remedies requiring the participation of a court clerk and a*

20    *sheriff, acts under color of state law.* "[m]isuse of power, possessed by virtue of state law

21    and made possible only because the wrong-doer is clothed with the authority of state law,

22    is action taken 'under color' of state law."( 313 U.S.299 (1941))

23    **4.**    This court has jurisdiction on this matter because of diversity under 28 U.S Code

1   §1332; PLAINTIFF is a Texas citizen, and the mortgaged real estate is located in Alvin,

2   Texas, while DEFENDANTS' (banks and servicers) principal offices are in North

3   Carolina and Oregon, and some of those individuals who are believed to be among those

4   to be added as discovered, are believed to be in North Carolina and Oregon.

5   **5.**       This Court also has subject-matter jurisdiction over those of Plaintiff's claims

6   that arise under 12 U.S. Code § 2605 - Servicing of mortgage loans and administration of

7   escrow accounts; pursuant to 12 U.S. Code § 2614 - Jurisdiction of courts; limitations,

8   any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be

9   brought in the United States district court or in any other court of competent jurisdiction,

10  for the district in which the property involved is located, or where the violation is alleged

11  to have occurred. The property involved is located in Alvin, Brazoria County, Texas, and

12  some of Plaintiff's claims arise under 12 U.S. Code § 2605. Plaintiff made payments in

13  Montgomery County, Texas.

14  **6.**       **STATUTE OF LIMITATIONS**:  Plaintiff has been subject to continuing and

15  repeated violations demonstrating a pattern of practices in violation of state and federal

16  law throughout the period of this mortgage loan. Defendants took advantage of

17  Plaintiff's known disabilities from stroke and traumatic brain injury, including

18  consecutive memory dysfunction, and engaged in fraudulent concealment and other

19  practices designed to create "plausible deniability." From time to time, Defendants

20  presented the appearance of correcting their egregious behavior, thus further delaying

21  Plaintiff's final understanding of their purpose and intent, as well as their actual deeds.

22  The continuing practices of Defendants, as described hereinafter and now ongoing, and

23  their concealment serves to toll any statute of limitations.

## II. PARTIES

1

2    **7.    PLAINTIFF** 71-year-old Plaintiff Kathleen Thomas is and at all times

3    mentioned in this complaint was a natural person residing in Conroe, Montgomery

4    County, Texas, and property owner in Alvin, Brazoria County, TX.  Plaintiff is a

5    member of the Kyothæ Tribe and is also known by her tribal call name, *Katei Blueclay*,

6    pronounced  "KT." Katei Blueclay is a Kyothæ Council member and sits on the Judicial

7    Panel. She has been Kyothæ Tribe's Ambassador to the Americas since 2010, is

8    managing editor of ACAJ, a creative arts journal, and intermittently teaches writing for

9    publication in Lonestar-Montgomery Community College's ALL Program. Plaintiff is

10   handicapped by disabilities secondary to stroke in the 1970's, a series of TIAs, and

11   traumatic brain injury, which limit consistent performance by reason of reduced capacity

12   and limited functioning. At all times alleged herein, Plaintiff is owner of a mortgaged

13   property at 614 Briarwilde Court, Alvin, TX, 77511, said property now the subject of a

14   fraudulent non-judicial foreclosure and Sale scheduled for June 6, 2017, with a 15-year

15   mortgage secured by fraudulent lien in March, 2002, for which Plaintiff accurately and

16   timely paid all mortgage payments, including double payments for the first two years of

17   the mortgage; all other required payments, including insurance and property taxes, were

18   timely and accurately paid by Plaintiff. Prior servicer Defendant Bank of America

19   (BOA) has in the past engaged in cyclic collection efforts, including notices of intent to

20   foreclose 4 or more times if Plaintiff did not pay the fraudulent charges and fees posted

21   by BOA, but each time, after Plaintiff's exhaustive efforts, corrected repeated, cyclic

22   fraudulent mortgage transactions and removed some of the fraudulent charges, although

23   BOA never made complete corrections and does not show the double payments made to

1    Countrywide Home Loan, Inc., during the first two years, or other extra payments made

2    from time to time through the loan period. After BOA notified Plaintiff that servicing

3    had been transferred to Defendant Seterus, Inc.(Seterus), Seterus continued the

4    fraudulent mortgage transactions. Plaintiff Thomas can be served at 10001 Overbrook

5    Drive, Conroe TX 77304. Plaintiff is not and has not been in default.

6    **8.**      **DEFENDANT** Bank of America Corporation (individually "BOAC", and

7    collectively, together with its consolidated subsidiaries including Bank of America NA,

8    identified as "Bank of America," or "BOA"), a Delaware corporation, is a bank holding

9    company (BHC), and a financial holding company. In public federal filings, BOA states

10   that "The Corporation" may refer to Bank of America Corporation individually, Bank of

11   America Corporation and its subsidiaries, or certain of Bank of America Corporation's

12   subsidiaries or affiliates, and further documents that "Bank of America is one of the

13   world's largest financial institutions, serving individual consumers, small- and middle-

14   market businesses, institutional investors, large corporations and governments with a full

15   range of banking, investing, asset management and other financial and risk management

16   products and services, with principal executive offices located in the Bank of America

17   Corporate Center, 100 North Tryon Street, Charlotte, North Carolina 28255." In 2016,

18   BOA assets were reported in excess of $2 Trillion. The officers and directors of Bank of

19   America Corp (BOAC) are the same as the officers and directors of Bank of America,

20   N.A (BANA). Brian Moynihan, an attorney and former BOA General Counsel (2008),

21   has been President, Chief Executive Officer, and Chairman of the Board of both BOAC

22   and BANA since January, 2010. In 2015, Moynihan survived a highly contested election

23   to determine whether he could keep his job as chairman of the board. According to

1    BOA's website, "In his more than 20 years at Bank of America, Moynihan has run each

2    of the major customer and client businesses: consumer and small business banking,

3    wealth management, and corporate and investment banking." In 2016, Moynihan's

4    reported total compensation was $20 million ($10,000/hr fulltime); the bank's board said

5    that 92.5% of Moynihan's pay was "variable and directly linked to company

6    performance," according to an SEC filing. The bank reported 2016 earnings of $17.9

7    billion, up 13% from 2015, the second-highest income reported in the company's history.

8    **9.    DEFENDANT** Bank of America NA (BANA), with principal executive offices

9    located in the Bank of America Corporate Center, 100 North Tryon Street, Charlotte,

10   North Carolina 28255, is a corporation organized under the laws of Delaware, and is

11   controlled/controlling subsidiary of Bank of America Corporation (BOA), sharing the

12   same officers and board members with BOA, and acts as lender and mortgage servicer,

13   with contracts with Fannie Mae. Defendants BOA and BANA control their affiliates,

14   agents, contractors and others with whom they do business, as further detailed hereinafter.

15   BANA identifies itself as a debt collector in communications to Plaintiff. Brian

16   Moynihan, an attorney and former BOA General Counsel, is President, Chairman of the

17   Board and Chief Executive Officer of both BOA and BANA.

18   **10.    DEFENDANT SETERUS, INC**., (hereinafter Seterus), previously owned by

19   BOA and sold as Wilshire Credit to IBM, who as condition of sale retained the BOA

20   employees, then changed its name to Seterus and was contracted by BOA thereafter to do

21   the same tasks they did as a BOA affiliate, is allegedly successor to/assignee of BANK

22   OF AMERICA NA home loan servicing, but not subject to the 2012 National Mortgage

23   Settlement Agreement. As shown in ASSIGNMENT OF DEED OF TRUST from BOA

1    to Fannie Mae, executed on December 14, 2015, by Bank of America NA, Seterus is

2    located at 14523 SW Millikan Way #200, <u>Beaverton, OR</u> 97005. Jeff Johnson is

3    President of Seterus and can be reached at 14523 Southwest Millikan Way, Suite 200

4    Beaverton, OR 97005. Seterus is a mortgage servicer and debt collector, as stated on

5    Seterus' documents mailed to Plaintiff. Seterus, Inc., is a mortgage servicer to whom

6    Defendant Bank of America (BOA), former servicer, transferred servicing in 2015 or

7    2016, depending on which of the conflicting documents one accepts as valid, together

8    with fraudulent and falsified mortgage transaction records, who has refused to correct

9    said records and who has continued the fraudulent entries. Pursuant to the unsigned,

10   unnotarized Notice of Trustee Sale mailed to Plaintiff by Marinosci Law Group, self-

11   labeled as a debt collector, "The Mortgage Servicer is authorized to represent the

12   Noteholder by virtue of a servicing agreement with the Noteholder. . .to administer any

13   resulting foreclosure. . ." Pursuant to Fannie Mae's servicing contracts and guides,

14   servicers stand in a fiduciary relationship to Fannie Mae and to borrowers, and borrowers

15   are identified as third-party beneficiaries of the contracts. Seterus' actual status and

16   relationship to BOA as servicer is somewhat confused: BOA notified Plaintiff that

17   servicing was transferred and Seterus was "servicer;" on a filed document, Seterus

18   identifies itself as "subservicer." Seterus is directly responsible for the actions of those

19   Seterus directs to act.

20   **11.     OTHER DEFENDANTS:** Plaintiff does not know who owns the note and/or

21   loan and so cannot add it/them at this time. Defendants Corporate Does 1 through 25,

22   inclusive, and John/Jane Does, inclusive, are sued in this complaint under fictitious

23   names. The true names and capacities, whether individual, corporate, associate, or

1    otherwise, of Defendants CORPORATE DOES 1 through 15 and JOHN/JANE DOES 1

2    through 25 are unknown to Plaintiff, because of the deliberate obscurity imposed by

3    named Defendants in their association and Plaintiff's inability to compel them to

4    disgorge the information absent legal action (*See* Bivens v. Six Unknown Named Agents

5    of Fed. Bureau of Narcotics, 403 U.S. 388, 390, fn. 2, 91 S. Ct. 1999, 2001, 29 L. Ed. 2d

6    619 (1971).  Therefore, Plaintiff sues said Defendants by such fictitious names pursuant

7    to Federal Rule of Civil Procedure Rule 15(a)(2), and Rule 21. Plaintiff alleges that each

8    of said fictitious Defendants is in some manner responsible for the acts hereinafter set

9    forth. Plaintiff will amend this Complaint to show the true names and capacities of these

10   DOE Defendants, as well as the manner in which each fictitious Defendant is responsible,

11   when these facts are ascertained. Plaintiff is informed and believes and thereon alleges,

12   that each of the fictitiously named defendants is responsible in some manner for the

13   occurrences alleged in this complaint, and that plaintiff's damages as alleged in this

14   complaint were proximately caused by those defendants.

15   **12.     AGENCY:** Plaintiff is informed and believes, and on that basis alleges, that at

16   all times relative to the events concerning each and all, each of the Defendants was an

17   agent, affiliate (controlled or cooperating), subsidiary, servant, employee, contractor,

18   joint venturer, and/or conspirator of each of the remaining Defendants, and was at all

19   times acting within the course and scope of such agency, service, employment, contract,

20   joint venture and/or conspiracy or other colluding relationship, and each Defendant has

21   ratified, approved, and authorized the acts of each of the remaining Defendants with full

22   knowledge of said facts.

23   **13.     COLLUSION, CONSPIRACY, AIDING AND ABETTING:** Each of the

1    Defendants abetted, encouraged, and rendered substantial assistance to the other

2    Defendants in breaching their direct obligations to Plaintiff as further detailed herein, and

3    their indirect obligations to Plaintiff as Plaintiff is the beneficiary of federal laws, rules,

4    regulations, and contracts, as alleged herein. In taking action, as alleged herein, to

5    collude, conspire, aid and abet and substantially assist the commissions of these wrongful

6    acts and other wrongdoings complained of, each of the Defendants acted with an

7    awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would

8    substantially assist the accomplishment of the wrongful conduct, wrongful goals, and

9    wrongdoing, and in many cases, would violate federal laws, rules, regulations, and

10   contracts to which they are subject.

11   **14.    ALTER EGO/ASSOCIATION:** There is a unity of interest between

12   Defendants, and each acts as the alter ego of the others. Further, a parent corporation is

13   the alter ego of a subsidiary corporation if it controls and directs its activities so that it

14   will have limited liability for its wrongful acts. Defendants are associated in their shared

15   financial interests and in the pattern of practices individually and collectively followed in

16   accomplishing their mutual aim. Because of the multiplicious, almost incestuous

17   relationships between the parties and the sheer size of the Defendants' wide-ranging

18   asset groups as documented hereinafter, Defendants exert control over not only their

19   official affiliates, but over the entire real estate mortgage sector. BOA Defendants'

20   officers and board members are the same for the two BOA entities named (Bank of

21   America Corp and Bank of America N.A.).

22   **15.    STANDING:** PLAINTIFF has clean hands and has suffered injuries and is

23   continuing to suffer injuries in fact, and those injuries are fairly traceable to Defendants'

1    conduct (See hereinafter below). It is likely that Plaintiff's injuries will be redressed by

2    the requested relief. U.S. Const. Art. III, § 2, cl. 1. Plaintiff has been and is suffering

3    personal and business economic injuries and personal injuries traceable to Defendants'

4    continuing egregious conduct. Actual and imminent further injury will occur if

5    Defendants are allowed to continue their unconscionable activities, further described

6    below. Plaintiff has diligently worked throughout the past 15 years to prevent and cure

7    Defendants' actions, and has periodically succeeded although Defendants' recidivism has

8    overcome all of Plaintiff's efforts, but Plaintiff's disabilities together with Plaintiff's

9    imperative duty to keep her chronically, critically ill granddaughter alive and in

10    reasonably good health and the resulting crisis-response life pattern has precluded legal

11    action except in extremity. Defendants have now moved their actions into extremity, and

12    Plaintiff is compelled to act at this time, lest irreparable harm ensues.

13    ### III.  EXHIBITS

14    **16.**    Exhibits hereto are provided with affidavit, attached hereto, and all exhibits are

15    incorporated herein by this reference, throughout.

16
17    ### IV.  REQUEST FOR EMERGENCY INJUNCTIVE RELIEF
18    ### AGAINST DEFENDANT SETERUS, INC., AUTHORIZED
19    ### REPRESENTATIVE/SUBSERVICER FOR FANNIE MAE
20

21    **17.**    Plaintiff with this request for emergency injunctive relief presents sufficient

22    evidence in the form of information and sworn exhibits to show that significant factual

23    and legal questions of ownership and indebtedness exist to require that these matters be

24    adjudicated prior to Defendants' proposed action of non-judicial foreclosure and sale of

25    Plaintiff's property. Plaintiff requests the Court to issue an emergency injunction in order

1    prevent lasting irreparable harm to Plaintiff and to provide Plaintiff meaningful access to

2    the judicial system, that justice might be done.

3    **18.**    Plaintiff does not seek to avoid payment of her mortgage. Plaintiff made a 20%

4    downpayment on her 15-year mortgage in 2002, and, in fact, Plaintiff has overpaid her

5    $110,400 mortgage, having made double mortgage payments for years 1 and 2 of the 15-

6    year mortgage, and having not missed a single payment since that time, having made

7    automatic BILLPAY payments from a BOA checking account established for that

8    purpose, and the records showing all payments made timely and confirmed (SEE Exhibit

9    4, BOA BILLPAY 2-2010 THRU 7-2016. SEE also Exhibits 25 and 26.) Because of the

10   double payments in the first two years beginning April, 2002, the mortgage was actually

11   paid up in April, 2015, but Plaintiff continued payments (disabilities) through July, 2016,

12   for an **overpayment** of $14,086.35. Further, from time to time, Plaintiff also made other

13   double payments. (See Exhibit 26.) In 2011, there appears to be no payment for 5/1/2011

14   on Exhibit 4, but the May payment was made 4/29/2011, and BOA customer service

15   afterward changed the due date for the mortgage payment to the 5th of the month for July,

16   2011, and thereafter, explained below.

17   **19.**    In a December, 2015, mailing, Defendants asserted Plaintiff owed

18   approximately $16,400, which consisted of fraudulent charges assessed apparently

19   beginning again in 2014 against an escrow account that had been waived in 2002.  Such

20   charges had previously been assessed and removed at least three (3) times prior to 2014.

21   These charges include late charges for payments that were paid on time and confirmed

22   paid with automatic BILLPAY transfers from a Bank of America checking account set

23   up to make mortgage payments (See Exhibit 4). Booked entries of dates payments

1    received on Plaintiff's BOA mortgage transaction records do not coincide with BOA's

2    BILLPAY records (See Exhibit 12). This is a manufactured fraudulent default.

3    **20.**      Plaintiff was deprived of the protection of her fundamental due process rights by

4    Defendants' deception and fraud when Defendants induced Plaintiff to first agree to

5    purchase a home and take out a mortgage, then to execute the closing documents (Note,

6    Deed of Trust) while Plaintiff was temporarily unable to read the documents because of a

7    series of Transient Ischemic Attacks. Plaintiff because of disabilities always paid in full

8    for her purchases until induced by Defendants to secure a mortgage. Plaintiff relied on

9    Defendants' representations because Defendants had established a fiduciary relationship

10    with Plaintiff some time before Defendants persuaded Plaintiff to accede to Defendants'

11    plan to develop a strong personal credit reference through monthly mortgage payments to

12    match her corporations' excellent credit reference so Defendant BOA could provide her

13    corporation accounts receivable financing at need. Since Plaintiff had never purchased a

14    property for other than full payment at purchase, Plaintiff was completely ignorant of the

15    transfer of rights in property that she later found she had signed, and of the other clauses

16    detrimental to her financial and personal interests, and of other material facts Defendants

17    carefully withheld from her. Had Plaintiff been able to read the documents she was

18    signing, she would not have signed them, particularly since she had no personal financial

19    need to secure a mortgage. Plaintiff trusted Defendants, to her lasting cost.

20    **21.**      With this request for injunctive relief, Plaintiff seeks to prevent fraudulent sale

21    of her property on June 6, 2017, until the matters presented herein are adjudicated by this

22    court, and this court can establish both ownership of the note and Deed of Trust,

23    determine whether any indebtedness exists, and if so, what that indebtedness is.

**22.**    Time is of the essence. Although Plaintiff is not and has not been in default, and rather has prepaid the mortgage, as explained herein, Defendants have filed non-judicial foreclosure and notice of sale of Plaintiff's property to be held on June 6, 2017.  Because of Plaintiff's disabilities and family illness, Plaintiff has had inadequate time to secure and work with an attorney, and attorneys have declined this case because of the time constraints, but would take it given adequate time to prepare a case which would be possible with this Court's issuance of emergency injunctive relief.  Given time by this Court's injunction, Plaintiff is determined to retain attorneys to conduct the litigation, because Plaintiff cannot otherwise secure meaningful access to the judicial system. Defendants have previously threatened foreclosure at least 4 times, based on their fraudulent mortgage transactions, and have each prior time, after extensive and exhaustive efforts by Plaintiff, finally "corrected" the record and removed the alleged default. Plaintiff's husband has been ill for over a month and had surgery on May 23, 2017. Plaintiff's critically, chronically ill granddaughter has just been referred for surgery within the next 3-4 weeks. Although filing this petition Pro Se, Plaintiff is well aware that her disabilities make her incompetent to assure meaningful access to the judicial system: Plaintiff is unable to prosecute her claims without the aid of attorneys whose fees she is well able to pay. Plaintiff requests injunctive relief to stop sale of Plaintiff's property until this matter can be adjudicated in this Court with an attorney or attorneys who will amend the petition to meet federal court requirements and proceed according to the rules.

**23.**    The Court might at first find this situation and Plaintiff's actions or periodic inactions inconsistent and unbelievable, but when one considers the exigencies of

1     Plaintiff's life with disabilities and her duties and responsibilities for maintaining the life,

2     health, and wellbeing of a child who can be triggered into sudden cardiac arrest or

3     laryngospasm by any ordinary change in any external or internal environmental factor,

4     and who cannot be resuscitated by normal means, who responds to only one medication

5     which is increasingly hard to secure, then it is easier to understand how and why crisis-

6     to-crisis existence precludes normal reactions and activities that would otherwise receive

7     high priority responses, and why Plaintiff found it almost impossible to deal adequately

8     with Defendants' depredations. That Defendants were well aware of Plaintiff's situation

9     from before the inception of the mortgage makes their actions all the more egregious.

10    **24.**    One of the basic policies of the common law is that no one shall be allowed to

11    profit by his own wrongdoing: "*nullus commondum capere protest de injuria sua*

12    *propria.*" A wrongdoer should not be enabled by law to take any advantage from his

13    actions: "*Commodum Ex Injuria Sua Nemo Habere Debet.*"

14    **25.**    Absent the Court's issuance of an injunction delaying sale of Plaintiff's

15    property, Defendants, including Seterus, Inc., will be enabled by law to profit by their

16    egregious wrongdoing, and Plaintiff will suffer great and irreparable injury.  Writ of

17    injunction may be granted if irreparable injury to real or personal property is threatened,

18    irrespective of any remedy at law. No financial restitution can restore to Plaintiff the

19    peace of mind threatened by Defendants' actions, or overcome the potential fatal effects

20    of Plaintiff's distraction from the essential management of a potentially fatal condition.

21    Sale of Plaintiff's property, whether later rescinded or whether financial restitution is

22    made, will also cause physical injury to Plaintiff and to Plaintiff's disabled adult son who

23    resides in the home. Stresses and the related rise in blood pressure are particularly

1    dangerous in those predisposed to stroke and TIAs, like Plaintiff, and Plaintiff has

2    already been hospitalized once as a direct result of Defendants' practices. Plaintiff is

3    entitled to the relief under the principles of equity and state statutes relating to

4    injunctions.

5    **26.**    Equity must assure that those who are harmed can find relief, that the relief will

6    only be granted for reasons that are themselves fair, that the form of the relief granted is

7    fair to all concerned, and that equity is not used for unfair purposes. Plaintiff has suffered

8    greatly as a result of the actions of Defendants, who first established themselves in a

9    position of such trust that Plaintiff was induced to forego habitual protections

10   necessitated by her stroke and traumatic brain injury disabilities, and then deliberately

11   violated every principle they advocated and expressed in order to increase their profits.

12   In spite of her handicaps and severe life conditions, Plaintiff has diligently fought

13   Defendants to the best of her abilities, and has refused to accede to extortionate threats.

14   **27.**    In spite of Defendants' deliberate fraud and violation of their oral agreements,

15   said agreements as demonstrated in the period of performance from 2002 – 2009,

16   Plaintiff has made all payments required by her unnecessary mortgage. Plaintiff's hands

17   are clean. Equity requires that Defendants not be enabled or assisted by the judicial

18   system to seize a property for nonpayment when Plaintiff has overpaid the loan.

19   **28.**    The chain of assignments is faulty, and Seterus thus has no authority to

20   foreclose and to sell Plaintiff's property. An obligor has standing to challenge the chain

21   of assignments by which a party claims a right to foreclose. *See Preston v. Seterus,*

22   *Inc.,* 931 F.Supp.2d 743, 751-55 (N.D. Tex. 2013); *Miller,* 881 F. Supp. 2d at 832

23   (collecting cases); *Millet v. JP Morgan Chase, N.A.,* No. SA-11-CV-1031-XR, 2012 WL

1     1029497, at *3-*4 (W.D. Tex. Mar. 26, 2012); *Rice v. Bank of New York*, No. 4:11-CV-

2     4220, 2012 WL 3685981, at *2 (S.D. Tex. Aug. 24, 2012). While a plaintiff may not

3     have standing to enforce the terms of an assignment to which he was not a party, he

4     would have standing to challenge the authority of a defendant to foreclose under a note

5     and deed of trust to which the plaintiff was a party. *Preston*, 931 F. Supp. 2d at 755. This

6     is because in the latter case the plaintiff's claims derive from the note and deed of trust

7     and not any related assignments of those instruments. *Id.*

8     **29.**     Seterus, Inc., filed a fraudulent APPOINTMENT OF SUBSTITUTE TRUSTEE

9     in Brazoria County, TX, on 4/20/17. This document contains two (2) or more false

10    statements, that Seterus knew or should have known were false. The statement that

11    Plaintiff executed and delivered to Trustee a Deed of Trust/Security Instruments securing

12    ***a note payable to the order of MORTGAGE ELECTRONIC REGISTRATION***

13    ***SYSTEMS, INC.***, is false (See Exhibit 10). The Promissory Note was payable to

14    Countrywide Home Loans, Inc., the "Mortgagee," and Vendor's Lien and Deed of Trust

15    lien was "assigned, transferred, and delivered to Mortgagee." (See Exhibit 8-A, p. 1

16    Warranty Deed With Vendor's Lien, citing note payable to Countrywide Home Loans,

17    Inc.) (Emphasis ours.)

18    **30.**     The second false statement is that "default was made in the payment of such

19    Note. . ." Plaintiff has made no default in payment, as Exhibit 4 demonstrates, together

20    with sundry other facts and proofs hereinafter and at trial.

21    **31.**     Third, within the Appointment, Seterus states it is "the undersigned, the legal

22    owner and holder of such note." The Appointment is signed by "Seterus, Inc., as

23    Authorized Subservicer for Federal National Mortgage Association ("Fannie Mae"). . ."

1    in the person of Rebecca Higley, Assistant Secretary for Lien Releases and Assignments,

2    in Bonneville County, Idaho. Beneath the notarization, "Grantor" is identified as Seterus,

3    Inc., etc., in Dallas, TX. The language in this Assignment of Substitute Trustee,

4    including the false statements, creates a question as to who is the owner and holder of the

5    referenced Note.

6    **32.**     Transfer of ownership of the promissory note is not a recordable transaction.

7    However, the Truth In Lending Act (TILA) requires that borrowers be notified of

8    ownership changes. Under federal law, borrowers are entitled to receive notification

9    when the ownership of their loan changes. Plaintiff was not notified of ownership

10   changes of the promissory note or of ownership of her loan when or if ownership

11   changed from Countrywide Home Loans, Inc., or thereafter.

12   **33.**     In the Original Deed of Trust filed 2002 (Exhibit 8), which Plaintiff was

13   induced by fraud and deception to execute, the trustee is identified as CTC Real Estate

14   Services at 400 Countrywide Way in Simi Valley CA, MERS is identified as a

15   beneficiary solely as nominee, but the property was granted and conveyed to Trustee

16   CTC Real Estate Services, in trust, with power of sale under a section titled Transfer of

17   Rights in the Property. MERS is described as a beneficiary in this section, but there is no

18   explanation of for whom the trustee serves anywhere in the document. The question

19   remains.

20   **34.**     According to MERS' published facts, "At closing, the lender and borrower

21   agree to appoint MERS as the mortgagee on the mortgage or deed of trust." "All

22   mortgages (or deeds of trust) registered on the MERS® System are recorded in the

23   public land records, and MER$ remains the lien holder in the land records whenever

1    transfers of the promissory note or servicing rights take place between MERS members."

2    "In 2011, MERS changed its rules so that foreclosures may no longer be started in its

3    name. Prior to the foreclosure, MERS will assign the loan back to the lender (or the

4    current owner of the loan). . . In a nonjudicial foreclosure, the lender or current owner of

5    the loan will be named as the beneficiary in the foreclosure notices."

6    **35.**    MERS is not appointed as mortgagee on Plaintiff's Deed of Trust, but is

7    beneficiary. Countrywide Home Loans, Inc., is named as mortgagee. Fannie Mae is

8    named as Noteholder in the Notice of Trustee's Sale, but the Assignment of Deed of

9    Trust, December, 2015, is from Bank of America as "successor to" "Countrywide Home

10    Loans Servicing, LP" to Fannie Mae. (See Exhibits 8 through 10.)  MERS allegedly

11    provides the missing link in the assignment chain; however, the position MERS states for

12    itself is not evident, since it is BOA who assigned the Deed of Trust to Fannie Mae.

13    **36.**    Further, the Deed of Trust/Security Instrument and the Note are a fraudulent lien

14    pursuant to Texas law, because execution of the documents was obtained by deception

15    by Bank of America and Countrywide Home Loans, Inc., jointly and severally, as

16    defined in TX Title 7, Chapter 31 Sec. 31.01 (execution of Note and Deed of Trust to

17    Countrywide Home Loans, Inc. secured by deception per TX Title 7 Chapter 32 Sec.

18    32.46), as further described and explained in this petition, and Plaintiff was induced by

19    trusted Defendants' knowingly false and deceptive iteration of the supposed contents of

20    the documents, to execute the documents while she was unable to read as a result of

21    having suffered a series of Transient Ischemic Attacks, Defendants having convinced her

22    not to wait until she had recovered. Since Plaintiff had also lost the ability to read when

23    she first had a stroke, then later regained it, Plaintiff believed she would again regain the

1    ability. Plaintiff's consent was not effective because it was induced by deception (TX

2    Penal Code Chapter 31 Sec. 31.01(3)(a)). The Deed of Trust and Promissory Note are

3    invalid because of ineffective consent. However, Plaintiff has overpaid the mortgage,

4    with double payments for the first two years, and having made all other payments each

5    month.

6    **37.**    Texas Penal Code Title 7 § 32.46 provides that  (a) A person commits an offense

7    if, with intent to defraud or harm any person, he, by deception: (1) causes another to sign

8    or execute any document affecting property or service or the pecuniary interest of any

9    person." Defendants have unlawfully appropriated Plaintiff's real property by

10   nonjudicial foreclosure based on a Deed of Trust and Note for which Plaintiff's consent

11   was not effective because induced by deception with intent to defraud Plaintiff, and now

12   seek to sell it. Texas Penal Code 31.03, Theft, provides that "(a) A person commits an

13   offense if he unlawfully appropriates property with intent to deprive the owner of

14   property. (b) Appropriation of property is unlawful if: (1) it is without the owner's

15   effective consent." "Chpt 31.01(4) "Appropriate" means: (A) to bring about a transfer or

16   purported transfer of title to or other nonpossessory interest in property, whether to the

17   actor or another; or (B) to acquire or otherwise exercise control over property other than

18   real property. (5) "Property" means: (A) real property; (B) tangible or intangible personal

19   property including anything severed from land; or (C) a document, including money, that

20   represents or embodies anything of value."

21   **38.**    Further, when Defendants as servicers received Plaintiff's regular mortgage

22   payments, failed to apply them to principal and interest, and applied them to the

1    fraudulent charges Defendants created and posted in "escrow," Defendants appropriated

2    Plaintiff's money, and are guilty of theft under Texas law.

3    **39.**    Defendant Seterus, Inc.(Seterus) filed this fraudulent Substitution of Trustee in

4    Brazoria County, TX, and in it issued or caused to be issued a Notice of Acceleration of

5    Maturity and Notice of Non-Judicial Foreclosure Sale based on faulty title and

6    manufactured default, Defendants' falsification of data, and their creation of fraudulent

7    mortgage transaction records falsely alleging default, while *Plaintiff is not and has not*

8    *been in default.* In the document, Seterus appointed Marinosci Law Group, PC, et al, as

9    substitute trustee and instructed trustee to sell Plaintiff's property.

10   **40.**    The unsigned, unnotarized NOTICE OF TRUSTEE'S SALE from Marinosci

11   Law Group, PC, the substitute trustee, states sale is scheduled for June 6, 2017. (SEE

12   Attached Exhibit 1, Cover Letter_Notices combined.)

13   **41.**    Plaintiff served on Defendants via certified mail a Demand that Defendants

14   execute release of the fraudulent lien or claim, pursuant to TX Title 7, Sec. 32.49, on

15   May 8, 2017. (SEE Attached Exhibit 2, DEMAND AND ATTACHMENTS, with

16   proofs). Plaintiff certified mailed the Demand to the following: Christopher K. Baxter,

17   Marinosci Law Group, PC; Brian Moynihan, CEO Bank of America Corp; Jeff Johnson,

18   President or his successor, Seterus; Timothy J. Mayopoulos, Pres. and CEO Fannie Mae;

19   Fannie Mae National Servicing Organization, Dallas; Chairman Mike Crapo, US Senate

20   Committee on Banking, Housing, and Urban Affairs; Chairman Jeb Hensarling,

21   Financial Services Committee; Director Mel Watt, FHFA.

22   **42.**    Defendant Seterus answered May 9, 2017, with an *unsigned form letter* stating

23   "Dear THOMAS, KATHLEEN: We are in receipt of your inquiry and are in the process

1    of reviewing the issue(s) presented" (SEE Attached Exhibit 3, Seterus Answer). The

2    form of Seterus' address of plaintiff by last name, first name, and failure to sign the letter

3    follows the usual and customary pattern of practices Defendants have continued to

4    engage in; and the arrogance and callous disregard of Plaintiff's rights and of the law

5    demonstrated in the unsigned form letter reflects Defendants' 3,000 pound canary

6    attitude.

7    **43.**    Defendant BOA's unsigned answer, received May 19, 2017, over the name of

8    Victor Kabasele, identified as a Resolution Specialist with Executive Mortgage Servicing

9    Complaints, states "We have found the best way to communicate is by phone," requests

10    that Plaintiff call him, and states that he expects to complete his review by May 26, 2017.

11    Based on the experiences of having previously dealt with BOA's resolution specialists,

12    as demonstrated by a review of Exhibit 12 A-D and Exhibits 19-A and 19-B, Plaintiff

13    does not expect to see a resolution of the problem, but rather more delaying action.

14    Further, BOA's files contain multiple notices that Plaintiff is handicapped and has

15    difficulty dealing with phone conversations. The fact that there is no signature indicates a

16    form letter, sent to add to the paper trail Defendants consistently create and maintain as

17    part of their pattern of practices, but effects no change or correction of the problem, as is

18    usual and customary with these Defendants.

19    **44.**    Under 12 U.S. Code § 2605 (e)(2), servicers are required "Not later than 30 days

20    (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any

21    borrower of any qualified written request under paragraph (1) and, if applicable, *before*

22    *taking any action with respect to the inquiry of the borrower,*" to  "make appropriate

23    corrections in the account of the borrower. . ." (Emphasis ours.) Sale of the property and

1   the harm to Plaintiff if Defendants continue with the announced action make delaying the

2   sale "applicable." Seterus gives no indication that the sale action will be delayed until

3   after resolution, and the 30-day period allowed for action does not allow time for

4   adjudication of the issues and for justice to be done; therefore Plaintiff seeks judicial

5   intervention in the form of injunction so that justice may be done.

6   **45.**     On May 22, 2017, Plaintiff received another letter from Seterus (See Exhibit 22),

7   with a stamped signature, refusing to release the fraudulent lien, and alleging that

8   Plaintiff provided no proof, although Plaintiff had attached documentary proof , Seterus,

9   as current servicer, is required by Fannie Mae to have received the complete mortgage

10   files from BOA, and the documents in the file should show clearly that no escrows, no

11   insurance queries, or any of the fraudulent entries appeared prior to BOA's becoming

12   servicer in about 2009-2010, should include notations of corrections, and sufficient other

13   evidence for Seterus to recognize wrong-doing and correct it. (See Exhibit 2, Demand

14   and Attachments. See also Exhibit 12, Some BOA Mortgage Transaction Reports, with

15   conflicting data, and Exhibit 4, BOA BILLPAY 2-2010 through 7-2016.)

16   **46.**     Seterus' response follows Defendants' usual practices of misdirection,

17   misrepresentation, reiteration of previous lies, and other deceptive practices, as described

18   in numerous legal actions and settlements, and documented in the Exhibits attached

19   hereto and the proofs to be provided at trial (See Exhibit 19 A and B for examples).

20   Exhibit 19 A includes the following: "Our records indicate we spoke to Great Lakes

21   Insurance on May 28, 2013, and we were advised the policy would not be renewed."

22   There is no date on that portion of the email.  On 19 B, there is a date of 9/10/2013 over

23   that comment. Plaintiff replied after discovering from her insurance agent that what had

1 actually happened was that on May 28, 2013, BOA had *instructed* the insurer to cancel

2 Plaintiff's policy; the agent did not do so, so Plaintiff's policy remained in force. After

3 Plaintiff's reply informing BOA of her discovery, BOA replied with the Message dated

4 03/06/2014, and supposedly corrected the escrow to remove the charge and return the

5 payment amount to the agreed $939.09. Plaintiff downloaded copies of this message at

6 different times, and found that the original message had been altered somehow. Note the

7 differences between 03/06/2014 on 19A and 19 B. 19 B contains 4 additional nonsensical

8 paragraphs "explaining" BOA's treatment of Plaintiff's mortgage payments. Note also

9 the sentence "Your next payment is due *February 1, 2014*," and that BOA has not

10 corrected the escrow and returned to the correct mortgage payment. (Emphasis ours.)

11 Defendants appear to be convinced that their misrepresentations will be accepted as fact,

12 provided that they continue to say them and maintain a written copy in their files, but

13 they are apparently unaware that some clients download and keep their messages.

14 **47.** Based on Plaintiff's business experience with computer programming and data

15 bases, deletion of a message and substitution of another message requires an individual

16 with programming skills at a level above that necessary for creating data base reports.

17 **48.** Defendants have refused to release the fraudulent lien, an offense under Texas

18 Penal Code 32.29.

19 **49.** Plaintiff is filing this action pro se because the attorneys approached to file the

20 suit after Plaintiff was noticed of the foreclosure and sale cited inability to do the

21 necessary work in the time given, particularly given Plaintiff's aphasia [verbal

22 communication difficulties] secondary to stroke. Based on previous cyclic action by

23 Defendants, Plaintiff expected several more months of vacillation, then Defendants'

1    action to correct the records, rather than fraudulent foreclosure and sale of the property.

2    With the Court's permission and injunctive relief permitting same, Plaintiff will secure

3    an attorney or attorneys to prosecute this case in compliance with the rules of Court

4    which Plaintiff is currently unable to comply with because of her disabilities.

5    **50.**    Plaintiff requests that this Court issue an order temporarily enjoining Defendant

6    Seterus, Defendants' employees, agents, associates, contractors, and assigns, including

7    trustees, or any other putative owner of the Note/Deed of Trust, from foreclosure sale of

8    Plaintiff's property at 614 Briarwilde Court Alvin TX 77511, for the pendency of this

9    action or as the Court may otherwise deem proper, so that justice may be done.

10   **51.**    Plaintiff's case differs from the usual mortgage fraud/foreclosure cases in that

11   Plaintiff *is not and never has been in default* on her 15-year mortgage for $110,400.00

12   secured in 2002, on a property at 614 Briarwilde Court, Alvin TX, 77511, said property

13   valued at $150,000.00. In fact, Plaintiff's mortgage should have been marked paid in

14   2015, because of double payments Plaintiff made for the first two years of the loan: 2002

15   – 2004. At all times, Plaintiff's automatic payments were made timely and confirmed

16   (SEE Attached Exhibit 4, BOA BILLPAY 2-2010 THRU 7-2016 Mortgage Payment

17   Records). At all times, Plaintiff maintained required insurance at actual replacement

18   value and provided proof of each year's renewal; at all times, Plaintiff paid property

19   taxes and other costs associated with the mortgaged home.  Escrow was waived to meet

20   Plaintiff's disability needs and requirements (SEE Attached Exhibit 5, Countrywide

21   Home Loans, Inc., memo waiving escrow.) and as part of the verbal agreement between

22   Plaintiff and Defendants which was used as part of the inducement for Plaintiff to

23   execute the documents (note and deed of trust, etc.) associated with the mortgage.

1    **52.**    In 2008-2009, BOA started booking fraudulent charges to Plaintiff's bank

2    records (mortgage transactions) by first transmitting to Plaintiff via computer a document

3    alleging a false minimum insurance requirement of $256,000 (requirement for insurance

4    in excess of insurable limits); "**Our records indicate that you did not have the**

5    **minimum required insurance for this loan. As a result, a lender placed policy has**

6    **been obtained for you.**" (See Exhibit 13.) The original 2002 15-year mortgage was

7    $110,400; Plaintiff maintained $150,000 or above throughout, with three policies as

8    required in that area of Texas: flood, HO or hazard, and wind (Texas Wind Insurance

9    Association).  At this time, the outstanding balance of the loan was considerably less

10   than $110,400, and BOA misrepresented the mortgagee's insurable interest at more than

11   double the original loan.

12   **53.**    BOA then created an unauthorized escrow account to which BOA posted

13   premiums for an alleged lender placed policy, although BOA had admitted Plaintiff's

14   policy was in effect and they had proof of insurance, since their document did not allege

15   that there was no proof of insurance, but that the insurance was less than the minimum

16   required. Although that charge was later reversed, from that time on, BOA made many

17   "errors" and fraudulent charges, removed them, added others, removed them, ad

18   infinitum, and continued manufacturing defaults and posting fraudulent data to the bank

19   records of Plaintiff's mortgage, from time to time. (See Exhibits 12 and 14.)  BOA email

20   customer services messages online from time to time prove Defendants knew insurance

21   was not escrowed "each year," and document Defendants' fraudulent "errors." (See

22   Exhibit 20, BOA Mortgage Account Memo 3_31_14.)  After BOA transferred servicing

23   to Seterus, by whatever process, Seterus continued the practices.

**54.**  In 2011, BOA failed to post an early payment for May, 2011, when it was made, and posted the June, 2011, payment as a late May payment. Customer service, after many delays, finally admitted in a telephone conversation that they had received 2 payments in April, shown on the BILLPAY records (Exhibit 4) on 4/1/2011 and 4/29/2011, and suggested changing the due date to the 5th of the month in order to prevent similar "posting errors." BILLPAY records show the payment for 7/1/2011 "cancelled" and a payment for 7/5/2011 processed, demonstrating Plaintiff's compliance with BOA customer service's change.

**55.**  All payments thereafter were made on or before the 5th of the month; and almost all of them were deliberately posted by Defendant BOA as "late payments" thereafter, in spite of their action to change the payment dates for their convenience. BOA used this false entry pattern as justification for labeling Plaintiff as in default, behind on her mortgage payments, and transmitting this false information to credit bureaus. (See Exhibit 12.)

**56.**  BOA also routinely posted completely fraudulent charges to Plaintiff's mortgage transaction reports. Exhibit 14 is a page of BOA's account analysis for 8/12/2010 on which Monthly PMI, PMI Payment, School tax pmt, Spec assessment tax, and County tax pmt appear, all of which are fraudulent. At other times, BOA posted FHA MIP. None of these relate to Plaintiff's mortgage. Plaintiff made a 20% down payment for this 15-year loan. Plaintiff's was not an FHA loan.

**57.**  Defendant Seterus, Inc., included as a portion of the alleged default certain sums that Seterus alleges are due from Plaintiff because Seterus paid Plaintiff's property taxes for 2015 and charged said payment against an unauthorized escrow set up after Bank of

1    America acquired Countrywide and became the loan servicer. At all times during the

2    mortgage period Plaintiff paid her own property taxes, and continued to pay all property

3    taxes after Seterus took over servicing.

4    **58.**    In 2015, Seterus or BOA made an unauthorized *duplicate* property tax payment

5    through subcontractor CoreLogic that was subsequently returned by Brazoria County

6    Tax Collector Ro'Vin Garrett, as documented in **Exhibit 6**, Brazoria County Property

7    Tax memos, proving Seterus' or BOA's payment was returned, with a copy of the front

8    and back of the cancelled check. Upon information and belief, Seterus or BOA made the

9    unauthorized payment in an attempt to legitimize the fraudulent escrow account, as a

10    waived escrow can only be established under Fannie Mae servicing when the

11    mortgagor's property tax payments are delinquent; Plaintiff's property taxes have never

12    been delinquent. Whether it was Seterus or BOA is confused because BOA informed

13    Plaintiff that servicing was transferred Dec. 1 or Dec. 15, 2015, but BOA also mailed

14    Plaintiff an Annual Escrow Account Disclosure Statement January 14, 2016, stating "We

15    are sending you this statement of activity in your escrow account from August 2015

16    through January 2016, the date on which your loan was paid in full or transferred to

17    another servicer." (See Exhibit 17.)

18    **59.**    Although Brazoria County returned the unauthorized payment, as shown by

19    copies of the cancelled check in Exhibit 6, BOA and/or Seterus maintain the charge

20    against the fraudulent escrow account, and falsely cited this returned payment as part of

21    Plaintiff's alleged default, and as the basis for altered escrow charges for future (after

22    Dec. 2016) and an increase in mortgage payment. Plaintiff has refused throughout this

1    period to pay the additional sums based on their fraudulent entries that Defendants have

2    attempted to extort from Plaintiff.

3    **60.**     Although Seterus' unauthorized duplicate tax payment for 2015 was refunded,

4    and Seterus, having been required by Fannie Mae to receive a complete copy of BOA's

5    mortgage file, and further having been notified by Plaintiff, knew that the mortgagee

6    and/or its servicer had never paid property taxes and were not authorized to pay

7    Plaintiff's property taxes, and further, knew or should have known that Plaintiff's

8    property taxes were not delinquent, Seterus nevertheless submitted another duplicate

9    property tax payment for 2016, which duplicate payment has been or will be refunded by

10   Brazoria County, because Plaintiff paid her property taxes as usual.

11   **61.**     Upon information and belief, Brazoria County has notified Seterus that it is

12   waiting for a written request from Seterus for its refund; Seterus is aware that their

13   payment is a duplicate and is to be refunded, but has failed to follow Brazoria County

14   procedures, preferring instead to assert a fraudulent debt owed by Plaintiff for Seterus'

15   unauthorized property tax payments.

16   **62.     FAULTY TITLE/OWNERSHIP: Proof of ownership is inadequate for**

17   **foreclosure and sale.**   A non-party homeowner may challenge a putative assignment's

18   validity on the basis that it was not effective to pass legal title to the putative

19   assignee. See Conlin v. Mortg. Elec. Registration Sys., 714 F.3d 355, 361 (6th Cir. 2013)

20   (stating that a third party may challenge an assignment if that challenge would render the

21   assignment void); Livonia Props., 399 F. App'x at 102; see also Woods v. Wells Fargo

22   Bank, N.A., 733 F.3d 349, 353–54 (1st Cir. 2013); 6A C.J.S. Assignments § 132 ("The

23   debtor may also question a plaintiff's lack of title or the right to sue.").

**63.**    On information and belief, proof of ownership is inadequate for foreclosure and sale. Any action to foreclose requires proof of ownership of the mortgage. This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership. Defendants have a history of misconduct related to legal title, documented in Consent Agreements, suits, settlements, affidavits and so forth dealing with proof of wrong-doing, which are here referenced to show a pattern of practices leading to a logical premise that that Defendants continued their wrongdoing, and that it is unlikely that Defendants failed to follow their usual pattern of practices. Plaintiff's title research shows this to be the case here. (See below and Exhibits 7 through 10.)

**64.**    For example, on April 13, 2011, the Office of the Comptroller of the Currency ("OCC") issued a Consent Order citing "systemic failure. . .to properly assign underlying mortgage loans, and finding that Bank of America N.A., including in its role as alleged successor to Countrywide, engaged in improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon underlying mortgage loans." *In re Bank of Am., N.A.*, Consent Order, AA-EC-11-12 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf. BOA tends to allege it is successor to Countrywide without specifying exactly what is meant by "Countrywide." Often that appears to be Countrywide Home Loans Servicing, LP, as in this case, rather than Countrywide Home Loans, Inc. Absent inquiry by the court or clarification by opposing parties, it seems that BOA's assertion is accepted as "successor to Countrywide Home Loans, Inc.," which redounds to BOA's benefit. BOA has a tendency to clever expressions, as in responding in one case where the Plaintiff sought to

1    verify that BOA was one of the founders of MERS and used 1994 as the putative date of

2    organization, BOA responded that it was not one of the founders of MERS *in 1994*.

3    **65.**    On researching, Plaintiff found that is no clear chain of evidence showing proper

4    transfers or assignment of title/ownership of the (fraudulent because executed as a result

5    of deception, pursuant to Texas law, see below) Deed of Trust to the proper parties that

6    would permit foreclosure and sale of the property, beginning with Countrywide Home

7    Loans, Inc., and ending with Fannie Mae, although MERS is a beneficiary. A May 2017

8    Brazoria County title search elicited 4 items: the Warranty Deed with Vendor's Lien;

9    original Deed of Trust recorded 4/01/2002, an Assignment of Deed of Trust recorded

10   12/15/2015, and an Appointment of Substitute Trustee recorded 4/12/2017 (See Exhibit

11   7, Brazoria County Title Search; See Exhibit 8, Original Deed of Trust; See Exhibit 8-A

12   Warranty Deed with Vendor's Lien; See Exhibit 9, Assignment of Deed of Trust). See

13   Exhibit 10, Appointment of Substitute Trustee).

14   **66.**    MERS is owned by **MERSCORP Holdings, Inc.**  Merscorp was founded in

15   either 1993 or 1995 and is owned by the major financial institutions involved in the

16   mortgage market, including Citigroup, Chase, Bank of America, Wells Fargo, FNMA,

17   FMAC and others. MERS tracks mortgages and was established to reduce the charges of

18   recording home ownership in local communities, thus making the widespread

19   securitization of residential mortgages possible.

20   **67.**    According to MERS Quick Facts, online, Lenders use MERS as a nominee, with

21   MERS as mortgagee, because when the loan is in MERS' name in the land records, this

22   saves time and recording costs because multiple assignments are not necessary each time

23   the loan changes hands. **MERS does not own the underlying debt.** While MERS then

1    acts as mortgagee in county land records, it does not actually own the promissory note. "In

2    2011, MERS changed its rules so that foreclosures may no longer be started in its name.

3    Prior to the foreclosure, MERS will assign the loan back to the lender (or the current

4    owner of the loan)."

5    **68.**     The loan is not in MERS name as mortgagee in the land records. There is no

6    assignment from MERS back to the lender or the current owner of the loan.

7    **69.**     The 2002 original Deed of Trust (Exhibit 8) records the Grantor as Kathleen

8    Thomas and the Grantee/Lender as <u>COUNTRYWIDE HOME LOANS, INC</u> (CHL), the

9    lender, with MERS as simple nominee (not mortgagee) for Lenders' successors and

10    assigns. The trustee is CTC Real Estate Services, which operates as a subsidiary of NB

11    Holdings Corporation, a bank holding company based in Charlotte, North Carolina,

12    which operates as a subsidiary of Bank of America Corporation. NB Holdings Corp's

13    address is 100 North Tryon Street 56th Floor, Charlotte NC 28202

14    **70.**     MERS' explanation of "How MERS Works" online (Exhibit 21) states "MERS

15    is appointed "mortgagee as nominee" for the lender and its successors and assigns," but

16    this language does not appear in the original Deed of Trust.

17    **71.**     According to MERS QUICK FACTS, Mortgage Electronic Registration

18    Systems, Inc. ("MERS") is a wholly-owned subsidiary of MERSCORP Holdings, and its

19    sole purpose is to serve as mortgagee in the land records for loans registered on the

20    MERS® System and MERS® Commercial. MERS is a nominee for the lender and

21    subsequent buyers ("beneficial owners") of a mortgage loan and serves as a common

22    agent for the mortgage industry. At closing, the lender and borrower agree to appoint

23    MERS as the mortgagee on the mortgage or deed of trust. This means that when a MERS

1    member sells the loan to another MERS member, only the promissory note-and not the

2    mortgage-transfers, because the mortgage is grounded in the name of MERS. Therefore,

3    because the mortgage did not transfer, an assignment to record the transfer need not be

4    filed. All mortgages (or deeds of trust) registered on the MERS® System are recorded in

5    the public land records, and MER$ remains the lien holder in the land records whenever

6    transfers of the promissory note or servicing rights take place between MERS members.

7    The  MERS® System is not a legal system of record nor a replacement for the public

8    land records. No interests are transferred on the system; they're only tracked.

9    Transfer of ownership of the promissory note is not a recordable transaction. However, the

10   Truth In Lending Act (TILA) requires that borrowers be notified of ownership changes.

11   [http://www.illinoiscourts.gov/SupremeCourt/Public_Hearings/Mortgage_Foreclosure/Pra

12   ctice_Procedures/2012/mercorp.pdf

13   **72.**    According to federal charges, MERS has created a "systemically important, yet

14   inherent unreliable, database," and a fatal flaw is that MERS allows "the entry and

15   management of data by those MERS members who are identified as  owners or servicers

16   in the MERS System, instead of controlling entry and management itself."  This includes

17   Defendants, who have unsupervised, unmonitored access and may make entries and alter

18   them at will. The validity of a data base which can be manipulated and/or altered by any

19   self-serving member is a vanishingly small number, and use of such a database to

20   determine ownership of a note or a property cannot produce reliable results.

21   **73.**    The 2015 Assignment of Deed of Trust is from Bank of America as "successor

22   by merger to BAC Home Loans Servicing, LP, FKA Countrywide Home Loans

23   Servicing, LP," to Fannie Mae/Dallas (Exhibit 9).

**74.**     The note referenced in Exhibit 8-A is payable to Countrywide Home Loans, Inc., which is not the same entity as Countrywide Home Loans Servicing, LP (Exhibit 8-A).

**75.**     Plaintiff was not notified of a change in ownership, pursuant to TILA. "Consistent with the statute, the final rule requires a purchaser or assignee that acquires a loan to provide the disclosures in writing no later than 30 days after the date on which the loan was sold, transferred or assigned." "The purchaser or assignee that acquires the loan must provide the required disclosures no later than 30 days after the date on which it acquired the loan. This provision is contained in TILA Section 131(g), 15 U.S.C. 1641(g), which applies to any consumer credit transaction secured by the principal dwelling of a consumer. Consequently, the disclosure requirements in Section 131(g) apply to both closed-end mortgage loans and open-end home equity lines of credit." "The legislative history indicates, however, that TILA Section 131(g) was not intended to require notice when a transaction "does not involve a change in the ownership of the physical note," such as when the note holder issues mortgage-backed securities but does not transfer legal title to the loan. 155 Cong. Rec. S5099."

**76.**     There appears to be no recorded transfer or assignment from Countrywide Home Loans, Inc., to any of the other parties, including Countrywide Home Loans Servicing, LP, or from Countrywide Home Loans Servicing, LP, to Bank of America or to Fannie Mae, regardless of MERS.

**77.**     No record is found of a transfer or assignment from Countrywide Home Loans, Inc., to Countrywide Home Loans Servicing, LP, to which BOA is allegedly "successor by merger."

1  **78.**      Plaintiff was not notified of a sale or transfer of her mortgage loans or note, as

2  required by TILA, and noted by MERS in its Quick Facts referenced in Para 63 above.

3  **79.**      BOA's usual claim in mortgage suits that it is a "successor by merger to

4  Countrywide" is not true as stated. BOA is not "Successor by merger" to Countrywide

5  Home Loans, Inc. CHL may have merged with Red Oak Merger Corp; there is some

6  confusion because of BOA's tendency to use the term "Countrywide" interchangeably

7  for any and all of the entities originally connected to Countrywide Financial, which may

8  have been the parent company of the others. BOA alleges Red Oak Merger Corp is its

9  wholly-owned subsidiary. Reviewing the actual merger disclosures, it is highly doubtful

10  and even inconsistent with other disclosures that Bank of America Corp or Bank of

11  America N.A. actually owns any loans originated by CHL.

12  **80.**      According to various business publications at the time, Countrywide Home

13  Loans, Inc., was a conduit and not a lender for the many trillions of dollars that were

14  originated using the Countrywide "platform," who operated through other thinly

15  capitalized "originators" none of whom were actually making loans.  The loans, by all

16  accounts, were presold or contemporaneously sold into the secondary market the moment

17  the "borrower" signed papers. In the case of Countrywide Home Loans, Inc., MERS was

18  used extensively, to hide the fact that there were no transactions in which anyone actually

19  bought the loans because the loans were already paid for with investor funds, according to

20  the press.

21  **81.**      Countrywide Home Loans Servicing, LP, (CHLS) was allegedly a subsidiary of

22  Countrywide Home Loans, Inc. (CHL), which was a part of Countrywide Financial. BOA

23  states BAC Home Loans Servicing, LP, was "formerly known as" <u>Countrywide Home</u>

1   Loans Servicing, LP;" however, Countrywide Home Loans Servicing, LP has never

2   owned the note and/or Deed of Trust.

3   **82.**     Further, the Appointment of Substitute Trustee recorded 4/12/2017, referencing

4   execution and delivery of note to CTC Real Estate Srv, Trustee for Countrywide Home

5   Loans, Inc., is signed by a Seterus VP, as the "legal owner" of the note (See Exhibit 10,

6   Appointment of Substitute Trustee) and as authorized subservicer for Fannie Mae.

7   **83.**     In the Appointment of Substitute Trustee (Exhibit 10) Defendant Seterus,

8   Inc.(Seterus) falsely asserted "a Note in the principal sum $110,400.00, *payable to the*

9   *order of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.*," while the

10  Warranty Deed cites the note payable to Countrywide Home Loans, Inc.(See Exhibit 8-A,

11  Warranty Deed with Vendor's Lien). [Emphasis ours].

12  **84.**     There is no "transfer back" from MERS to any entity, including from MERS to

13  Fannie Mae.

14  **85.**     The Appointment of Substitute Trustee appoints Marinosci Law Group, et al, and

15  instructs sale of the property, but absent clear chain of evidence of legal transfer and

16  ownership, the validity of the Appointment is in question, as is the ownership of the

17  Deed of Trust.

18  **86.**     Countrywide Home Loans Servicing, LP, is not successor or assign of

19  Countrywide Home Loans, Inc.

20  **87.**     FIRSTMORTGAGE OWNERSHIP: Further clouding the ownership of the loan,

21  numerous times Defendant BOA's online communications to Plaintiff referenced "past

22  due" mortgage payments for "0005429193 FirstMortgage at 614 BRIARWILDE

23  COURT," indicating that the mortgage owner was **FirstMortgage**. FirstMortgage

1    appears as owner of Plaintiff's loan in BOA's online notices from 2010 through 2015.

2    (See Exhibit 18 A-E BOA FirstMortgage 2010-2015, downloaded from BOA's banking

3    website: 18-A FirstMortgage BOA Blocking Screens, 2010; 18-B, 2011; 18-C, 2012; 18-

4    D, 2014; 18-E, 9/2015.)

5    **88.**    There is a valid question as to ownership of the Note and Deed of Trust which

6    precludes foreclosure and sale of the property until after the Court adjudicates this matter.

7    **89.**    Note that of these communications in Exhibit 18 citing past due mortgage

8    payments were Defendants' willful, deliberate, fraudulent "errors," and Plaintiff finally

9    got them corrected each time. For example, Exhibit 18-C asserted May, 2012's payment

10   was past due; Exhibit 4, p. 9, shows the payment was made and confirmed 5/4/2012,

11   pursuant to BOA customer service's change of due date to the 5th in 2011. Plaintiff's

12   mortgage payments were made on time by automatic BILLPAY transfer from BOA

13   checking to BOA mortgage.

14   **90.**    This blocking screen appears intermittently. This blocking screen prevents the

15   mortgagor from accessing mortgage transaction records until a payment is made. It is

16   counterproductive for the mortgagor, because a mortgagor cannot enter unit specific data

17   or determine exactly what entries have been made; it is another delaying tactic. Each

18   time, while unable to see the actual mortgage transaction entries, Plaintiff was able to

19   confirm via her BOA checking account BILLPAY that all payments had been timely

20   made, receipt certified.

21   **91.**    The original Deed of Trust identifies Countrywide Home Loans, Inc., as the

22   lender, and states "Lender includes any holder of the Note who is entitled to receive

23   payments under the Note."  MERS "is acting solely as a nominee for Lender and

1    Lender's successors and assigns." If BOA is not the successor to Countrywide Home

2    Loans, Inc., or if Plaintiff's Deed of Trust/Note/ownership of the loan was not transferred

3    or assigned to BOA, as the records seem to indicate was not done, then BOA was not

4    "entitled to receive payments under the Note." Nor is BOA entitled to assign the Deed of

5    Trust to Fannie Mae, as was done December 14, 2015. And if BOA was not entitled to

6    assign the Deed of Trust as successor by merger to Countrywide Home Loans Servicing,

7    LP, then Seterus, "the undersigned," is not "the legal owner and holder of such Note,"

8    and is not entitled to appoint a substitute trustee, declare the note due immediately due

9    and payable and request the substitute trustee "to sell the property."

10   **92.**     Adjudication is required to establish proof of ownership and to establish a true

11   mortgage transaction record proving exactly who own what to whom, before a fraudulent

12   sale, so that justice may be done.

13   **93.     The Deed of Trust is fraudulent, pursuant to Texas law Title 7 Chapters 31**

14   **and 32, Defendants having secured its execution by deception, and under the**

15   **doctrine of estoppel, Defendants are barred from the foreclosure and intended sale.**

16   As described hereinafter, Defendants misrepresented material facts and deliberately

17   withheld material facts from Plaintiff in order to induce her to execute the documents,

18   thus denying Plaintiff material information necessary for effective consent under Texas

19   law. Consent is not effective if induced by deception or coercion. (Title 7, Chapter 31,

20   Sec. 31.01(1);(3)).

21   **94.**     When Plaintiff in reliance on BOA's advice secured the mortgage from

22   Countrywide Home Loans, Inc., in 2002, Countrywide Home Loans, Inc., and BOA

23   worked together to arrange the mortgage, putatively to help Plaintiff to create a strong

1   personal credit record to match the very strong credit record held by her business, then a

2   small business client of BOA, so that in the event of need, BOA stated, Plaintiff's

3   business could qualify for accounts-receivable (AR) financing from BOA.

4   **95.**   Defendant BOA had previously established a fiduciary relationship with Plaintiff,

5   then CEO of CMSI with an extending banking relationship with BOA, with Thomas

6   relying on BOA's financial advice and assistance with personal and professional

7   business needs over the preceding years. Thomas' background as an English teacher

8   prior to stroke and her continuing disabilities had led Thomas to believe that she needed

9   BOA's assistance, and BOA's strong marketing and public relations program added to

10   the perception that BOA was honest, trustworthy, and as they stated orally and in writing,

11   had their clients' best interests at heart.

12   **96.**   Defendant BOA convinced Plaintiff to make advance preparations for the

13   eventuality that her business might need accounts receivable financing, because although

14   it was cash-rich and sound, it was expanding rapidly, represented that she would need a

15   good personal credit record, and introduced a plan to "help" Plaintiff.

16   **97.**   Prior to this time, Plaintiff's usual and customary procedure was to pay cash for

17   everything because of disabilities related to a stroke she had when she was in her early

18   30's. Although Plaintiff already owned several properties in Louisiana and Texas for

19   which she paid in full at purchase, BOA worked out the plan of home purchase with

20   mortgage, including automatic payments which were to relieve her of difficulties and

21   severe anxiety related to her disabilities and purchases – and her reluctance to enter into a

22   mortgage agreement or any other long-term payment plan, so that Plaintiff could qualify

23   for the AR financing BOA wanted to provide her in the future. Because of Plaintiff's

1    financial standing and healthy business, Plaintiff's obvious ability to continue paying all-

2    cash for her purchases, and Plaintiff's desire not to be bothered with multiple payments

3    or changes in mortgage payments which might occur as the result of changing insurance

4    and other rates, escrow was waived, as part of the "simplified" process BOA and

5    Countrywide Home Loans, Inc., promised Plaintiff. (SEE Attached Exhibit 5,

6    Countrywide Home Loans, Inc., memo waiving escrow.)

7    **98.**    BOA referred Plaintiff to Countrywide Home Loans, Inc., for mortgage because,

8    BOA stated, it was in Plaintiff's interest to have a broader based frame of credit

9    references, and BOA would be providing the references for Plaintiff's business.

10    **99.**    At the time of closing, Plaintiff Thomas had suffered several Transient Ischemic

11    Attacks (small strokes) and temporarily could not read. Although Thomas kept this

12    temporary condition secret, she informed both BOA and Countrywide Home Loans, Inc.,

13    that she could not read, and they all discussed delaying the purchase and closing.

14    Because Thomas had been unable to read after her stroke in her 30's, and had regained

15    the ability afterward, Plaintiff believed she would be able to read later. Both assured

16    Thomas that the documents were in order, that they contained exactly what the parties

17    had agreed, that it was important to get the closing done, and that if Plaintiff was able to

18    sign documents, it would be best to do so. Thomas could sign her name, and her left-

19    handedness was presumed to account for any variations. Relying on those representations

20    and the trusted relationship Defendants had established with her, Thomas went ahead

21    with the closing and executed the documents, including a Deed of Trust and Note.

22    **100.**    Both BOA and Countrywide deceived Plaintiff, made material

23    misrepresentations to Plaintiff, and withheld material information. Plaintiff was given

1    false information and denied essential facts necessary for her to give effective consent, in

2    violation of TX Title 7, Chapter 32, Sec. 32.46 SECURING EXECUTION OF

3    DOCUMENT BY DECEPTION, a third-degree felony,  *"(a) A person commits an*

4    *offense if, with intent to defraud or harm any person, he, by deception:  (1)  causes*

5    *another to sign or execute any document affecting property or service or the pecuniary*

6    *interest of any person . . "* and of Chapter 31, "Consent is not effective if:

7    (A) induced by deception . . ." (Emphasis ours.)

8    **101.**    Defendants knowingly, and with intent to defraud, by deception induced Plaintiff

9    to execute documents affecting property and the pecuniary interest of Plaintiff that

10   contained numerous clauses detrimental to Plaintiff, including escrow and partial

11   payment schema, which allowed the servicers to pyramid and misapply payments and

12   otherwise manipulate mortgage transactions to harm Plaintiff and increase their profits.

13   Absent Defendants' deception, Plaintiff would not have executed these injurious

14   documents. Absent Defendants' strenuous efforts to persuade her, Plaintiff would not

15   have accepted a mortgage.

16   **102.**    Based on the representations made to her, Plaintiff believed that Countrywide

17   Home Loans, Inc., was the mortgagee, and Defendants failed to correct this false

18   impression. Later, when BOA allegedly acquired Countrywide Home Loans, Inc,

19   Thomas believed that BOA was the mortgagee. At no time before closing or for years

20   afterward was Thomas informed that either was to act as servicer, or given material facts

21   about the nature of the relationship between servicers and mortgagors. At no time was

22   Thomas made aware that the interests of servicers were not aligned with her interests.

23   Further, knowing that Plaintiff's disabilities prevented her reading the closing documents,

1   both BOA and Countrywide lied about the contents of the loan documents: it was clearly

2   understood by all parties that Thomas would either purchase insurance or self-insure;

3   neither informed Thomas that the documents contained escrow clauses or other clauses

4   detrimental to Thomas' known interests and needs; in proof, both verbally verified that

5   escrow was waived and Countrywide Home Loans, Inc., confirmed escrow waived in

6   writing.

7   **103.**   Defendants promised performance as mortgagors that they knew they would not

8   perform, with full knowledge and intent to act as servicers. Defendants prevented

9   Plaintiff from acquiring this and other correct information that would have likely caused

10   Plaintiff's judgment to be sufficiently affected as to prevent the purchase of a dwelling

11   and acquiring a mortgage (TX Title 7, Chapter 31), and secured execution of the

12   mortgage documents, including Deed of Trust, by deception, a felony in Texas. (Sec.

13   32.46 (a)(1).

14   **104.**   Further, when Plaintiff expressed anxiety and extreme reluctance to dealing with

15   additional paperwork, given her situation and disabilities, Defendants assured Plaintiff

16   that although there was no way they could turn off automatic notifications of receipt and

17   such spam, Plaintiff did not even have to open these – that if there were any problem,

18   Defendants would immediately contact her by phone to take care of it. Consequently,

19   Plaintiff did not open and read the copious mail, and that worked for her until 2009,

20   when Defendant BOA did not call and absent Plaintiff's knowledge and intervention,

21   started churning the mortgage transactions and payments to their benefit, as

22   demonstrated in the attached exhibits. Defendants' misrepresentations and deceptions

23   acted to delay Plaintiff's discovery of Defendants' peculations.

1   **105.    FRAUDULENT DEFAULT STATUS**: Plaintiff has neither missed a mortgage

2   payment nor made late payments. In fact, Plaintiff prepaid, making double payments for

3   the first two years of her 15-year mortgage, beginning on the payments at the end of the

4   purchase month, in advance of due date for the first payment. Originally, because

5   Thomas began prepayment prior to due date, payments were made on the 26th of the

6   month, as documented in Countrywide Home Loans email dated September 27, 2008

7   (See Attached Exhibit 11, Countrywide Home Loans email dated September 27, 2008.)

8   At some point, Defendant BOA changed the due date to the 1st of the month, but since

9   Plaintiff was prepaying ahead of time, payments made after the first were still timely.

10  **106.**    In June, 2011, Defendant BOA changed the due date to the 5th of the month to

11  eliminate a repetitious error in their posting. (See Exhibit 4, BOA BILLPAY 2-2010

12  THRU 7-2016 p. 9, 6/1/11 and later.) This change was made in a long-distance telephone

13  conversation with BOA customer service. Because of holidays or other closings, BOA's

14  BILLPAY sometimes made 2 payments in one month, one on the 1st and one on the 30th.

15  (April 1, then April 30 for May, for example.) The next due payment would then fall on

16  June 1. When that happened, BOA's mortgage people would apply the April 1 payment

17  to April, fail to apply the second payment to May; then they would apply the payment

18  made on June 1 to May and show it one month in arrears – and take various punitive

19  actions. Plaintiff would then have to engage in time-consuming frustrating efforts to get

20  the information corrected. Although the change of payment due date was made by BOA,

21  thereafter, BOA labeled those payments as "late."

22  **107.**    Plaintiff's payments of $939.09 were automatically timely made and confirmed

23  from a Bank of America (BOA) checking account, through BOA's BILLPAY program

1    (*SEE* Attached EXHIBIT 4, BOA BILLPAY 2-2010 THRU 7-2016, payments

2    consistently made timely).  Although Plaintiff has requested earlier records, Defendant

3    BOA has not provided them.

4    **108.**    Further, because of her disabilities from stroke and traumatic brain injury and

5    Defendants' creative record-keeping and data entries, Plaintiff's automatic payments

6    continued to be made long after the loan should have been marked PAID.

7    **109.**    At all times, Plaintiff Thomas maintained insurance at replacement value on the

8    mortgaged property, ensured that proof of insurance was provided to BOA, to

9    Countrywide, and to Seterus, and paid all taxes and other costs related to the property

10    and to the mortgage. Because of Plaintiff's financial standing and assets and her personal

11    and business relationship with Defendant Bank of America (BOA) as CEO of CMSI

12    Group, and because Plaintiff refused to deal with varying mortgage payments and the

13    related effort to ensure their correctness, escrow for this mortgage was waived (See

14    Attached Exhibit 5, Countrywide Home Loans, Inc. memo waiving escrow). Plaintiff

15    Thomas is not now and has never been in default on her mortgage loan.

16    **110.**    Yet, since 2009, Plaintiff has been the victim of unrelenting, egregious attacks by

17    Defendants BOA and others, as Defendants, servicers, engaged in a pattern of practices

18    designed to place Plaintiff in default on paper, to effect foreclosure and sale of Plaintiff's

19    small home, and to increase their profits. Plaintiff fought Defendants for years, as

20    Defendants engaged in a pattern of practices, repeatedly making the same "errors" for

21    long periods, "correcting" the errors for short periods, then repeating the process, as the

22    attached exhibits and additional proof to be presented at trial comprehensively show.

23    Mortgage transaction records downloaded and printed at different times for the same

1    periods are so strikingly different from each other and so confusing that it is almost

2    impossible to actually track mortgage payments; however, Plaintiff's checking account

3    BILLPAY records of the automatic payments are clear – and show all payments timely

4    made and confirmed. (See Attached Exhibit 12 (A-D), Some BOA Mortgage Transaction

5    Reports; See Exhibit 4.)

6    **111.**    The pattern of practices to which Plaintiff was subjected is also now a matter of

7    common knowledge and public record, having been exhaustively described in a

8    multitude of class actions and other types of legal efforts prosecuted against banks and

9    other mortgage servicers, and are further described hereinafter, below. Defendants

10   bombarded Plaintiff with simultaneous conflicting letters, demands, and threats from

11   multiple associates all over the US; instituted excessive credit collection calls; posted

12   email messages on Defendants' website in Plaintiff's accounts, and just generally applied

13   extortionate pressure to compel Plaintiff to pay the fraudulent charges Defendants

14   created.

15   **112.**    Each time Plaintiff found Defendants making "errors," Plaintiff spent months in

16   efforts to compel Defendants to correct her mortgage transaction records, to provide

17   complete and understandable records, and to address their policies, procedures, and

18   practices. Copies of mortgage transaction records downloaded from BOA's site at

19   various times during disputes show both the creative accounting "errors," and their

20   "corrections," and usually after a month or two, reposting of similar "errors." (See

21   Attached Exhibit 12 A-D, Some BOA Mortgage Transaction Reports)

1   **113.**   Each time Defendants "corrected" the records, Defendants contrived to leave at

2   least one "error," usually showing that Plaintiff was one month in arrears, in order to

3   maintain the fiction that Plaintiff was in default. (See Exhibit 12.)

4   **114.**   Defendants followed the pattern of practices outlined more fully in the RICO

5   count below, engaging willfully and with knowledge and intent in the predation in the

6   mortgage industry that is now common knowledge, although virtually without criminal

7   prosecution.

8   **115.**   Defendant BOA started depredations against Plaintiff in 2008-09, approximately,

9   with insurance fraud. Since Plaintiff's proofs of insurance had been documented,

10   Defendant apparently opted to violate the insurable interest provisions. With an original

11   loan amount of $110,400 in 2002, a valuation of $150,000, and Plaintiff's replacement

12   value coverage in excess of $150,000, Defendant BOA falsely notified Plaintiff that she

13   did not have the "minimum required insurance for this loan," and posted a lender policy

14   for $256,000 coverage, more than $100,000 over the replacement value and about

15   $186,000 over the mortgagee's insurable interest as noted [without deducting the double

16   payments] with an UPB of around $70,000. (See Exhibit 13, BOA 2010 HO INS min).

17   Defendant BOA created an unauthorized escrow and started posting charges. It took

18   Plaintiff years to get this partially corrected.

19   **116.**   On more than one occasion, BOA customer service informed Plaintiff that her

20   insurer had "cancelled" her insurance policy, and BOA had purchased lender insurance.

21   Plaintiff discovered that what actually happened was BOA called the insurance company

22   and told them to cancel the policy; the insurance company called the agent; and the agent

23   told them not to cancel the policy. The policy was not cancelled, and when Plaintiff

1    informed BOA that it had not been cancelled, BOA customer service waffled and

2    admitted the policy was in effect. However, in some way BOA was able to change the

3    message as it appears in the file, and 19-B is significantly different from 19-A. (See

4    Exhibit 19-A BOA Emails 3_6_14 and 2_27_14 and 19-B, BOA Emails 3_6_14 and

5    2_27_14 Revised.). In 2014, Defendants did cancel the HO policy, but Plaintiff replaced

6    it when her agent notified her of Defendants' unlawful action.

7    **117.**    **Unquestionably fraudulent charges**: Defendants' mortgage account analyses

8    show various other unauthorized and illegal charges, including monthly FHA MIP or PIP

9    – Plaintiff's is not an FHA loan – and other fraudulent escrow charges which Defendants

10   attempted to collect. (See Exhibit 14, BOA escrow fraud PMI etc 2010.) These actions

11   violate Tex. Fin. Code §§ 392.304(a)(8), (19) .

12   **118.**    Further, while Plaintiff's BOA BILLPAY records clearly show timely mortgage

13   payments and confirmations, Defendants' "mortgage transaction" records do not present

14   a clear and accurate record of real mortgage transactions. A comparison of the BILLPAY

15   records, EXHIBIT 4, to some of the mortgage transaction history (See EXHIBIT 12 A-D,

16   Some BOA Mortgage Transaction Reports) Plaintiff has been able to secure from

17   Defendants, shows not only the "errors" deliberately entered into the records, but also the

18   corrections Plaintiff forced Defendants to make from time to time – and the almost

19   immediate resumption of Defendants' deliberate wrongful entries, which also started

20   collection harassment. Defendants violated Section 392.304 of the TDCPA, which

21   prevents a debt collector from misrepresenting the character or amount of a debt or

22   making false representations to collect a debt.

1     **119.**    One example of corrections which BOA declared "brought the account current"

2     is BOA Customer Service memos dated 3_31_14. It verifies that the "correction" allows

3     Defendant BOA to submit a credit bureau correction for the months of January and

4     February, 2014, which BOA reported 30 days late. (See Exhibit 20 BOA Mortgage

5     Account memos 3_31_14.) These memos also verify that insurance is "not escrowed

6     each year."

7     **120.**    Exhibit 20 is a series of memos between Plaintiff and Defendant BOA. The

8     original memo that begins "You jerks" is in answer to the BOA memoranda below,

9     where BOA explains its fraudulent charges to escrow, "partial payments," and its failure

10    to properly apply the mortgage payments to principal and interest. The partial payments

11    occurred when Plaintiff refused to increase the mortgage note based on the fraudulent

12    insurance charges, about which Defendant states "A refund from the Lender Placed

13    Policy has been requested and will be applied to the escrow when received." Note

14    however that the next memo declares that the "next installment" is a fraudulent

15    "$950.83." Plaintiff's BILLPAY records show all payments made timely.

16    **121.**    Plaintiff requested a "paper copy of everything related to my mortgage,"

17    including "who owns it," in this series of memos. Defendant did not forward those copies.

18    **122.**    The extreme nature of Defendants' harassment of Plaintiff resulted in Plaintiff's

19    notifying Defendant BOA in 2010 that she was billing them for the time required to

20    interact with Defendants in correction attempts, repeated posting errors and

21    communications errors, etc., since BOA was taking time from her working projects.

22    Plaintiff billed them at her usual and customary hourly rates, and increased the rates to

23    maximum hazard rates as Defendants continued their intransigency. Certain of the

1    invoices document numerous telephone calls for collection of the fraudulent charges.

2    Plaintiff needed her time to establish and grow her retirement business designed to

3    provide for her chronically, critically ill granddaughter after Plaintiff's death. (SEE

4    EXHIBIT 23 A-I, Hourly Billing BOA Hours.) Plaintiff generated invoices from 2010 to

5    the present, documenting time and effort required to deal with BOA and their

6    conspirators. As part of her developing retirement businesses, Plaintiff billed for

7    consulting services; Defendant BOA usurped billable time which Plaintiff could have

8    more effectively used, and failed to pay after having been noticed before billing and

9    having received invoices subsequently.

10    **123.**    Defendants' actions are unconscionable and blatant. Defendants' threatened

11    wrongful conduct, the sale of Plaintiff's property, unless and until enjoined and

12    restrained by order of this Court, will cause great and irreparable injury to Plaintiff and

13    her family. Plaintiff's adult disabled son, a former EMT, resides in the home. He is ill,

14    unable to endure additional stress, and has already been hospitalized once as a result of

15    Defendants' recent activities. Plaintiff, in her 70's, is also ill and suffers an anxiety

16    disorder and high blood pressure because of Defendants' actions. The additional time

17    and effort to undo a sale will also endanger Plaintiff's granddaughter because it will

18    require time and attention which should be spent managing her illness. Defendants'

19    willful actions have worsened Plaintiff's disability symptoms of stroke. Plaintiff has no

20    adequate remedy at law for the injuries threatened/currently suffered as an award of

21    monetary damages would not provide an adequate remedy for the injustice to be

22    perpetrated by Defendants, who allege they are acting for Fannie Mae (under color of

23    law).

124. Plaintiff is in her 70's and suffers disabilities because of a stroke when she was in her early 30's. During the past 9 years, Defendants have already deprived her of excessive amounts of valuable time fighting these predators to compel them to obey the law and correct the mortgage transaction records. Further, Defendants' egregious actions negatively affect Plaintiff's ability to adequately care for her chronically ill granddaughter, who lives with a potentially fatal condition. Allowing the Trustee's Sale of Plaintiff's property would result in the deprivation of additional time, require highly stressful activity, and further destroy Plaintiff's failing health. Further, it is not in the interests of society to permit Defendants to profit from their wrongdoing, at the expense of an elderly, disabled individual. Texas law provides for heightened penalties for exploitation of the elderly and/or disabled. Plaintiff has no adequate remedy at law for the injuries threatened and to be suffered as a result of the scheduled Trustee's Sale of Plaintiff's property, should the Court fail to issue the requested temporary injunction, as an award of monetary damages would not provide an adequate remedy for the resulting harm.

125. Defendants' actions are made more unconscionable and egregious because Plaintiff's disabilities and the necessities of her life and those of her dependents, for whose continuing lives she is directly responsible, were well-known to Defendants at the time Defendants drew Plaintiff into their nefarious schemes through deception, and Plaintiff continued to reference her disabilities throughout the period of the loan, as she complained in writing of their pattern of practices. Defendants had full knowledge of Plaintiff's disabilities, and they know about them at this time.

1      **126.**     Defendants knew that Plaintiff had suffered a severe stroke while in her 30's, that

2      she was only partially recovered, and that the disabilities she suffered made carrying out

3      her life tasks, including her business and professional efforts, extremely difficult and time-

4      consuming. Defendants knew that Plaintiff's memory and concentration were significantly

5      impaired, although her IQ was far above norm. Defendants knew that Plaintiff's physical

6      abilities were diminished, with poor control of her right side. Defendants knew that

7      Plaintiff's strength was reduced. Defendants knew that Plaintiff's abilities to communicate

8      were made difficult by aphasia. Defendants knew that Plaintiff's stamina was reduced,

9      and that completion of necessary tasks was made more difficult because tasking required

10     Plaintiff's intense concentration and control, that distraction inflicted an extra factor that

11     exponentially increased the difficulty of task completion. Defendants knew that Plaintiff's

12     ability to consistently produce was significantly impaired. Defendants knew that anything

13     not in Plaintiff's field of vision for all intents and purposes did not exist for Plaintiff.

14     Defendants knew that Plaintiff had deliberately and carefully reduced her life to

15     necessities, because Plaintiff could no longer effectively deal with other matters without

16     those other matters reducing her competency to deal with essential, life-sustaining tasks

17     for which she was directly responsible. Defendants knew that Plaintiff controlled

18     significant financial resources, her own and those of her business. Defendants knew that

19     although Plaintiff had structured her life and tasks with multiple fail-safes, Plaintiff was

20     emotionally and mentally overladen with the inherent possibilities of failure, and suffered

21     acute anxiety and depression because of life-threatening events with which she daily dealt.

22     **127.**     Defendants also knew that at the time of purchase and closing on the property,

23     Plaintiff was suffering a series of Transient Ischemic Attacks (TIAs) and could not read.

**128.**   Further, Defendants were fully aware of the ramifications of Plaintiff's inability to read the closing documents, including note and Deed of Trust, because Defendants and Plaintiff discussed whether or not Plaintiff should delay closing until she might be able to read again. Plaintiff was aware of the possibility that she might read again because she lost the ability to read in her first stroke when she was in her 30's, and regained it within a few months. Defendants were fully cognizant of all of these facts when they advised her to do the closing without delay, lying to her about the content of the documents when they reassured her that all would be well.

**129.**   Defendants knew all of this because Plaintiff told them all about her life and business, and the factors that Defendants would need to consider in helping her with her business and personal finances and other issues. Defendants know at this time because Plaintiff has continued, with each contact and written complaint, to reference her known disabilities.

**130.**   It was Plaintiff's usual and customary procedure to disclose these significant matters to those with whom she had a close business and personal relationship, because these significant matters affected the way she had to interact with all parties and Plaintiff believed they had a right to know about them.

**131.**   Plaintiff's most important task was keeping her critically, chronically ill granddaughter alive and healthy. Because one of the diagnoses is Generalized Autonomic Dysfunction (ADG), an incurable potential fatal condition, Plaintiff had to monitor and control both the external and internal environments, because any factor could without other cause trigger sudden cardiac arrest, central apnea, laryngeal spasm (sudden closure of breathway), and other deadly symptoms. Plaintiff had to provide eyes-on care 24/7,

1    train and supervise other caregivers, and develop and implement a program of integrated

2    physical and mental therapy for the child, who was 7 years old in 2002.

3    **132.**    ADG is a rare condition, similar to Familial Dysautonomia,  in which symptoms

4    can be triggered by any change affecting the autonomic nervous system (ANS) and its

5    work to maintain stasis. The ANS controls all of the bodily "automatics,"  i.e. breathing,

6    blood pressure, temperature adjustment, heart, etc. When comparing ADG-diagnosed

7    individuals and "normal" individuals, one could say that normals have a full cup of

8    responsiveness to use before the body shuts down in overload, which ADGs have only 1/3

9    cup. The ANS's job is to react to environmental cues and to bring the body back to and

10   maintain stasis, or normal functioning.  Thus, when a physical threat is perceived, the

11   ANS triggers flight-or-fight reactions, and after the emergency is over, bring the body

12   back to normal conditions. When the temperature outside rises, the ANS makes bodily

13   changes to keep the individual healthy and functioning.

14   **133.**    However, when the ANS is stressed beyond its ability to maintain the body

15   (overloaded), it shuts down. The result is death. For people with ADG, an overload comes

16   much more quickly, and it may come without any warning. If the ANS is currently dealing

17   with three (3) stimuli, and a fourth occurs, the ANS functioning that would control that 4th

18   stimuli ceases functioning. This can trigger a cascade effect, resulting in sudden cardiac

19   arrest and death.

20   **134.**    There is no cure for ADG. The only thing one can do is rigidly control every

21   internal and external stimulus, watch the patient (eyes on) with unrelenting attention, react

22   *immediately* to symptoms, and pray.

135.     ADG is a brain function, not a problem with various organs. In the event of

sudden cardiac arrest, for example, the usual and customary emergency treatments do not

work. Restarting the heart does not do the job; the brain has to be restarted. For an infant,

this can be as simple as turning the baby upside down and right side up to stimulate

sudden shocking blood flow to the brain, which sometimes works. Fortunately for

Plaintiff and her granddaughter, the lead physician on this case had the knowledge and

expertise to provide a reasonably effective baseline care program, including prescribing

the emergency administration of belladonna tincture, which proved to work at restarting

the brain.

136.     Plaintiff was 49 years old when she took custody of her granddaughter under a

court order with permanent injunction for care. She was aware of her own mortality, and

even then concerned with her granddaughter's life in the event of her own death. In 2002,

at the time of the mortgage, while Plaintiff was experiencing TIAs, at age 57 she was

immediately concerned with maintaining her business stability and growing her business

with the idea of it sustaining her granddaughter in the event of Plaintiff's sudden or later

death.

137.     By 2007, at age 62, Plaintiff had realized her business could not be maintained

and that her granddaughter could not manage such an enterprise or even work at the

specialized tasks which required continuing effort and attention, and Plaintiff developed a

plan of interlocking small businesses in the arts, including ebook publishing, music,

audible books and tapes, and other activities using tribal relationships and family, each of

which after startup could be immediately directed by various individuals, with income

flowing to her granddaughter. Her granddaughter's special skills and abilities would allow

1    the granddaughter to contribute or work on a part-time basis, when she was well enough,

2    and would give her a sense of personal worth. Continuing royalties and other such income

3    could conceivably support her granddaughter throughout her life.

4    **138.**    Plaintiff was well on the way to realizing her plans when Defendants ramped up

5    their activities and began their years-long persecution in 2008-09. Startups require intense

6    concentration and effort. Bringing the different members of tribe and family into the

7    interlocking businesses required that each be well started before bringing in new people to

8    be trained and to run the businesses. Plaintiff secured websites and developed products.

9    **139.**    However, at this crucial point, Defendants threw a monkey wrench into the

10   works. Their carefully-structured documentary framework (designed to confuse and

11   reduce the effectiveness of borrowers' complaints and correction efforts); their distancing

12   of effective error-correction power from contacts; their urgent threats and postulations;

13   their lies, misdirections, forgeries, and manufactured defaults derailed Plaintiff, who was

14   not only trying to startup her linked businesses but dealing with the sudden symptoms and

15   problems of her granddaughter, and with other family problems, including a dying eldest

16   sister who served as Plaintiff's surrogate mother and a younger DAV's problems.

17   **140.**    Because of the excessive time interacting with Defendants required and the

18   intense distractions Defendants provided, Plaintiff has been unable to complete the

19   necessary work on her businesses, handle all of her family problems, and manage the

20   necessities of daily living. After the first act ("errors and corrections"), Defendants

21   periodically started up their next series. Further, every time a personal or business crisis

22   unrelated to Defendants loomed, Defendants pitched in with their efforts to defraud

23   Plaintiff, force her to pay fraudulent charges, or seize and sell her house. At this time that

1    Defendants have picked to once again threaten foreclosure and noticed sale of the

2    property, Plaintiff's husband is recovering from surgery May 23, 2017, and Plaintiff's

3    granddaughter was diagnosed and must have surgery "within the next few weeks."

4    **141.**    Plaintiff is now 71 years old, and will be 72 in August, 2017, as Defendants

5    know. The imminence of death and her concerns for her granddaughter's continued life

6    after Plaintiff's death create an almost intolerable stress on Plaintiff, to which Defendants'

7    added immeasurably with their latest abuses. Defendants' actions are egregious and

8    unconscionable, and Defendants should be penalized in direct proportion to the severity of

9    their trespasses against Plaintiff and others who have also experienced their nefarious

10   activities in support of their RICO enterprise and its financial goals.

11   **142.**    The pattern of practices imposed on Plaintiff has continued from 2002 to the

12   present, with a variety of RICO agents and employees contributing to the illegal action.

13   BOA and Countrywide Home Loans, Inc., contributed at the inception, with the deception

14   necessary to convince Plaintiff to execute a fraudulent deed of trust and the note. On

15   belief and information, Countrywide Home Loans, Inc., or BOA received and stole 24

16   mortgage payments made as double payments during the first 2 years of the mortgage;

17   after BOA acquired Countrywide Home Loans Servicing, LP, BOA accelerated the illegal

18   activities and increased the pressure on Plaintiff, forging mortgage transactions with false

19   and misleading entries, and violating numerous state and federal laws. BOA then passed

20   the task of defrauding Plaintiff and the US government, in the person of Fannie Mae, to

21   Seterus, who continued the exact same pattern of practices, which is not unexpected,

22   given that Seterus was once owned by BOA and when sold BOA required the buyer to

23   retain its employees. On information and belief, the group of RICO associates is far larger

1     than just the Defendants named herein; the illegal practices are widespread and identical,

2     which absent some special connection between the parties could not reasonably be the

3     case.

4     **143.**     To this point, Defendants have been remarkably successful at perpetrating Fraud

5     upon the Courts, with outright lies and misdirection. For example, although Fannie Mae

6     servicer contracts create a fiduciary relationship between the servicers and "Fannie Mae

7     and others," including specifically the "borrowers," some Courts have ruled there is no

8     fiduciary relationship between servicers and borrowers, probably because no party has

9     introduced the appropriate Fannie Mae documents proving the relationship. Further,

10     Courts have accepted BOA's consistently identifying itself as "successor" to

11     "Countrywide," without specifying which "Countrywide," and there are a number of

12     entities originally part of Countrywide Financial which actually merged with Red Oak

13     Merger Corp, not BOA. One of the Countrywide entities which did not disappear was

14     Countrywide Home Loans Servicing, LP, which became BAC Home Loans Servicing, LP.

15     **144.**     PLAINTIFF makes this request for injunctive relief in the interests of justice.

16     Given the facts and the evidence, Plaintiff has a substantial likelihood of success on the

17     merits. An injunction would not substantially injure other interested parties except in

18     denying Defendants their profits from wrongdoing, since Plaintiff 's proof of timely,

19     accurate payments as shown on Defendant BOA's own BILLPAY records show that the

20     mortgage has been completely paid off, in excess of the original $110,400.00. Given the

21     preponderance of evidence Plaintiff provides even prior to discovery, it is likely that

22     Plaintiff will prevail in this suit.

1    **145.**    Defendants and their fellow actors continue their unconscionable, egregious

2    actions *because they can*. They have deep pockets, endless time, and no authority has

3    taken the necessary action or action adequate to curb their nefarious activities. It is in the

4    public interest that Defendants and their cohort be denied their profits from wrongdoing,

5    that they be shown that there is authority to compel them to obey the law of the land, and

6    that a chilling effect be produced on the Defendants and the pattern of practices they

7    have continued to use despite all settlement agreements and judicial orders to amend

8    their ways. (*Baumann v. Dist. of Columbia*, 655 F. Supp. 2d 1, 6 (D.D.C. 2009) (citing

9    *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006));

10   *accord National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987); *Cobell v.*

11   *Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

12   **146.**    Plaintiff Thomas requests EMERGENCY INJUNCTIVE RELIEF against

13   Defendants, including Defendant **Seterus, Inc.**, identified on the Notice of Trustee's Sale

14   as the authorized representative/agent of Fannie Mae, to preclude irreparable harm as a

15   result of Defendants' stated intention to foreclose or already completed nonjudicial

16   foreclosure and sell Plaintiff's property June 6, 2017, despite proof that Plaintiff is not in

17   default on her mortgage, requesting the honorable Court to issue an order enjoining

18   Defendants, Defendants' employees, agents, associates, contractors, and assigns, from

19   further action against Plaintiff, including foreclosure and sale, during the pendency of

20   this action, or as may suit the Court. Equitable relief is necessary because relief at law is

21   inadequate for this foreclosure and sale of property.

22

23                **V. BACKGROUND, INTRODUCTION, ADDITIONAL FACTS**

147.    Predation in the mortgage industry is now common knowledge and a matter of public record, after the multitude of class and individual actions, state regulatory suits, investigations, findings, and related actions, and settlement after settlement made by various banks, servicing agencies, insurance entities, and others. RICO violations have been pled, but have been proven or admitted only once to Plaintiff's knowledge, since settlements precluded further action in Court which would have elicited evidence, although members of the predators' wolf packs have been identified over and over again, as well as "certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in . . . initiation and handling of foreclosure proceedings," as a US Department of the Treasury Comptroller of the Currency Consent Order described them.

148.    According to federal suits, most settled, under pressure to generate profits, Bank of America and others developed and implemented a money-making scheme. With relatively low mortgage rates, performing mortgages created a fixed income for BOA. However, by selling these mortgages and securing servicing contracts with the buyers, BOA and others were in position to make a double strike: mortgage purchase price *and* servicing fees. Further, they had control of the means of increasing servicing fees, by tweaking mortgage records and payments, and through the use of lender-placed insurance and escrow accounts. BOA and others could also manipulate escrow accounts, raise mortgage payments, declare payments "partial" and hold them without applying to principal and interest, and manufacture defaults. Foreclosing and selling properties also presented unparalleled earning opportunities for those willing to take risks – and the risks were abnormally low, because BOA and others had complete control of everything related to the mortgaged properties, including all

1    documentation. And regulators were apparently content to accept their versions

2    of facts, whenever a controversy was presented.

3    **149.**    Without quality controls, the government said, trouble ensued. The

4    number of borrowers that fell behind on their payments was *"abnormally high,"*

5    according to federal lawsuits, and the turbulence "cannot be explained solely by

6    the downturn in the real estate market" alone. According to the government's

7    assessment, at least 23 percent of the mortgages had defaulted or were

8    delinquent as of June 2013. When one considers the well-known ability to

9    manipulate escrow accounts, manufacture defaults, and unilaterally increase

10    mortgage payments, one can clearly understand the abnormally high figures.

11    *150.*    BOA and others created "error machine" and other practices and

12    procedures designed to increase servicing activities and fees. They structured for

13    "plausible deniability." Although the actions they took against purchasers and

14    mortgagees were deliberate, they used the "error" card to delay and to continue

15    their money-making activities. They neglected to tell mortgagors that their loans

16    had been sold; therefore mortgagors were denied information which might have

17    helped them to understand and defeat the 'Cuckoo's Nest/Twilight Zone' morass

18    into which BOA placed them with its machinations. When mortgagors believed

19    that BOA owned their loans, they could see no logical reason for BOA's

20    manipulations, because these manipulations would result in *losses to the owners,*

21    and BOA was believed to be the *owner*. It was easy to accept the error concept,

22    because otherwise BOA's activities were irrational. However, when one considers

23    that BOA collected servicing fees for all of the work associated with their "errors,"

their activities and hardheaded determination to continue in their errors is more easily understood.

**151.** Among the tactics BOA and others employed was diversification of departmental services, thus ensuring that multiple contacts were necessary for any mortgagor to resolve any of the errors created by BOA. They deliberately sabotaged problem resolution. They worked through affiliates, who presented themselves as BOA employees and routinely misinformed borrowers. For example, mortgagors were directed to send payments to an address in California, to correspond with BOA Support Services through emails online at the BOA site, to send documents to the "insurance department" at a third address in Texas.

**152.** Former BOA employees have provided sworn testimony that BOA procedures included removing identifying data from correspondence, so the documents could not be correlated with the mortgage account, thus prolonging error status. Other procedures were designed to delay corrections of the "errors" BOA created. Bank of America employees regularly lied to homeowners seeking loan modifications, denied their applications for made-up reasons, and were rewarded for sending homeowners to foreclosure, according to sworn statements by former bank employees. Six of the former employees worked for the bank, while one worked for a contractor. They range from former managers to front-line employees, and all dealt with homeowners seeking to avoid foreclosure through the government's program. (Case 1:10-md-02193-RWZ United States District Court for the District of Massachusetts; sworn statements.)

**153.** Theresa Terrelonge, an ex-employee, said that "the company would consistently tell homeowners to resubmit information." Others say that bank employees falsified

1    records in the computer system and removed documents from homeowner files. Worse

2    than this, Bank of America would simply throw out documents on a consistent basis.

3    **154.**    About twice a month, former case management supervisor William Wilson said,

4    the bank ordered that all files with documentation 60 or more days old simply be denied.

5    "During a blitz, a single team would decline between 600 and 1,500 modification files at a

6    time," he said in the sworn declaration. To justify the denials, employees produced

7    fictitious reasons, *for instance saying the homeowner had not sent in the required*

8    *documents*, when in actuality, they had. (Emphisis ours.)

9    **155.**    Five of the former Bank of America employees stated that they were encouraged

10    to mislead customers. **"We were told to lie to customers and claim that Bank of**

11    **America had not received documents it had requested," said Simone Gordon,** who

12    worked at the bank from 2007 until early 2012 as a senior collector. "We were told that

13    admitting that the Bank received documents 'would open a can of worms,'" she said.

14    (Declaration of Simone Gordon, Case 1:10-md-02193-RWZ Document 210-2 Filed

15    06/07/13, in the United States District Court for the District of Massachusetts.)

16    **156.**    Simone Gordon described meetings where managers created quotas for lower-

17    level employees, and a bonus system for reaching those quotas. Employees "who placed

18    ten or more accounts into foreclosure in a given month received a $500 bonus," Gordon

19    wrote. "Bank of America also gave employees gift cards to retail stores like Target or Bed

20    Bath and Beyond as rewards for placing accounts into foreclosure." Employees were

21    closely monitored, and those who didn't meet quotas, or who dared to give borrowers

22    accurate information, were fired, as was anyone who "questioned the ethics ... of

1    declining loan modifications for false and fraudulent reasons," according to William

2    Wilson.

3    **157.**     The ex-employees listed by name specific executives who authorized and

4    directed the fraudulent processes, but given the number and kind of suits and other actions

5    filed against BOA and other defendants, every executive and board member of Defendants

6    knew or should have known about the violations of state and federal law, and should have

7    acted to prevent continuing violations. As an attorney, BOA President, CEO,  and

8    Chairman of the Board, and BOA General Counsel in 2008,  Brian Moynihan is uniquely

9    qualified to address the many issues that have been and are being raised. The failure of

10   executives and board members to act to correct the abuses and violations presents strong

11   evidence of culpability.

12   **158.**     To this point, the legal action against servicers has mostly focused on forced

13   placed insurance and specific mortgage loan servicing/foreclosure practices (robosigning,

14   etc.), all agreed to be "unconscionable," although there still exists a rationale that many

15   of the faults were "errors," and the predators continue to offer their assurances that they

16   "were only trying to help." For example, when Bank of America foreclosed and seized a

17   home that they held no mortgage on, a Florida court awarded the homeowners a

18   judgment against the bank, the homeowners had to get a writ of execution in order to

19   compel BOA to pay it, and a BOA spokesman characterized the events as a "series of

20   unfortunate circumstances that Mr. Nyerges experienced."

21   (http://abcnews.go.com/Business/bank-america-florida-foreclosed-angry-homeowner-

22   bofa/story?id=13775638)  When another couple was awarded in excess of $1,000,000 in

23   a BOA subsidiary loan collection call case, BOA's Sr. VP Dan Frahm said, ""Bank of

1    America has *helped* 2 million homeowners avoid foreclosure. Our calls to the Coniglios

2    were not to collect a debt, but rather *to help them* avoid foreclosure after they fell behind

3    on their mortgage payments in 2009. . . We are committed to *help* homeowners in need

4    of assistance avoid foreclosure."(Emphasis ours.) http://abcnews.go.com/US/couple-

5    wins-1m-suit-major-bank-outrageous-robocall/story?id=27542208

6    **159.**    The settlement orders and consent orders for these legal actions frequently

7    purport to "end mortgage abuses." When, in 2014, Bank of America (BAC.N) and QBE

8    Insurance Corp agreed to pay $228 million to settle claims that they engaged in a

9    kickback scheme inflating the cost of insurance that homeowners were forced to buy, the

10   Court wrote: "The injunctive portion of the settlement *mandates an end to force-*

11   *placed insurance practices* which are the subject of this litigation." (Cheryl Hall et

12   al v Bank of America N.A. et al, U.S. District Court, Southern District of Florida, No 12-

13   cv-22700) (Emphasis ours.)

14   **160.**    The vaunted 2012 National Mortgage Settlement between the US and 49

15   individual states and borrowers and the Defendant banks, with its $25 billion payment, is

16   only one of the documents purporting to end the abuses, and the defendants' release from

17   obligations *after three years* was not made widely known. Payments were also made to

18   The National Association of Attorneys General ($15 million to create and administer the

19   "Financial Services and Consumer Protection Enforcement, Education and Training

20   Fund"); The Conference of State Bank Supervisors ($65 million—$15 million to

21   establish the "State Financial Regulation Fund" and $1 million to each state financial

22   regulator who signed the consent judgment); the state members of the executive

23   committee who negotiated the settlement and the Ameriquest Financial Services Fund

1    ($10 million to cover costs and attorneys' fees). Nearly $3 billion was committed to

2    refinance "underwater" mortgages, for borrowers who were current on their payments,

3    but whose mortgage was more than their home's current market value. Approximately

4    $17 billion, was dedicated to consumers for mortgage modifications, short sales,

5    deficiency waivers, anti-blight prevention activities and principal forbearance for

6    unemployed borrowers, along with specific short sale provisions for military borrowers.

7    *A mere 6% of the total,* $1.5 billion, was set aside for cash payments to qualifying

8    individuals whose homes were sold or taken in foreclosure between Jan. 1, 2008, and

9    Dec. 31, 2011, who submitted claims.

10    **161.**    Were borrowers made whole by the various settlements? From its $134, 628, 489

11    2012 National Mortgage Settlement share, Texas directed $10 million to the Judicial

12    Fund as civil penalties, and the rest to the State General Fund. Whether any of the

13    borrowers actually defrauded by the banks were recompensed is hotly debated and highly

14    problematic. To the general public, the big settlements and lack of criminal prosecution,

15    both state and federal, indicate a system of payoffs previously seen only in connection

16    with the Mafia and/or corrupt politicians.

17    **162.**    Were mortgage abuses ended by the various settlements? From the consumers'

18    viewpoint, nothing has changed, except the predators have become more efficient at

19    creating the trappings of plausible deniability, through **their** documentation of mortgagor

20    contacts and file stuffing, like the unsigned form letters Defendants sent Plaintiff.

21    Violations of the settlement orders have been documented many times, and Plaintiff and

22    many others have continued to experience the full range of Defendants' predatory

23    behaviors.

163.   RICO actions have been filed; banks have settled; criminal prosecution has proceeded in very few cases.

164.   The fault lines remain in the same locations. In mortgage securitization transactions, while the mortgage servicer forwards the borrower's payment of principal and interest to the certificate holders (investors) of the special securitized trust that owns and holds the promissory notes secured by the mortgages and deeds of trust, the servicer is allowed to *retain late fees, BPO fees, inspection fees, and other fees charged or assessed to a borrower's account*. In addition to the fee income, the servicer is allowed to retain the net liquidation proceeds of any foreclosure sale (net after foreclosure expenses and principal balance to investors). This provides an incentive to unscrupulous servicers who aggressively interpret mortgage documents to add additional fees to a borrower's mortgage account. Many times, the additional fees added on create an event of default allowing the mortgage servicer to foreclose on the property. This practice is commonly referred to as ***manufacturing a default***.

http://seattletimes.nwsource.com/html/realestate/2003522241_guttentag14.html?syndication=rss

165.   Servicers earn a small percentage of mortgage payments, but what has made the business especially profitable are late fees and other ancillary costs such as property inspections, lender insurance, and other manufactured fees collected from borrowers in delinquency and in default, particularly since servicers can manipulate every aspect of every mortgage-related transaction. They receive the payments and can create a late payment simply by the date of receipt they enter into the records. Few borrowers have the data necessary to argue the date payment was received. Plaintiff is fortunate in that she

1   made automatic payments from a BOA checking account, through BOA's BILLPAY

2   program, to BOA as servicer, and her BILLPAY records show every payment made, made

3   timely, and timely receipt is certified. The fact that the BILLPAY records and Plaintiff's

4   BOA mortgage transaction reports do not agree is particularly telling in this

5   relationship.(See Exhibits 4 and 12.)

6   **166.**     When the servicer manufactures a default, usually by padding the escrow account

7   and using the padding to increase the required mortgage payment, the servicer can then

8   hold the regular mortgage payments in limbo by labeling them as "partial payments"

9   which Fannie Mae, for example, allows servicers to retain, refuse to apply the mortgage

10   payments to principal and interest, show the mortgage in default, move to foreclosure –

11   and make a killing. He who creates accounting creates wealth. . .

12   **167.**     It is now common knowledge and a matter of public record that the modern

13   servicing structure has made it more profitable for large loan servicers to foreclose on the

14   loans they service than to negotiate loan modifications, ***even where the modifications***

15   ***would be more profitable for the investors who own the loans***. *See* Schwarcz, *The Future*

16   *of Securitization*, 41 Conn. L.Rev at 1322; Alan M. White, *Deleveraging the American*

17   *Homeowner: The Failure of 2008 Voluntary Mortgage Contract Modifications* (2009) 41

18   Conn. L.Rev. 1107, 1127 (stating that ***"the investor losses may be very large, but the***

19   ***servicer will almost always benefit by completing a foreclosure sale")***; Steve Ruterman,

20   "Servicers Behaving Badly: An Insider's Perspective to extend default and information

21   asymmetry between investor and servicer

22   http://www.subprimeshakeout.com/2012/03/servicers- behaving-badly-an-insiders-

23   perspective-on-the-root-cause-of-this- recurring-problem.html.); *see also* Diane

1    Thompson, *Foreclosing Modifications: How Servicer Incentives Discourage Loan*

2    *Modifications* (2011) 86 Wash. L.Rev. 755, 767-68 ("Moreover, servicers can bill

3    investors for services of third parties during the foreclosure process. Servicers often own

4    shares in companies that provide these ancillary services, and charge above market rates

5    on these services. *See* National Mortgage Servicing Standards and Conflicts of Interest,

6    Hearings Before Sen. Com. on Banking, Hous. & Urban Affairs, 112th Cong., 1st Sess.,

7    pp. 122-128 (2011), testimony of Laurie F. Goodman, Senior Managing Dir., Amherst

8    Securities.

9    **168.**    It appears to the consumer that the predators have paid off the various regulatory

10    agents and complainants, and that their profits from their continued predation in the

11    mortgage industry outweigh all of the payoffs – and the predation continues.

12    **169.**    Most if not all of the settlement agreements and consent orders are deeply flawed.

13    For example, the 2008 Bank of America Settlement Agreement gave BOA a tool called a

14    "foreclosure avoidance budget," which strangely enough gave the bank the option of

15    foreclosing on homeowners whenever, in the judgment of the bank's analysts, more

16    money could be recouped by foreclosing than by modifying the loan. The 2012 National

17    Mortgage Settlement allegedly allowed Defendants to monitor themselves for

18    compliance with its terms, requiring only that they report themselves to the Monitor if

19    they found any problem. It is apparent to the consumer, if not to the signers, that the

20    agreement is flawed. A further flaw is the 3-year period of alleged monitoring. Text of

21    the documents is available at http://www.nationalmortgagesettlement.com/settlement-

22    documents.

1    **170.    PATTERN OF PRACTICES**: During the period of the mortgage, mostly

2    unknown to Plaintiff Thomas at the time because of her disabilities, substantial legal

3    action has been undertaken by a variety of individuals, state and federal officials; these

4    actions and resulting judgments and/or settlements, including the 2012 National

5    Mortgage Settlement entered into between a number of banks, including Defendant

6    BOA, and various states' attorneys general. Each of these civil and regulatory actions

7    detail many of the same types of practices Defendants applied in Plaintiff Thomas' case,

8    and essentially the same kind of unconscionable behavior and disdain for the law,

9    although the extent of fraudulent practices employed against Plaintiff has not been

10   detailed, and Plaintiff differs in that Plaintiff has not defaulted. These cases are

11   referenced to show a pattern of practices by Defendants, and the failure of regulating

12   agencies to enforce the law, rules, and regulations or the contracts with Fannie Mae that

13   Defendants continue to ignore or break.

14   **171.    ASSOCIATION** Like the proverbial shell-game, Defendants and their cohort

15   move business back and forth between their openly admitted affiliates and their

16   unrecognized other 'controlled' entities. They "sell" affiliates to other associates, then

17   establish exclusive contracts with the buyers to provide the same services the seller was

18   providing through that particular affiliate. Very often, the "sale" includes a proviso that

19   the buyer must retain all of the seller's employees working for the sold affiliate. Also very

20   often, the "sale" is in response to regulatory or civil action, so the Defendants and their

21   associates can claim to have divested themselves of affiliates under threat of investigation

22   or already under adverse action, or can distance themselves from the "bad actor" among

23   their affiliates. They can claim ignorance, error, and attempts to correct problems, without

1    admitting guilt or knowledge. The buyer can then continue the fraudulent actions, basing

2    the continuation on ignorance and on following procedures based on information they

3    created in the files, without admitting knowledge that the files have been cooked and

4    without correcting the accounts. They can claim lack of control.

5    **172.**    BOA acquired parts of Countrywide Financial in 2008 after CF's merger with

6    Red Oak Merger Corp, including Balboa Insurance, force placed insurance provider and

7    Countrywide Home Loans Servicing, LP. (Countrywide Home Loans Servicing, LP

8    became BAC Home Loans Servicing, LP.) Also in 2008, BOA acquired mortgage servicer

9    Wilshire Credit Corp. as part of its $50 billion purchase of Merrill Lynch & Co.

10   **173.**   In 2010, BOA sold Wilshire to IBM; one of the requirements of sale was that

11   IBM retained BOA's Wilshire employees. In 2010, Wilshire was touted as set to receive a

12   substantial servicing portfolio from Fannie Mae.

13   **174.**   In 2011, IBM changed Wilshire's name to Seterus. In 2011, while under

14   investigation of force placed insurance practices, BOA sold Balboa Insurance to QBE

15   Insurance Group, who reportedly retained BOA Balboa's employees, and BOA

16   subsequently entered into exclusive contracts with QBE to provide not only insurance

17   products, but to provide administrative functions for BOA. Balboa is defined to refer to

18   BOA's subsidiaries BA Insurance Group, Inc. ("BA Insurance Group"), Balboa Insurance

19   Company ("BIC"), Meritplan Insurance Company ("MIC"), Newport Insurance

20   Corporation ("NIC"), and BOA's former subsidiary Newport Management Corporation

21   ("Newport").  Although BOA retained the BA Insurance Group, BIC and MIC legal

22   entities, QBE manages all of Balboa's force-placed business and Balboa entered a 100%

23   quota share reinsurance agreement with QBE pursuant to which QBE receives Balboa's

1     premiums and assumes the risk of Balboa's force-placed insurance. Balboa's existing

2     force-placed insurance policies are in run off and being transitioned to QBE Insurance.

3     Bank of America and QBE also entered into distribution agreements for insurance and real

4     estate-owned programs and other consumer insurance products.

5     **175.**     In January 2012, <u>BOA</u> transferred over 35,000 mortgages servicing to <u>Seterus</u>.

6     In September 2012, <u>Fannie Mae</u> elected to transfer mortgage servicing from BOA

7     "without cause" (despite the state and federal charges against BOA) and agreed to pay

8     BOA $511 million for the privilege, according to public records.

9     **176.**     In May, 2011, <u>Bank of America, Chase, and Wells Fargo</u> formed a "New

10     Venture To Help Consumers Make Person-to-Person Payments Electronically."

11     According to published reports, "The three banks will own and run <u>clearXchange</u>, with

12     *Bank of America's John Feldman serving as General Manager*. Financial terms were not

13     disclosed.  clearXchange is headquartered in Charlotte, North Carolina."

14     **177.**     In January, 2016, owners <u>Bank of America, Capital One, JPMorgan Chase, US</u>

15     <u>Bank, and Wells Fargo</u>, sold <u>clearXchange</u> to **Early Warning**. (Emphasis ours)

16     **178.**     In 2015, **Early Warning** was owned by <u>Bank of America, BB&T, Capital One,</u>

17     <u>JPMorgan Chase, and Wells Fargo</u>; after the acquisition of clearXchange in 2016, it was

18     owned by <u>Bank of America, BB&T, Capital One, JPMorgan Chase, PNC, U.S. Bank, and</u>

19     <u>Wells Fargo</u>, according to the websites. "Early Warning provides risk management

20     solutions to a diverse network of 2,300 financial institutions, government entities and

21     payment companies, enabling businesses and consumers to transact securely and

22     conveniently. Early Warning's unique business model facilitates a data exchange system

23     based on collaborative, shared intelligence. For 25 years, the company has worked with

organizations of all sizes to advance collaborative risk management and fraud prevention." https://www.clearxchange.com/news#ew-acq

**179.** The clearXchange Early Warning development and sale is an example of one of the changes in RICO practices: Defendants and others are moving away from using their well-known names. When consumers see the name "Early Warning," they do not connect it with Defendants. This makes it easier for Defendants who have earned bad reputations to continue their predation.

**180.** And, of course, there is MERS and MERSCORP, a privately held entity of which it is difficult to access the owners, although BOA and other major banks are among them, according to the media. It is possibly MERSCORP which underlies the entire mortgage servicing scam and makes it possible for the enterprise to prosper.

**181.** In probability statistics, errors that <u>all</u> favor the group making the errors, as one finds with Defendants' errors, are systematic or determinate errors that tend to indicate deliberate causation, or as General Sun Tzu reportedly said: "One may be an accident; two may be  coincidence; three times is enemy action." Defendants and other servicers claim their fraudulent entries are "errors," and cite difficulties melding systems and programs as causes of their "inability" to maintain accurate mortgage transaction records. Their demonstrated ability to develop Early Warning and clearXchange, to meld them seamlessly, and to provide real-time solutions argues that these excuses are specious. Their reported exclusive contracts allowing insurors and others to troll their files must provide for some kind of centralized access; otherwise, how could they do the work so cheaply? Further, the acknowledged assets of BOA, for example, at over *$2 trillion* would

1    seem to allow for whatever equipment and programs necessary to prevent their continued

2    depredations.

3    **182.**    Plaintiff's suit goes beyond force placed insurance and the documentary abuses

4    of foreclosure, such as robosigning. Plaintiff's mortgage has been paid. Plaintiff's

5    situation differs from most of the suits filed because Plaintiff has never missed a

6    payment; she was and is financially able to maintain mortgage and other related

7    payments without difficulty. Yet Plaintiff was slotted into Defendants' machine and has

8    been almost overwhelmed by their rapacious practices. In spite of meeting all of her

9    obligations and having paid more than the total of the mortgage with 2 years of double

10   payments, Plaintiff has been forced into the manufactured default assembly line.

11   **183.**    Plaintiff's experiences with Defendants, named and unnamed, expose the

12   practices, tactics, and connections between the predators that demonstrate beyond all

13   doubt that these are not the result of "errors," but of deliberate, egregious acts, designed

14   for the sole purpose of increasing the profits of the wolf packs and their associates, and

15   that the intent of Defendants is not to "help" mortgagors, but to foreclose, sell the

16   properties, and otherwise maximize their profits.

17   **184.**    Defendants originated mortgages as trusted advisors to borrowers who were led

18   to believe that Defendants were mortgagees. Through websites, advertisements, and

19   posters in their bank, as well as incredibly expensive Super Bowl ads, BOA and others

20   touted their alleged position as helpful mortgagees. Borrowers were led to believe that

21   Defendants' financial interests were aligned with those of borrowers. Defendants

22   knowingly misrepresented the facts and withheld material facts from borrowers.

185.    Defendants sold the mortgages, often to Fannie Mae, and became servicers,
without informing the mortgagors. As servicers, Defendants entered into contracts with
Fannie Mae. These servicing contracts presented opportunities for Defendants to broaden
and deepen their income stream from mortgages through various fees and charges, some
legal and other not legal.

186.    Certain critical elements of the servicing contracts made predation easy for
Defendants and their cohort. Defendants, as servicers, maintained all records on the
mortgages. Defendants controlled all of those records and data input. Defendants made
crucial decisions as to when charges could be made, the amount of charges, precisely
how and when they were entered, and monitored themselves, for the most part.
Defendants were in the position of controllers of a monopoly, being the single enterprise
to supply and/or control servicing and its related profits.

187.    Defendants also controlled all other service providers for anything related to the
mortgages and the mortgaged properties. To a mortgagor, the servicer controls a
monopsony, because the service is the single entity to control the market to purchase
goods or services related to the mortgaged property's mortgage. Defendants entered into
lucrative exclusive contracts, often structured to hide such things as kickbacks and
affiliations.

188.    Defendants' contracts with Fannie Mae required servicers to verify required
insurance and to provide insurance in certain events. Although servicers are required to
ensure that mortgagors carry insurance to meet Fannie Mae's requirements, the
requirements are stated as the *lesser* of two options –essentially replacement value, or the
UPB (Unpaid Balance) of the mortgage loan. The unpaid balance of the loan is the legal

1    insurable interest of the mortgagee. However, the definition included in Fannie Mae's

2    UPB clause is ambiguous, and could be construed to be greater than the unpaid balance,

3    and thus used as the basis of an "error." ("the UPB of the mortgage loan. . .as long as the

4    UPB of the mortgage loan (or the combined UPBs) equals at least the minimum amount

5    required to compensate for damage or loss on a replacement cost basis, which is usually

6    80% of the insurable value of the improvements." Fannie Mae Servicing Guide, B-2-02,

7    Determining Minimum Coverage).  80% of the insurable value of the improvements can

8    exceed the UPB, and does, in Plaintiff's case. This portion of the guide is at:

9    https://www.fanniemae.com/content/guide/servicing/b/2/02.html

10   **189.**    Defendants' servicing contracts and guides, incorporated into the contracts,

11   allowed Defendants to manipulate mortgage transactions in such ways as to increase

12   Defendants' fees and charges, and general income from mortgages. BOA and others had

13   control of the means of increasing servicing fees, by tweaking mortgage records and

14   payments, and through the use of lender-placed insurance and escrow accounts.

15   **190.**    Defendants made charges to existing escrow accounts, and used those charges to

16   increase the mortgage payment due. If mortgagors made the increased payments,

17   Defendants used the increase to take their charges through application to escrow fees and

18   charges, increasing their income.

19   **191.**    If mortgagors refused to pay the increases, under servicing contracts, Defendants

20   and other servicers designated those usual and customary mortgage payments as partial

21   payments, did not apply them to principal and interest, and retained them, showing them

22   in escrow and applying them to the fraudulent charges and fees, thus increasing their

23   income.

192. Defendants had the control and ability to force a mortgagor into default through use of the "partial payment" designation, inflating fees and charges, pyramiding as it is now known, create manufactured default, and force a foreclosure sale.

193. In the event of a foreclosure sale, Defendants and other servicers are permitted to take their fees and charges first, and pay the actual mortgagee the remainder, thus they are incentivized to apply fraudulent charges.

194. Defendants' pattern of practices was designed to increase their profits by generating fees and charges and forcing mortgagors into foreclosure. A close look at the profits of selling and reselling foreclosed properties and the additional profits thus generated would be appropriate.

195. In many suits against Defendants and other servicers, Defendants allege that plaintiffs are at fault because they failed to make the mortgage payments. There does not appear to be a criminal investigation to determine whether or not borrowers who fell behind on their payments fell behind primarily as a result of Defendant BOA's and others' frauds and other criminal activities, designed to increase fees from service contracts, or comparisons of the original mortgage payments with mortgage payments artificially inflated by Defendants and other servicers, or partial payment schemes.

196. One of the racketeering practices Defendants and other services employed was a lender insurance scheme whereby Defendants received kickbacks or other self-dealing benefits. When borrowers were in trouble financially and found maintaining insurance difficult, Defendants force placed insurance at extremely high rates with one of their RICO partners, often at insurance limits in excess of the mortgagee's insurable interest.

1     Defendants misrepresented the insurance requirements, and raked in more profits based

2     on the limits insured.

3     **197.** Finding the insurance racket profitable, Defendants went further, and frequently

4     falsely notified mortgagors that they had no "proof of insurance," as required. In many

5     cases, including that of Plaintiff, they were provided proof of insurance multiple times,

6     and, according to whistleblower testimony, a matter of public record, Defendants had

7     instituted special file procedures to "lose" documents, instructed their service reps to lie

8     to mortgagors, and to do other such acts in order to delay acknowledgement so they

9     could at least bill for a partial period, that period during which they could claim not to

10    have received proof of insurance. Among the evidence in the public record are sworn

11    statements of former BOA employees *who have testified that BOA procedures included*

12    *removing identifying data from correspondence, so the documents could not be*

13    *correlated with the mortgage account, thus prolonging error status. Other procedures*

14    *were designed to delay corrections of the "errors" BOA created. Bank of America*

15    *employees regularly lied to homeowners seeking loan modifications, denied their*

16    *applications for made-up reasons, and were rewarded for sending homeowners to*

17    *foreclosure, according to sworn statements by former bank employees. (Simone Gordon*

18    *affidavit) Six of the former employees worked for the bank, while one worked for a*

19    *contractor. They range from former managers to front-line employees, and all dealt with*

20    *homeowners seeking to avoid foreclosure through the government's program.*

21    (Declaration of Simone Gordon, Case 1:10-md-02193-RWZ Document 210-2 Filed

22    06/07/13, in the United States District Court for the District of Massachusetts.)

198.    Federal Trade Commission (FTC) complaints cited BOA and others for failure to post consumers' mortgage payments in a timely and proper manner, and then charging consumers late fees or additional interest for failing to make their payments "on time;" charging consumers for placing casualty insurance on their loans when insurance was already in place; assessing and collecting improper or unwarranted fees, such as late fees, delinquency fees, attorneys' fees, and other fees; misrepresenting the amounts consumers owed; falsely representing the character, amount, or legal status of consumers' debts; communicating or threatening to communicate credit information which was known or which should have been known to be false, including the failure to communicate that a debt was disputed; using false representations or deceptive means to collect or attempt to collect a debt, or to obtain information concerning a consumer; collecting amounts not authorized by the agreement or permitted by law; and failing to validate debts.

199.    When for some reason they could not deny having proof of insurance, Defendants fraudulently notified mortgagors, including Plaintiff, that their insurance was less than the minimum required for the loan, thus misrepresenting the law and the insurable interest requirements.

200.    Defendants could also increase their profits from their insurance scams by the judicial use of credit bureau reporting. Once they reported the loan in arrears, the insurance went into the high risk or surplus category, and the cost of the borrowers insurance greatly increased. Since their kickbacks were based on the premiums, their profits increased.

201.    Plaintiff was the victim of this tactic, and suffered damages because of the increases in cost of insurance for the mortgaged property and for all of her other

1       insurance and other goods and services from those who use credit scores to determine

2       fees and costs.

3       **202.**     Another possible aspect of the insurance scams relates to claims paid. When

4       Defendants purchased lender insurance for excessive limits above their actual insurable

5       interest from their associates in the RICO enterprise and from others, how much was

6       paid to Defendants on claims made? For example, Texas Windstorm Insurance

7       Association (TWIA) provides windstorm insurance in Texas, and customarily pays

8       claims to the mortgagee, without ever checking to find out exactly what the mortgagee's

9       insurable interest actually is. Other insurors have the same policy. It is posited that an

10      insurer active in the RICO enterprise would pay at the policy limits, rather than at

11      insurable interest.

12      **203.**     Backdating insurance policies, often for months, was also a customary practice

13      of Defendants and other servicers participating in the insurance scams. Backdating is

14      unlawful for several reasons: it is illegal to backdate an insurance policy in order to

15      collect damages for claims that occurred during the uncovered period. That given,

16      backdating an insurance policy when no claims occurred is fraudulently creating a record

17      in order to charge for services not rendered. Fraud involves intentional deception or

18      misrepresentation intended to result in an unauthorized benefit. An example would be

19      billing for services that are not rendered. Abuse involves charging for services that are

20      not necessary, do not conform to professionally recognized standards, or are unfairly

21      priced. Backdating insurance is both fraud and abuse, which Defendants attempted to

22      perpetrate on Plaintiff.

**204.** Defendants have alleged in other cases that backdating is necessary to comply with their servicing contracts with Fannie Mae, and some Courts have appeared to accept this rationale. However, this backdating is a fraudulent attempt to hide violation of their contracts, and to avoid penalties for it. Backdating to secure payment of a claim while without insurance is a crime in Texas. Backdating when there is no claim and requiring the borrower to pay for that period when no benefit can be acquired is the same as requiring someone to pay for services not rendered and received. Complying with Fannie Mae servicing contracts which require that servicers monitor and require insurance to cover the risks is not the responsibility of borrowers. When servicers fail to comply, then backdate policies to make it appear that they have not violated their contracts, they are engaging in fraud, defrauding both Fannie Mae and the borrowers by forcing borrowers to pay for the coverup, and requiring borrowers to act involuntary accessories, which is unlawful.

**205.** Since it would be unlawful to backdate an insurance policy and collect for a claim that occurred during the backdated period, no services are being rendered.

**206.** Defendant BOA and others created an error-driven rube goldberg machine consisting of a series of linked actions supposedly designed to perform simple tasks which in actuality perform as fun-house deadends, regardless of where the mortgagor might enter the system. This pattern of perpetual-motion self-defeating practices is designed to increase servicing activities and fees, to exhaust the mortgagor, to prevent ready detection by authorities, and to drive the mortgage into default.

**207.** Defendants' and their associates' practices are structured for "plausible deniability." Although the actions they took against purchasers and mortgagees were

1    deliberate, they used the "error" card to delay and to continue their nefarious activities.

2    They neglected to tell mortgagors, including Plaintiff, that their loans had been sold and

3    to provide the notices required by TILA when ownership changes hands; therefore

4    mortgagors were denied information which might have helped them to understand and

5    defeat the 'Cuckoo's Nest/Twilight Zone' morass into which Defendants placed them

6    with their machinations. When mortgagors believed that Defendant BOA owned their

7    loans, they could see no logical reason for BOA's manipulations, because these

8    manipulations would result in losses to the owners. It was easy to accept the error

9    concept, because otherwise Defendants' activities were irrational. However, when one

10    considers that Defendants collected servicing fees for all of the work associated with

11    their "errors," maximized their profits by false charges, and retained the bulk of

12    foreclosure assets, their activities and hardheaded determination to continue in their

13    errors is easily understood.

14    **208.**    For example, BOA diversified previously unified services, thus ensuring that

15    multiple contacts were necessary for any mortgagor to resolve any of the "errors" created

16    by BOA. They completely separated their local bank employees and data from the

17    various entities working with mortgages. They "outsourced" to their RICO associates.

18    They "churned." They worked through affiliates and contractors who presented

19    themselves as BOA employees. Mortgagors, including Plaintiff, were directed by mail to

20    send payments to an address in California, to correspond with BOA Support Services

21    through emails online at the BOA site, to send documents to the "insurance department"

22    at a third address in Texas, and were often required to communicate by telephone in

23    order, it is believed, to prevent the formation and retention of documented evidence.

1   **209.**    Defendants violated the insurable interest requirement and violated fraud statutes

2   by misrepresenting "the minimum required insurance for this loan."  For example, in

3   Plaintiff's case, as in others, Defendants specifically notified Plaintiff that her insurance

4   was inadequate. Plaintiff's original loan in 2002 was $110,400; Plaintiff at all times

5   maintained all insurance on the property, beginning at $150,000 coverage limits, as

6   established by valuation prior to purchase, and Plaintiff's insurance agents automatically

7   provided proof of insurance to Defendants at each renewal. However, in 2009-2010,

8   Defendant BOA, unable to maintain absence of proof of insurance, instead claimed that

9   Plaintiff's coverage was below the minimum, and "acquired" lender placed insurance for

10   coverage limits of $256,000, more than $100,000 over the replacement value of the home,

11   while in April, 2009, Countrywide documents had placed the UPB at slightly over

12   $70,000, exclusive of the double payments, about $186,000 over the mortgagee's

13   insurable interest. (See Exhibit 13)  Defendants charged Plaintiff over $7,000.00 for this

14   policy, which turned out to be a California Subsistence Policy, which is not a usual

15   Texas hazard. Although Defendant refused to pay it and eventually succeeded in having

16   it removed, BOA's correction left errors in the mortgage transactions.

17   **210.**    Further, Fannie Mae appears to have done inadequate monitoring and control of

18   their contractors. A Fannie Mae service representative told Plaintiff, for example, that

19   they had no access to BOA's servicing records after BOA transferred Plaintiff's

20   mortgage servicing to Seterus, although Fannie Mae contracts specifically require

21   servicers to maintain servicing files on each mortgage during and after a servicing

22   contract. In August, 2011, Reuters and others reported that Fannie Mae agreed to pay

23   BOA $512 million (more than contractually required) to make a *without cause* (rather

1    than based on poor performance) transfer of servicing to another firm – this while serious

2    charges of poor servicing performance were being litigated nationwide.

3    https://www.debt.org/blog/fannie-mae-bank-of-america-09-20-2012/

4    **211.**    In reference to Mortgage Loan Payments, Fannie Mae requires that "All funds

5    tendered by the borrower for application to a first-lien mortgage loan that Fannie Mae

6    owns or securitizes (whether such loan is current or delinquent) **must be applied as**

7    **intended by the borrower an**d should not be reallocated as payment towards any

8    subordinate lien." (Chpt 1. Mortgage Loan Payments, 10/31/08). Servicers' charges are a

9    subordinate lien, yet Defendants converted Plaintiff's correct and timely payments to

10    their own use through the fraudulent escrow account, thus failing to make appropriate

11    entries to the mortgage transaction reports showing payment to interest and principal.

12    **212.**    For Mortgage loans closed on instruments dated March 1999 and later, Fannie

13    Mae requires that: "Payments must be applied in the following order for a mortgage loan

14    closed on one of the uniform security instruments that has a date of March 1999 or later:

15          · first to interest,

16          · then to principal,

17          · then to any required deposits for escrow items (which include taxes and

18    assessments, property or mortgage insurance premiums, leasehold payments or ground

19    rents, and community association dues, fees, and charges, as applicable). When the

20    payment includes late charges, the late charges should be applied only after all of the

21    scheduled payment has been applied."

22    **213.**    However, Fannie Mae also allows a servicer who designates or actually receives

23    a payment that is for "less than the full amount due," "if the mortgage loan is an

1   actual/actual remittance type," "to remit only the funds that were actually applied to the

2   loan." Therefore, if the servicer manipulates escrow and charges in order to create an

3   increase in the mortgage payment, and the mortgagor fails to pay the increased amount,

4   then the servicer can designate the payment as a short payment, assign it to escrow and

5   avoid remitting it to Fannie Mae.  Defendants did this to Plaintiff, increasing the mortgage

6   payment by adding the fraudulent escrow charges to it, then labeling the regular timely

7   payments as "partial" although they were for the full amount of the mortgage payment due.

8   **214.**    Lacking material facts about their servicers and the servicers' relationships with

9   Fannie Mae and others, mortgagors like Plaintiff were unable to protect themselves from

10   predation. Defendants' deliberate and egregious actions against Plaintiff and others are

11   worsened by Defendants' failure to comply with some of the specific parts of Fannie

12   Mae Servicing Contracts and Guides, and by Fannie Mae's failure to compel servicers to

13   comply.

14   **215.**    FIDUCIARY RELATIONSHIP: Fannie Mae through contract with Defendants

15   clearly established a fiduciary relationship to be enjoyed by mortgagors including

16   Plaintiff, in the conditions to which Defendants are subject under their contracts

17   including the requirement to comply with the servicing guides, and to which Defendants

18   agreed by undertaking those contracts. FANNIE MAE's servicing guide clearly defines

19   Defendants' function under their contracts as a *fiduciary* for both FANNIE MAE and for

20   the borrower (Plaintiff); stating: "The servicer's authorization to receive, handle, or

21   dispose of funds representing mortgage loan payments (for principal, interest, and tax

22   and insurance escrows) or of other funds or assets related to the mortgage loans it

23   services for Fannie Mae or to the properties secured by those mortgage loans is limited to

1    those servicing actions that are expressly authorized in this Guide or in the Lender

2    Contract. *Since these funds and assets are owned by **Fannie Mae and other parties**

3    **(such as the borrower**, a participating lender, or an MBS holder), the servicer in its*

4    *handling of these funds is acting on behalf of, and **as a fiduciary** for, **Fannie Mae and***

5    ***other parties**, as their respective interests may appear—and not as a debtor of Fannie*

6    *Mae.* If the servicer takes any action with respect to these funds or assets that is not

7    expressly authorized—such as the withdrawal or retention of mortgage loan payment

8    funds Fannie Mae is due as an offset against any claim the servicer may have against

9    Fannie Mae—the servicer is not only violating the provisions of this Guide and the

10   Lender Contract, *but also is violating the rights of any and all other parties that have a*

11   *beneficial interest in the funds.* Such action is therefore prohibited and will be considered

12   a breach of the Lender Contract."  FANNIE MAE SERVICING GUIDE, SECTION

13   202.02  (Emphasis ours.)

14   **216.**    Fannie Mae clearly defined "other parties" to include the borrower, in this case

15   Plaintiff THOMAS.  The fiduciary relationship between BOA and Plaintiff was also

16   established by other factors, including a special relationship enjoyed prior to the

17   incidents complained of, described and discussed below.

18   **217.**    Fannie Mae also provides that in a servicing transfer, borrowers are third-party

19   beneficiaries. "Any contract for transfer or sale of servicing rights shall designate that

20   borrowers are third party beneficiaries under paragraphs IV.M.1.b and IV.M.1.c, above."

21   **218.**    In 2002, Defendant Bank of America ("BOA") had established a fiduciary

22   relationship with Plaintiff Thomas, acting as knowledgeable trusted advisor to Thomas, a

23   former English teacher with disabilities from stroke and with limited business

1     experience, who established Contract Management Services, Inc., and served as its CEO.

2     Plaintiff relied on the bank's greater, superior knowledge of the small business world,

3     particularly because, unlike BOA's, Plaintiff's background was as a teacher and

4     consultant rather than as a financial maven. CMSI and Thomas banked at Nations Bank

5     which was acquired by BOA, then placed all business and personal banking accounts at

6     BOA. Thomas trusted them and relied upon their representations in making personal and

7     professional business decisions. Plaintiff took business advice from no other person or

8     group. In particular, BOA provided financial guidance and advice. At no time was

9     Plaintiff made aware of BOA's conflicting or divergent interests.

10    **219.**    On the advice of Defendant BOA given for a specific purpose allegedly associated

11    with Plaintiff's business operations [qualifying for accounts receivable financing],

12    Plaintiff THOMAS invested in real estate, purchasing a small home at 614 Briarwilde

13    Court in Alvin, Texas, in 2002, with a <u>15-year</u> mortgage in the amount of <u>$110,800.00,</u>

14    with Countrywide Home Loans as instructed by BOA.

15    **220.**    BOA advised Plaintiff Thomas that at some point in the future, with CMSI

16    growing rapidly, CMSI might need accounts receivable financing, which BOA would be

17    happy to provide if Plaintiff met the requirements, and that Thomas should be prepared

18    for that eventuality.

19    **221.**    BOA represented that CMSI's credit was very good, but that accounts receivable

20    financing required that the CEO, Thomas, have very good personal credit. Defendant

21    BOA advised that because of Plaintiff's business interests and planned and continuing

22    expansion, it was important for Plaintiff to establish some form of personal credit record

23    that would support any future application for corporate accounts receivable financing,

1   and that purchasing a home using a mortgage would best ensure this, particularly if she

2   made automatic payments of some sort that would also accommodate her handicaps. The

3   concept seemed reasonable to Plaintiff; Defendants demonstrated their concern with

4   Plaintiff's reasons for cash payments and provided a workable solution; Plaintiff trusted

5   BOA, and based partially on their marketing/ advertising/ PR campaigns, and on her

6   understanding of how banks made money, believed in their expertise and impartiality.

7   Plaintiff also believed that, as they often stated and published on their websites and other

8   documents, they were there to help and had their clients' best interests at heart. In

9   essence, what both BOA and Countrywide said was that "when you prosper, we prosper."

10   **222.**   BOA advised that Countrywide Home Loans was her best partner for this

11   mortgage. Because of the trust established between BOA and Plaintiff, Plaintiff agreed

12   and proceeded with the directed purchase. BOA was aware that Thomas consistently paid

13   cash in order to avoid credit problems due to her stroke disabilities [memory, etc.] BOA

14   advised Thomas that buying a house would take care of the personal credit issue, referred

15   Thomas to Countrywide, and interacted with Thomas and Countrywide during the

16   subsequent purchase.

17   **223.**   BOA and Countrywide were fully aware of Thomas' disabilities from stroke and

18   Transient Ischemic Attacks (TIA's); Plaintiff followed her usual and customary

19   procedure of making full disclosure of disabilities that might affect her business

20   relationships.

21   **224.**   Plaintiff had consistently before this occasion paid in full for all of her purchases

22   because of disabilities from stroke, specifically to avoid poor credit because of memory

23   failures, and owned a number of properties outright. Neither Plaintiff nor her corporate

1    group used any credit other than a monthly paid-in-full business credit card. Neither

2    Plaintiff nor her corporate group had any outstanding debts. BOA advised Thomas that

3    her concerns about her disabilities and debts could be addressed by setting up automatic

4    payments for the mortgage.

5    **225.**    Escrow was specifically waived (See Exhibit 5, Countrywide memo waiving

6    escrow) based on the Defendant's knowledge that Plaintiff was well able to pay outright

7    for the real estate and Plaintiff's determination to avoid varying payments, and Plaintiff

8    was to self-insure or purchase insurance at her option and to pay all taxes and ancillary

9    charges. In answer to Plaintiff's question re disclosure, Countrywide stated that charges re

10   insurance were not charges but rather there to show it would be an expense of Plaintiff

11   (see Exhibit 5, Countrywide memo).  Both Countrywide and BOA seemed relaxed and

12   comfortable with the special terms they offered Plaintiff, and assured her of complete

13   compliance with her special needs.

14   **226.**    At the time of closing, Plaintiff Thomas had suffered several Transient Ischemic

15   Attacks (small strokes) and temporarily could not read. Although Thomas kept this

16   temporary condition secret, she informed both BOA and Countrywide that she could not

17   read, and discussed delaying the purchase. Both assured Thomas that the documents

18   were in order, that they contained exactly what the parties had agreed, that it was

19   important to get the closing done, and that if Plaintiff was able to sign documents, it

20   would be best to do so, and relying on those representations, Thomas agreed to go ahead

21   with the closing and sign the documents. However, her discomfort was noted in a memo

22   on which she scribbled a disguised reference to her inability to read to remind

23   Defendants (See Exhibit 15).

1   **227.**   Thomas signed mortgage documents based entirely on the misrepresentations by

2   BOA and Countrywide, on Defendants' failure to provide material facts including the

3   actual contents of the note and agreement they induced her to sign, and on her

4   understanding of the situation as BOA and Countrywide represented it.

5   **228.**   BOA and Countrywide failed to disclose material factors that would have altered

6   Thomas' decisions and actions. It was Thomas' clear understanding that the mortgagee

7   was Countrywide, and when Countrywide was acquired by BOA, that the mortgagee

8   became BOA. At no time was Thomas made aware that Countrywide and later BOA

9   were to act as servicers, and that their financial interests as servicers were in opposition

10  to her interests as mortgagor. BOA took advantage of its trusted relationship with

11  Plaintiff to place her in a situation contrary to her interests and designed only to increase

12  Defendants' profits.

13  **229.**   Plaintiff was not made aware or informed of the multiplicious connections

14  between BOA and Countrywide, of any conflicts of interest, or of any profit motives that

15  might harm Plaintiff in the present or future. Plaintiff was not made aware of Defendants'

16  multiple roles – as lender, servicer, investor/seller, insurance company, and so forth, nor

17  of the cross-connections of lender/servicer between BOA and Countrywide and other

18  banks and servicers.

19  **230.**   Plaintiff was not made aware of the conflict between servicers' financial interests

20  and those of a borrower. It is now commonly known that **because modern mortgage**

21  **servicing is divorced from ownership of the loan, servicers have incentives to charge**

22  **borrowers unnecessary fees and to extend default.** In the past, a lender holding a

23  nonperforming loan would have every incentive to modify the loan with terms that create

90

1     a positive "net present value," – that is, that will produce a revenue stream that, over time,

2     is predicted to exceed the benefit to the lender of foreclosing. The typical modern

3     mortgage servicer, on the other hand, has competing incentives. Thomas, however, was

4     completely unaware of servicers as entities or of their functions, and neither BOA nor

5     Countrywide Home Loan Inc disclosed that information to her.

6     **231.**     Representatives of both BOA and Countrywide Home Loan, Inc., made material

7     false representations to Plaintiff, at the time and during the pendency of Plaintiff's loan,

8     and have continued to do so to this date.

9     **232.**     Absent the *failures to disclose and material misrepresentations*, Plaintiff would

10    not have entered into this arrangement for a mortgage or signed the mortgage documents,

11    but would have paid for the house outright if Plaintiff decided to purchase it for any other

12    reason.

13    **233.**     BOA knowingly and willfully made these material false statements and omitted

14    to disclose other important information with the purpose and intent of inducing the

15    Plaintiff to enter into an agreement counter to her interests and intents, which were

16    known to Defendant and which Defendant falsely asserted were consistent with the

17    contents of the mortgage documents/agreement (Deed of Trust/Note), in order to increase

18    their profits. Thomas believed Countrywide Home Loans, Inc., was the mortgagee, and

19    when BOA informed Plaintiff that BOA had "acquired Countrywide," Thomas believed

20    BOA was her mortgagee.

21    **234.**     These material misrepresentations and omissions of fact are among the reasons

22    Thomas had so much difficulty dealing with the situation in which she found herself; she

23    could not understand why Defendants behaved as they did. Lacking a logical reason for

1    Defendants' behavior [unaware of their profit motives], Thomas could not find a way to

2    address the problems effectively, and for many years believed that her disabilities were

3    causing her to misperceive the situation.

4    **235.**    In actual fact, Plaintiff has never been in default on her mortgage. Payments

5    were automatically, timely made direct from a BOA checking account, via BILLPAY,

6    and those checking account records show all payments confirmed received timely,

7    although entries on the mortgage transaction documents do not agree with BOA's own

8    banking records from Plaintiff's checking account. (See Exhibit 4, BOA BILLPAY 2-

9    2010 THRU 7-2016). Further, during the first two years of the mortgage before BOA

10    "acquired Countrywide," Plaintiff made double payments, which do not appear to have

11    been credited to Plaintiff's mortgage account, according to BOA's mortgage records.

12    Plaintiff's mortgage transactions, if in compliance with actual fact, would show her 15-

13    year mortgage long paid up. (Compare Exhibit 4 and Exhibit 12.)

14    **236.**    Defendants, as is their usual and customary practice, created a fraudulent escrow

15    account, significantly far into the mortgage period, applied false charges, penalties and

16    fees, asserted fraudulent increases in mortgage payments, and asserted that Plaintiff was

17    in default. Plaintiff then spent weeks fighting with Defendants, and finally got some

18    "correction" of the records. However, in a very brief time thereafter, Plaintiff would once

19    again find "errors." Defendants created a very unmerry merry-go-round.

20    **237.**    Defendants used the Fannie Mae insurance requirements and their own insurance

21    providers to create "plausible" but fraudulent records, and to significantly increase their

22    profits.

1    **238.**    At all times, Plaintiff maintained insurance, sometimes far in excess of

2    Defendant's insurable interest, because of Defendant's fraudulent misrepresentation to

3    Plaintiff, and proof of insurance was repeatedly supplied.

4    **239.**    While it was a usual and customary procedure for Defendants to deny receipt of

5    proof of insurance, Defendant BOA, having inadvertently acknowledged receipt of proof

6    of insurance, notified Plaintiff in 2009-2010 that her insurance did not "meet the

7    minimum requirements" for the loan, and had already force placed insurance.

8    **240.**    The original loan was for $110,400 (2002); Defendant BOA had posted lender

9    placed insurance with limits of $256,000 approx. 8 years into the mortgage period.

10   Defendants misrepresented the mortgagee's insurable interest and requirements. (See

11   Exhibit 13, BOA 2010 HO INS min).

12   **241.**    Defendants then applied the charges to escrow and notified Plaintiff of an

13   increased payment, which Plaintiff refused to make, and while Plaintiff was eventually

14   able to compel Defendants to remove the fraudulent charges, during the period of

15   intransigency, Defendants continued to post defaults and notify credit agencies that

16   Plaintiff was behind in her mortgage payments.

17   **242.**    While Defendants seem to make at least an attempt to fake a justification for

18   fraudulent entries, in some cases there seem to be no possible connection between

19   Defendants' posted entries and Plaintiff's mortgage. For example, from time to time after

20   establishing the fraudulent escrow account, Defendant BOA posted "Monthly PMI," or

21   "FHA" charges, when Plaintiff's mortgage had neither PMI nor any connection to FHA.

22   (See Exhibit 14,  BOA escrow fraud PMI etc 2010.pdf.)

243.    For example, in 2009, Defendant BOA posted not only PMI payment, but "School tax pmt," "Spec assessment tax" and "County tax pmt," showing dates in December, 2009, under "Last Year's Escrow Payments." Defendant made none of these payments for Plaintiff; and in fact, no county billed such charges to Plaintiff. (See Exhibit 14, BOA escrow fraud PMI etc 2010)

244.    During each of the periods of Defendants' "errors," Defendant inundated and constantly pressured Plaintiff with multiple, confusing, conflicting letters from multiple sources, threats, rude collection calls, and other tactics designed to extort payments from mortgagors, such that, with her stroke disabilities, Plaintiff was unable to complete work on her own business development and personal imperatives.

245.    Defendants deliberately created and employed a system and a pattern of practices designed to frustrate, block, delay, and exhaust mortgagors, including Plaintiff, in their efforts to secure corrections or to simply communicate with a knowledgeable person or one empowered to act to correct "errors."

246.    For example, Defendant BOA notified the borrower that a "payment had not been received." Plaintiff went to the computer to sign on, an exhausting process in itself for someone who has suffered stroke, and tried to access her mortgage account. When she did so, she found that Defendant had interposed a blocking screen, denying access to the mortgage transaction records or mail until and unless Plaintiff first made a payment online from checking. (See Exhibit 16, BOA BLOCKING SCREEN.) As a paperless client, Plaintiff could not access her mortgage records in order to determine what was happening. Further, this screen lacked input spaces for sufficient information.

247.  Fortunately, Plaintiff paid her mortgage with automatic payments from a BOA checking account through BOA's BILLPAY program. Thus, Plaintiff would access the BILLPAY records, where she could see that the "missing payment" had been made and confirmed received on time. This process used about two hours each time, not including the time it took her to start all over whatever task that was interrupted by BOA's missing payment notices. (See Exhibit 4.)

248.  As a result of Defendants' egregious behavior and criminal activities, including fraud, Plaintiff suffered ill health, including hospitalization for high blood pressure, anxiety disorder, weight gain, insomnia, teeth-grinding sufficient to break Plaintiff's permanent bridges (which continue to abride), distraction, frustration, depression, and anger management problems. Plaintiff developed chronic inflammation and pain, suffered migraine, and worsened symptoms of her disabilities. Plaintiff's overall function declined, and her quality of life deteriorated significantly as a result of Defendants' unconscionable actions and practices. Further, because of Plaintiff's known disabilities, Defendants' egregious practices diminished her capacity to perform essential tasks related to care of her chronically ill granddaughter and other important tasks of daily living.

249.  Defendants' creative bookkeeping and falsification of mortgage transaction records deliberately created a false and fraudulent record indicating that Plaintiff was in default, damaging Plaintiff's reputation and her credit standing, as Defendants falsely reported that Plaintiff was behind in her mortgage payments.

1     **250.**    The lowered credit scores Defendants caused impacted Plaintiff financially,

2    because of providers who use credit scores to determine rates. Plaintiff's insurance rates

3    went up, not only for the mortgaged property, but for all of her other insurance needs.

4    **251.**    The situation was made worse for Plaintiff by the knowledge that the entire

5    situation, from purchase and mortgage to the current difficulties, had been deliberately

6    crafted ostensibly to make Plaintiff's life easier, but in actuality simply to increase

7    Defendants' profits, and from Plaintiff's point of view, had been totally unnecessary.

8    Plaintiff's businesses never needed A/R financing.

9    **252.**    The BOA Mortgage Transaction records Plaintiff has been able to acquire, in

10    spite of BOA's repeated failures to provide the records during their servicing, display

11    long periods of fraudulent entries, followed by short periods of "corrected" data,

12    followed by more fraudulent entries. (See Exhibit 12 A-D, Some BOA Mortgage

13    Transaction Reports). BOA is consistent in creating the errors in its favor and in delaying

14    correction of its records, and Seterus is following in its parent's steps.

15    **253.**    In 2015, Plaintiff's loan balance was less than $10,000.00, when BOA made

16    Plaintiff Thomas a refinance offer, which Plaintiff rejected, since she was well able to

17    pay her mortgage, provided Defendant eschewed fraudulent transaction entries.  This

18    480-month (40 years) loan term option sported a monthly payment amount of <u>$950.78,</u>

19    an increase of about $12/month over Plaintiff's then payment of <u>$939.09,</u> and included

20    detachable payment forms for that amount to be paid to Bank of America, NA, in <u>Dallas,</u>

21    <u>TX</u>. As of March, 2016, the balance of THOMAS' loan per Amortization Schedule

22    provided at closing, not counting prepayments Thomas made, would have been

1    approximately **$6500.00**, including principal and interest, with about $103,000.00 having

2    been paid by Plaintiff, without considering the double payments made in years 1 and 2.

3    **254.**    The 480-month refinance loan offered by BOA with a payment of

4    $950.78/month_ assessed Plaintiff a total of an additional **$456,374.40** over a 40-year

5    period, as opposed to the loan balance of less than $10,000.00 at the time.

6    **255.**    The "new" loan payment included **$114.15 monthly principal and interest** for a

7    **total of $54,792, *with a monthly escrow amount of $836.63, for an escrow total of***

8    ***$401,582.40***. In other words, FANNIE MAE gets $54,792 while the servicer and their

9    cohorts get over $400,000.00, part of which is the illegal kickbacks extorted  from the

10    homeowner by the bank, who pays the colluding insurer, who then pays the bank its

11    kickback. The farcical idea that any person of normal intelligence would accept this offer

12    leads PLAINTIFF to believe that DEFENDANT does not intend such offers to be

13    acceptable to mortgagors, and that DEFENDANTs' actual goal is to force mortgagors

14    into foreclosure. Defendants' intent to secure exorbitant profits is clear and compelling.

15    **256.**    In November, 2015, as Plaintiff was again trying to compel BOA to correct its

16    records, Defendant suddenly increased its usual barrage of simultaneously conflicting

17    letters from "affiliates" located all over the US, failed to respond to Plaintiff's ongoing

18    attempts to compel the usual corrections, then notified Plaintiff in the last week of the

19    month that DEFENDANT SETERUS would be her servicer effective December 1, 2015,

20    and provided a telephone number for Defendant Seterus,  pursuant to the Fannie Mae

21    servicer agreement and rule amendments.

257.   The contact number provided by BOA was to a recorded Seterus message, telling callers to call back after they received documents from Defendant Seterus, and Plaintiff's attempts to contact Seterus for payment directions was unavailing.

258.   Further, BOA transferred the mortgage to DEFENDANT SETERUS without correcting the fraudulent entries; DEFENDANT Seterus still falsely shows PLAINTIFF in default on her mortgage, continues to add fraudulent charges, and asserted that they will foreclose if PLAINTIFF does not pay their trumped up charges.

259.   As with Defendants' other records, the transfer records are confusing and conflicting.  After Plaintiff received the December 1, 2015, notice of transfer, BOA sent Plaintiff an ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT dated **January 14, 2016**, stating "We are sending you this statement of activity in your escrow account from August 2015 through *January 2016,* the date on which your loan was paid in full or transferred to another servicer," in essence stating that BOA was the servicer through January 2016. (Emphasis ours.) (See Exhibit 17, 2016 Annual Escrow Account Disclosure Statement.)

260.   An Assignment of Deed of Trust from BOA to Fannie Mae is dated and filed with Brazoria County 12/15/16, and Doc 2015057772 was registered with MERS 12/15/16. (See Exhibit 9, Assignment of Deed of Trust.) Brazoria County shows assignment from Khoury, seller, to Thomas, buyer, and from Thomas to Countrywide Home Loans, Inc., both in 2002, but no assignment from Countrywide Home Loans, Inc., to BOA. (See Exhibit 7, Brazoria County Title Search.)

261.   Yet the unauthorized servicer first time payment of Plaintiff's property taxes (which was refunded as a duplicate payment to Seterus via CoreLogic by Brazoria

1    County) was made by Defendants' contractor CORELOGIC **11/18/15**, and claimed by

2    Defendants against Plaintiff. (See Exhibit 6, Brazoria County Property Tax memos)).

3    **262.**    Seterus' status is also confused. BOA notified Plaintiff that Seterus was the new

4    servicer. However, on the Assignment of Substitute Trustee Seterus filed in Brazoria

5    County, Seterus identified itself as "Subservicer" (See Exhibit 10).

6    **263.**    Defendant BOA or Seterus, in order to legalize the fraudulent escrow account

7    [according to Fannie Mae], made an unauthorized payment to Ro'Vin Garrett, Tax

8    Assessor, Brazoria County, TX, for Plaintiff's property taxes. This was the first time in

9    the entire mortgage loan period that a payment for property taxes had been made.

10    Plaintiff's property taxes were not in default. This payment duplicated Plaintiff's usual

11    and customary property tax payment, and Ro'Vin Garret, Brazoria County Tax Collector,

12    upon receiving Plaintiff's complaint and reviewing the files, returned Defendants'

13    unauthorized payment, and subsequently provided Plaintiff with a copy of the cashed

14    check. (See Exhibit 6.)

15    **264.**    This refunded payment serves as part of the basis for Defendants' claim that

16    Plaintiff is in default. Following Defendants' usual practice, Defendants posted the

17    unauthorized payment to the fraudulent escrow account, and increased Plaintiff's

18    mortgage payment amount. Defendant Seterus continues to this date to maintain that

19    Plaintiff owes for the payment, although Brazoria County has verified the return and

20    provided copies of the front and back of the cancelled check (Exhibit 6).

21    **265.**    Further, upon knowledge and belief, Seterus continues to use the refunded

22    payment as a basis for account analysis and fraudulent escrow charges.

1     **266.**     Brazoria County included in their email verification to Plaintiff a copy of a

2     CORELOGIC email about the refunded tax payment. At this period in time, Seterus was

3     supposed to be the servicer; however, Corelogic's email is addressed to "CTAX-RA-

4     BAC.OS.TAR," and Plaintiff finds the "BAC" as possibly indicating Bank of America

5     Corporation, indicative of controlled connections. (See Exhibit 6)

6     **267.**     CORELOGIC's name appears in various connections with Defendants.

7     Defendants' unauthorized property tax payment was made by CoreLogic. BOA's 2015

8     Assignment of Deed of Trust to Fannie Mae says "When recorded mail to: CoreLogic

9     Mail Stop: ASGN P.O. BOX 961006 FT. WORTH TX 76161-9836." (See Exhibit 9) On

10     information and belief, CoreLogic has access to the mortgage records of Defendants, as

11     has been reported in various suits about other subcontractors and affiliates; these entities

12     troll the mortgage records and take various actions in support of Defendants' enterprises.

13     **268.**     Defendants' relationships with CoreLogic gives rise to privacy violations in

14     violation of federal laws. Banks and servicers are required to protect mortgagors' private

15     financial and related information, according to Fannie Mae Section 309: "The servicer

16     must take appropriate steps to ensure the security, integrity, and confidentiality of

17     individual mortgage loan files and borrower payment records and to protect against

18     unauthorized access to or use of such mortgage loan files and records. In addition, this

19     information must not be used by the servicer or anyone connected with it (or be passed

20     on to a third party for its use) in any way that could be viewed as a conflict of interest, a

21     breach of confidentiality, or the gaining of an unfair advantage from its relationship with

22     Fannie Mae."

269.   CoreLogic announced in 2011 "a new type of credit file, which is based on the giant repository of consumer data it maintains on just about everything that most of the traditional credit bureaus do not: missed rental payments that have gone into collection, any evictions or child support judgments, as well as any applications for payday loans, along with your repayment history. The new report also includes any property tax liens and whether you've fallen behind on your homeowner's association dues. It may reflect that you now owe more than your house is worth or if you own any other real estate properties outright." CoreLogic also announced a new partnership with FICO, the provider of credit scores popular with lenders. CoreLogic's access to and use of Defendants' records is in violation of federal law and Fannie Mae contracts.

270.   As a result of their fraudulent entries, Defendants have declared Plaintiff in default and non-judicial foreclosure with sale scheduled June 6, 2017 (Exhibit 1)

271.   Although PLAINTIFF has NOTICED Defendants multiple times since 2009 with complaints, supporting evidence, and invoices for time via certified mail, receipt confirmed, about the specific "errors" and their multiple past admissions of the same "errors," confirming with BILLPAY records that she is not in default on her mortgage and demanding mortgage transactions corrections to accuracy, including pursuant to Texas law a Demand for Release of Fraudulent Lien May 4, 2017, DEFENDANTS have noticed PLAINTIFF that they intend to foreclose, and have not corrected the mortgage transaction records.

272.   After becoming servicer, DEFENDANT SETERUS failed to respond to Plaintiff's multiple letters for some time. Because of her disabilities, Plaintiff Thomas was unable to immediately figure out how to pay Defendant Seterus while maintaining proof

1     of payment. BOA customer service told Plaintiff that payments made to BOA in the

2     interim would be forwarded to Defendant Seterus, so Plaintiff paid December, 2015,

3     January and February, 2016, via billpay to BOA. BOA returned the February payment to

4     Plaintiff's checking account.

5     **273.**     In the meantime, absent a reply from Defendant Seterus, Plaintiff finally

6     figured out that she could do billpay payments from her BOA checking account to

7     Defendant Seterus, and brought the payments current.

8     **274.**     Plaintiff was informed by BOA's customer service department that Plaintiff's

9     December, 2015, and January, 2016 payments would be forwarded to Defendant Seterus,

10     but it appears this was not done. Defendant BOA apparently converted those funds.

11     **275.**     DEFENDANT SETERUS, as might be expected given its history of association

12     with Defendant BOA who previously owned them and employed the same people, is

13     using the same tactics used by Defendant BOA. On review of various suits against a

14     number of banks involved in mortgage servicing, Plaintiff believes that all of them are

15     following the same basic pattern of practices and procedures, even to using the exact same

16     terminology in their evasive maneuvers, and that there appears to be collusion between

17     them. For example, BOA serviced loans for other banks, including Wells Fargo, and other

18     banks serviced BOA loans. They are associated and engaged in the enterprise of mortgage

19     loan frauds with a pattern of practices designed to maximize their financial gains.

20     **276.**     Seterus fails to respond to Plaintiff with adequate information; fails to provide

21     contact information for anyone capable of or willing to make corrections; and is

22     stonewalling.

1   **277.** After Seterus sent Plaintiff Thomas multiple memos stating payments were in

2   arrears, Plaintiff provided documentary proof of payments, which Seterus apparently

3   ignored.

4   **278.** Plaintiff received a communication from Seterus notifying Plaintiff that

5   Defendant Seterus had not received proof of insurance as previously requested and had

6   therefore purchased a lender placed policy. However, just the day before receipt of that

7   communication from Seterus, Plaintiff had received a copy of a new face sheet for

8   Plaintiff's own policy from the insuror, showing that Defendant Seterus had added itself

9   to the policy before informing Plaintiff that they had no proof of insurance. Seterus'

10  notification is obviously meant to provide file documentation to support their fraudulent

11  mortgage transactions, and the act of adding themselves to the policy proves they knew

12  they were committing fraud.

13  **279.** Upon researching the matter with insurer TWIA and agency, Plaintiff found that

14  the addition as mortgagee to the policy was requested directly by Defendant Seterus or its

15  subcontractor, and that Defendant Seterus had received a copy of the new facesheet ***before***

16  Plaintiff had.

17  **280.** On May 22, 2017, Plaintiff received another letter from Seterus, with a stamped

18  signature, refusing to release the fraudulent lien, and citing correspondence allegedly sent

19  to Plaintiff June 21, and September 7, 2017, in which Seterus is supposed to have

20  addressed what Seterus characterizes as Plaintiff's "concerns." Since it is May, 2017, and

21  both June and September, 2017, are still in the future, this is obviously another of Seterus'

22  "errors." Seterus included a copy of a 3-page letter dated June 21, 2016, in which Seterus

23  reiterated its usual lies including those about not having received proof of insurance, and

stating that BOA advised them that the tax payment with which BOA created the latest
escrow account was disbursed for Plaintiff's property taxes "as the loan was in review
for loss mitigation assistance which required the loan have an escrow account and any
taxes to be paid immediately."

281.    Plaintiff 's loan was not in review for loss mitigation assistance. The only loss
mitigation Plaintiff required was for the theft and conversion of Plaintiff's mortgage
payments by BOA. Further, Fannie Mae requires that each servicer keep a full and
extensive file on each mortgage, and that the file be transferred to any new servicer.
Seterus' claim that BOA "advised" them is specious, since the complete mortgage file
from 2002 to the present should be immediately in Seterus' possession for review and
investigation of complaints.

282.    Seterus further stated in the June 21, 2016, letter that Plaintiff was approved for
"the enclosed Trial Period Plan 240. . .We have since been advised by Fannie Mae that
you have advised them that you would be accepting the Trial Period Plan 240." This is
absolutely false. Plaintiff never applied for any such plan; therefore, no approval could
have been issued. Plaintiff never advised Fannie Mae that Plaintiff would be accepting
any Plan. Plaintiff requests that the Court require Defendant Seterus to provide strict
proof of these false statements.

283.    Defendants have alleged that Plaintiff is in default on her mortgage, but evidence
will show that Defendants' fraudulent entries and other unlawful acts produced a false
record. Defendants deliberately manufactured a fraudulent default. Defendants have had
absolute control over Plaintiff's payments and over all the records relating to the
mortgage.  Defendants repeatedly notified Plaintiff, over the years, that payments had not

1   been received, or were received late. However, Defendant BOA's own downloaded

2   records of Plaintiff's checking account mortgage payments through BOA BILLPAY

3   direct, automatic payments, clearly show payments made timely and certified receipt.

4   Plaintiff not only has never missed a payment; Plaintiff made double payments during

5   the first 2 years of the loan. At all times relevant to this suit, THOMAS timely paid her

6   mortgage via direct automatic, verified bank transfers from her BOA checking account

7   maintained for that purpose, by BOA to BOA (see **Exhibit 4**, attached hereto and

8   incorporated herein by reference).   In fact, Plaintiff's mortgage was actually paid off in

9   April, 2015; yet because of her disabilities and Defendants' actions, Plaintiff continued

10  to make payments through July, 2016, for an overpayment of  $14,086.35.

11  **284.**      Comparison of Plaintiff's BILLPAY records and Defendants' mortgage

12  transaction records show clear and convincing discrepancies and evidence of Defendants'

13  fraud. (See Exhibit 4 BOA BILLPAY 2-2010 THRU 7-2016 and Exhibit 12 A-D Some

14  BOA Mortgage Transaction Reports.)

15  **285.**      The events detailed here are only a sample of the actions Defendants engaged in

16  against Plaintiff.

17  **286.**      Because Plaintiff is an elderly person with disabilities from stroke, and because

18  Plaintiff has operated in the business world, Plaintiff has maintained extensive copies of

19  communications between Plaintiff and Defendants, and between Plaintiff and others

20  related to this matter, and has documented all interactions. Plaintiff 's unprecedented

21  chain of evidence will prove the predation Plaintiff complains of.

22  **287.**      Further, Plaintiff recorded some of the conversations with various BOA

23  representatives of "the President's office."

1    **288.**    Plaintiff has made the fraud known to the CEOs of both BOA and Seterus, via

2    complaints via certified letter, many times since 2008. Both know or should have known

3    of the illegalities and other issues with their usual and customary practices. The various

4    divisions/affiliates, etc., of BOA are headed by the same people, who are individually

5    responsible for the actions of their underlings. Seterus' CEO is directly responsible for

6    the actions of Defendant Seterus. BOA's CEO/President/Chairman of the Board, an

7    attorney, is directly responsible for the actions of Defendant BOA.

8    **289.**    Defendant BOA had access to both the mortgage transactions and to the

9    BILLPAY records, since both were created and maintained by BOA, and under the

10    control of the same people.

11    **290.**    Plaintiff also filed complaints with Fannie Mae, whose directors and officers are

12    responsible for enforcing their contracts with their servicers, and who know or should

13    have known about the irregularities Plaintiff complained of.

14    **291.**    Defendants vigorously assert they are acting on behalf of Fannie Mae, a quasi-

15    government agency; thus their actions are "under color of law." Defendants have violated

16    Plaintiff's constitutional rights to due process, equal protection under the law, property

17    rights, and privacy. A private party may be engaged in "state action" if the act which

18    deprived federal rights could not have occurred but for the existence of a governmental

19    framework requiring government approval or action. In *North Georgia Finishing,*

20    *Incorporated v. Di-Chem, Incorporated, the Court found state action in a private party's*

21    *invocation of a court ordered attachment that failed to afford due process to the debtor.*

22    *Similarly, in Lugar v. Edmondson Oil Company, the Court held that a creditor who*

23    *invokes prejudgment attachment remedies requiring the participation of a court clerk*

1   *and a sheriff, acts under color of state law.* "[m]isuse of power, possessed by virtue of

2   state law and made possible only because the wrong-doer is clothed with the authority of

3   state law, is action taken 'under color' of state law."( 313 U.S.299 (1941))

4   **292.**   Defendants are using state law to facilitate fraudulent foreclosure and

5   seizure/sale of Plaintiff's property.

6   **293.   Some Relationships between Defendants are documented in Paragraphs**

7   **164-170  and incorporated here as though repeated.** These relationships appear to be

8   extended to a wide range of others operating towards the same goals and apparently

9   employing the same Policy and Procedures Manual. The similarity of the responses and

10   overt actions is undeniable, and cannot be explained by mere coincidence, or by

11   servicing contracts which require an end performance but do not assert intermediate steps.

12   As a former CEO of a corporation operating nationally in the healthcare industry,

13   Plaintiff is well aware of corporations' protective attitudes to administrative documents

14   such as Policy and Procedures Manuals, and that such a wide variety of entities would

15   employ the same evasive statements, language protocols, and forms without collusion is

16   not credible.

17   **294.   PEOPLE WITH KNOWLEDGE**: From time to time during the mortgage

18   period, since 2008, PLAINTIFF has filed detailed written complaints with evidence,

19   usually by certified mail, to various individuals in authority at Defendants' offices and

20   others deemed to have the power to affect Plaintiff's situation. These responsible

21   individuals know or should have known even before receipt of Plaintiff's specific

22   complaints about the egregious acts of which Plaintiff complained, and under the law of

23   the land and as a function of their position within the organizations, these individuals

1    may be found to be liable in part for criminal action and for the damages Plaintiff

2    suffered.

3                                          **DAMAGES**

4

5    **295.**    Plaintiff's damages resulting from Defendants' unconscionable actions are

6    damages imposed on an adult female now in her 70's. It is common knowledge that

7    aging humans grow weaker, their physical and mental status decline, and their stamina is

8    gradually reduced. They become less able to accomplish both physical and mental tasks.

9    They become more apt to experience debilitating illness and injuries. Consequently, their

10    effective time becomes increasingly valuable. When disabilities, such as from stroke and

11    traumatic brain injury, are added to the aging condition, there is a commensurate increase

12    in the value of effective time.

13    **296.**    Although aging and suffering disabilities, Plaintiff's duties and imperatives have

14    not lessened. Instead, as she approaches the end of her life, she finds that effective

15    performance is more necessary because of the potential end of her life and the need to

16    provide for members of her family whose sole support she is.

17    **297.**    Defendants are and were fully aware of Plaintiff's disabilities related to stroke,

18    and have taken advantage of these disabilities and Plaintiff's age for their nefarious

19    purposes.

20    **298.**    Plaintiff proved to be a very successful business woman whose plans and

21    activities in aid of retirement income and a guaranteed income after her death for her

22    dependents, including a chronically, critically ill young adult who will not be able to

23    work because of the life-threatening disabilities associated with her condition and whose

1    medical expenses are astronomical, have been derailed by Defendants' continuing

2    disruptions, tactics designed to confuse and obfuscate and keep Plaintiff responding to

3    multiple, conflicting communications, demands, and threats.  As a result of Defendants'

4    actions, Plaintiff has been deliberately prevented from completing the work necessary.

5    **299.**    Prior to her retirement in 2007, Plaintiff devised a business plan, created backup,

6    and began startup of this new business conglomerate. During the period of Defendants'

7    persecution of Plaintiff, Plaintiff undertook the first steps of the work. However, the

8    constant predations over the past years, including the months of time necessary to

9    compel corrections, the repetition of Defendants' actions after a few months, constant

10    harassment by Defendant's collection agencies, and going through this whole thing

11    multiple times since 2008-2009, precluded successful startups. Because of Defendants'

12    persecution, Plaintiff was unable to do the work planned.

13    **300.**    Plaintiff designed a business conglomerate to produce income from copyrighted

14    materials over long periods, without requiring future consistent work on the part of her

15    chronically ill granddaughter. Plaintiff started Blueclay Publications, an ebook

16    publication company. She resumed her work as an editing consultant and an editor for

17    previously unpublished authors. She writes and performs oral history tales, and started

18    recording these for release and sale. She taught Writing for Publication at Lonestar,

19    created ACAJ, a creative arts journal for the ALL Program, and served as managing

20    editor. Plaintiff created a business plan for Kyothæ Tribe that included licensing tribal

21    artwork, and created  SOLESTONES and its website. Because of Defendants'

22    unconscionable persecution, none of these projects have come to fruition. At her present

23    age and condition, Plaintiff will require employees and contractors to complete the work.

**301.**   As an editor and as a consultant it is usual and customary for Plaintiff to bill by the hour for her services, including for management and error correction. As a result of and a business response to Defendants' egregious conduct, Plaintiff notified Defendants that she would be billing them for the time they willfully usurped from her business activities. On 8/25/2010, Plaintiff billed Defendant BOA for time required for management and error correction services necessary for such items as: Failure to communicate between BOA and BOA HLS, LP; Failure to timely post payments made by BOA to BOA HLS, LP; Repeated miscommunication/ harassment of Borrower and ER contact; Failure to provide handicapped access for Borrower; Denial of access to information required by Borrower, including on-line access; Failure to provide documentation on request;  Loss/confusion of Borrower records; Inappropriate and unauthorized agency activities; Website inadequacies, for a total of $3750 for 15 hours.

**302.**   Plaintiff's invoice carried the following note: Please note: "Borrower has consistently paid mortgage timely through her checking account at BOA. Borrower has provided insurance information multiple times, and Lender has either ignored the information or failed to file it correctly/lost it. Further failures will result in additional fees assessed, based on time expended in dealing with BOA/BOA HLS, LP and their agents."

**303.**   Over a period of months, Plaintiff gradually increased her billrate, as usual and customary with Plaintiff, until she was billing at hazard rate for any and all time expended, with a minimum 1 hour for each incursion. Plaintiff invoiced Defendant BOA with explanations and comprehensive complaints; BOA has failed to pay for Plaintiffs

1    hours/time they expended after having been noticed. See Exhibit 23 A-I, for sample

2    invoices from 8/2010 to  Additional invoices will be presented as evidence at trial.

3    **304.**    Defendant used Plaintiff's services and has not paid for those services. Plaintiff's

4    unpaid invoiced fees and services are part of her damages.

5    **305.**    Defendants' egregious actions have damaged her further because of the nature of

6    her disabilities, when distraction and stress causes her physical and mental functioning

7    ability to significantly decline. As a result of Defendants' unlawful and egregious actions,

8    Plaintiff has suffered a significant decline in her ability to peacefully enjoy the remaining

9    days of her life. Since BOA became her loan servicer and proceeded to act in its usual

10    and customary manner as demonstrated in the many suits and actions against BOA and

11    other banks, Plaintiff has suffered unrelenting torture imposed by those who deliberately

12    secured her trust. Defendants' egregious actions are unconscionable.

13    **306.**    As a result of the intensely stressful criminal actions of Defendants, Plaintiff

14    started grinding her teeth in her sleep, and Plaintiff's permanent bridges broke and

15    continue to crumble. Estimates of the necessary removal, replacement and other repairs

16    necessitated by the damage exceed $40,000.00 and require surgical procedures

17    dangerous to a person of Plaintiff's age and condition.

18    **307.**    PLAINTIFF seeks redress for damages caused by Defendants' egregious and

19    criminal actions committed jointly and severally against Plaintiff, as detailed herein, in

20    an amount sufficient to make Plaintiff whole.

21    **308.**    Plaintiff also seeks damages for the deliberation infliction of emotional and

22    psychological stress and worsening of her physical condition caused by the willful,

23    deliberate and egregious actions of Defendants.

1    **309.**    Defendants' egregious actions in increasing their profits are contrary to the

2    public good, as has been demonstrated in legal actions, judgments, settlements, and

3    consent decrees over the past 15 years. These past cases are referenced as showing

4    Defendants' continuing pattern of practices. Although Defendants BOA signed the 2012

5    National Mortgage Settlement, BOA has failed to comply with its terms, as will be

6    proven in evidence produced by Plaintiff during trial. Past performance, Consent

7    Agreements, suits, affidavits and so forth dealing with proof of wrong-doing  are here

8    referenced to show a pattern of practices leading to a logical premise that, given the cited

9    factors driving the servicing industry, (suggesting the likelihood that Defendants

10    continued their wrongdoing rather than that they suddenly stopped) it is unlikely that

11    Defendants failed to follow their usual pattern of practices. To date, the costs of

12    Defendants' illegal, unfair, and abusive practices have not approached the gains

13    Defendants make through these practices. It is in the nation's and the general public's

14    interest to stop these practices. Therefore, Plaintiff seeks an award sufficient to cool

15    Defendants' ardor for this pattern of practices, by compelling disgorgement of the

16    windfalls Defendants have created for themselves and their co-actors.

17    **310.**    Defendants have demonstrated that their pattern of practices is designed to be

18    perceived as "errors," and to allow them "plausible deniability." However, it is

19    significant that these "errors" are consistently in Defendants' favor. Further, it is

20    inconceivable that Defendants, with their deep pockets, are and were unable to set up

21    systems, policies, and procedures to comply with the laws, rules, and regulations under

22    which they operate and the contracts to which they are parties. The sophistication with

23    which Defendants have grown their profits during these past 15 years belies Defendants'

1    inability to eliminate systemic, replicating errors, such as are seen in Defendants'

2    handling of Thomas' mortgage payments and related matters.

3    **311.**    Defendants engaged in this conduct in bad faith, knowing that their actions were

4    inconsistent with applicable law, reasonable commercial standards of fair dealing, and

5    the reasonable expectations of borrowers upon originating their mortgages.

6    **312.**    Plaintiff seeks damages for every violation of law and decency, and seeks return

7    of the overpayment of Plaintiff's mortgage, together with penalties and interest.

8    **313.**    Plaintiff further seeks the imposition of all applicable fines and penalties

9    attendant upon Defendants' violations of state and federal laws.

10                                  **COUNTS**

11          **COUNT 1. SECURING EXECUTION OF DOCUMENT BY DECEPTION**

12   **314.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

13   paragraphs 1 through 313 above with the same force and effect as if herein set forth.

14   **315.**    Defendants, in violation of TX Title 7, Chapter 32, Sec 32.46, with intent to

15   defraud and harm Plaintiff, in the course of their business, by deception caused Plaintiff

16   to sign and execute a Deed of Trust and note that affected Plaintiff's property and her

17   pecuniary interest.

18   **316.**    Defendants deceived Plaintiff as to the relationships between the parties and the

19   status of those involved in the transactions, at the time and to follow. At no time before

20   closing was Thomas informed that either was to act as servicer, or given material facts

21   about the nature of the relationship between servicers and mortgagors. At no time was

22   Thomas made aware that the interests of servicers were not aligned with her interests.

23   Further, knowing at the time that Plaintiff suffered the temporary disability of being

1    unable to read the documents because of TIA's, both BOA and Countrywide lied about

2    the contents of the loan documents: both verified that escrow was waived; neither

3    informed Thomas that the documents contained escrow clauses. Defendants knew the

4    statements they made were false, and intended Plaintiff to rely on those false statements.

5    **317.**    Defendants misrepresented both the facts surrounding execution of the

6    documents and the contents of the documents they induced Plaintiff to sign. Defendants

7    led Plaintiff to believe that Countrywide Home Mortgage, Inc., was the mortgagee and

8    intended to remain the mortgagee, and that the financial interests of the parties were

9    aligned.

10    **318.**    Defendants prevented Plaintiff from acquiring the correct information that would

11    have likely caused Plaintiff's judgment to be sufficiently affected as to prevent the

12    purchase of a dwelling and acquiring a mortgage (TX Title 7, Chapter 31), and secured

13    execution of the mortgage documents including Note and Deed of Trust by deception.

14    (Sec. 32.46 (a)(1). Defendants prevented Plaintiff from acquiring the information that

15    Countrywide Home Loans, Inc., was not the sole and primary actor, the mortgage

16    owner/note holder. Defendants knowingly and deliberately prevented Plaintiff from

17    acquiring the information that the Deed of Trust provided a Trustee (CTC Real Estate

18    Services, which operates as a subsidiary of NB Holdings Corporation, a bank holding

19    company based in Charlotte, North Carolina, which operates as a subsidiary of Bank of

20    America Corporation), that MERS was a beneficiary under the security instrument

21    "acting solely as a nominee for Lender and Lender's successors and assigns," and that

22    there was an irrevocable Transfer of Rights in the Property to Trustee CTC Real Estate

1   Services, including the power of sale. Had Plaintiff been able to read the documents she

2   signed, she would not have signed them.

3   **319.**   Defendants failed to disclose that they had sold or intended to sell the mortgage

4   (securitize it); that they intended to act as servicers; that Plaintiff would be dealing with a

5   number of different entities; that Defendants' interests were in conflict to Plaintiffs

6   interests; that an escrow and other such clauses requiring specific performance were

7   written into the documents; that Defendants' goals included increasing their financial

8   gain; that Defendants would control all documents and all aspects related to the mortgage

9   and could alter them as they wished; that the documents gave Defendants control over

10   various options that would prove to be costly for Plaintiff and to exponentially increase

11   the amount of time and energy Plaintiff would have to expend dealing with the mortgage

12   and Defendants; and other such material facts.

13   **320.**   Defendants promised performance as mortgagors that they knew they would not

14   perform. Defendants knew that they intended to securitize the mortgage, thus increasing

15   their profits, and that they were going to act as servicers and further increase their profits.

16   **321.**   Plaintiff relied on the representations of Defendants and on their provision of

17   accurate, complete data, and acted in reliance on them. As a result, Plaintiff suffered

18   economic, physical and mental damages, for which Defendants' actions were the

19   proximate cause. The documents Defendants induced her to sign thorough fraud and

20   deception placed her under the control of mortgage servicers whose interests were

21   opposed to hers, and who were engaged in a pattern of practices designed to drive

22   mortgagors into foreclosure in order to maximize their profits.

1   **322.**   Because execution of the closing documents was secured by deception,

2   Plaintiff's consent was ineffective.

3   **323.**   Defendants secured execution of the note and Deed of Trust by deception, and

4   Defendants' deception proximately caused injury and damages to Plaintiff.

5   **324.**   Plaintiff seeks damages and all other relief for Defendants' actions.

6   **COUNT 2  FRAUDULENT LIEN**

7   **325.**   Plaintiff repeats and realleges and incorporates by reference the allegations in

8   paragraphs 1 through 324 above with the same force and effect as if herein set forth.

9   **326.**   Defendants, with intent to defraud Plaintiff, by deception caused Plaintiff to

10   execute a Deed of Trust and Note, for the property at 614 Briarwilde Court Alvin Tx,

11   thus creating a fraudulent lien or liens.

12   **327.**   Because of Defendants' deception, Plaintiff's consent was and is ineffective.

13   **328.**   Because Plaintiff's consent is not effective, the lien created thereby is fraudulent.

14   **329.**   Because the lien is fraudulent, neither note nor deed of trust can be used to seize

15   and sell Plaintiff's property.

16   **330.**   Because the lien is fraudulent, any assignment or other transfer is rendered

17   fraudulent or invalid or void.

18   **331.**   Defendants have used the fraudulent lien to effect a nonjudicial foreclosure and

19   are intending to use the fraudulent lien to seize and sell Plaintiff's property.

20   **332.**   Defendants' actions in creating, using, and attempting to continue using the

21   fraudulent lien is the proximate cause of injury to Plaintiff.

22   **333.**   Plaintiff seeks damages and all other appropriate relief, including injunctive

23   release and declaratory relief.

## COUNT 3 REFUSAL TO EXECUTE RELEASE
## OF FRAUDULENT LIEN OR CLAIM

**334.** Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 333 above with the same force and effect as if herein set forth.

**335.** Texas Penal Code 32.49 (a) A person commits an offense if, with intent to defraud or harm another, the person: (1) owns, holds, or is the beneficiary of a purported lien or claim asserted against real or personal property or an interest in real or personal property that is fraudulent, as described by Section 51.901(c), Government Code; and (2) not later than the 21st day after the date of receipt of actual or written notice sent by either certified or registered mail, return receipt requested, to the person's last known address, or by telephonic document transfer to the recipient's current telecopier number, requesting the execution of a release of the fraudulent lien or claim, refuses to execute the release on the request of: (A) the obligor or debtor; or (B) any person who owns any interest in the real or personal property described in the document or instrument that is the basis for the lien or claim. (b) A person who fails to execute a release of the purported lien or claim within the period prescribed by Subsection (a)(2) is presumed to have had the intent to harm or defraud another.

**336.** Defendants own, holds, or are the beneficiaries of a purported lien asserted against Plaintiff's real property at 614 Briarwilde Ct, Alvin TX, said lien in the form of Deed of Trust and Note, execution being induced by Defendants' deception and Plaintiff's consent to the lien rendered ineffective.

**337.** On receipt of Demand to Execute Release of Fraudulent Lien, Defendants refused to release the lien.

338.    Defendants refusal to execute release of the fraudulent lien is the proximate cause of injury to Plaintiff, and has caused Plaintiff to expend valuable time on dealing with Defendants and to be unable to participate in the normal events of daily life, pain and suffering, and other damages, for which Plaintiff seeks all available relief.

## COUNT 4 FRAUD BY MISREPRESENTATION AND NONDISCLOSURE

339.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 338 above with the same force and effect as if herein set forth.

340.    Defendants knowingly made false material representations concerning the mortgage and the closing documents to Plaintiff, with the intent that Plaintiff should act upon the representations and execute said documents; Plaintiff acted in reliance on the false material representations when executing the Deed of Trust and other documents, and as a result Plaintiff suffered damages.

341.    Defendants' false material representations included the assurance that buying a house with a Countrywide Home Loan, Inc., mortgage would solve a potential business and personal problem; that the purchase and subsequent actions would result in excellent personal credit standing to support her business' excellent credit standing; that Defendants would make the process easy for Plaintiff; that escrow was waived and that there was nothing in the closing documents that would create problems for Plaintiff; that the documents accurately represented the agreement of the parties as they had explained them to her, that Defendants' purpose and goal was to help Plaintiff.

342.    Plaintiff clearly understood from Defendants that Defendants' profits from the transaction derived from the interest charged for the mortgage, and from potential future business with Plaintiff and her corporations. Defendants deliberately failed to disclose

1    material information that would have affected Plaintiff's decisions in this matter. Absent

2    Defendants material misrepresentations and nondisclosure, Plaintiff would not have

3    executed the documents and entered into the loan agreement.

4    **343.**    Defendants represented that Countrywide Home Loans, Inc. (CHL) was the

5    mortgagee and would continue to be the mortgagee and owner of the note Plaintiff was

6    to execute. Defendants represented that CHL would handle any problems that arose.

7    Defendants represented that Plaintiff would not have to deal with any other person or

8    entity, that Plaintiff's mortgage payments were and would remain $939.09 per month,

9    that Plaintiff could self-insure or purchase insurance to cover the mortgaged property as

10    she chose and found most convenient, that all Plaintiff was required to do was set up

11    automatic mortgage payments, that CHL would send her confirmations that Plaintiff

12    would not even have to open because CHL would contact Plaintiff by phone if any

13    problem arose, that Plaintiff could pay off the note early without penalty, and that there

14    would be no changes. Defendants represented that Plaintiff was a valued customer and

15    friend, that Defendants fully understood Plaintiff's disabilities and difficulties as well as

16    Plaintiff's anxiety and reluctance to use a mortgage rather than paying cash, that it was

17    essential that Plaintiff do so in order to establish good personal credit to match her

18    company's excellent credit, and when informed about Plaintiff's inability to read as a

19    result of TIAs convinced Plaintiff that she should go ahead and execute the documents

20    based on their assurance that the documents contained all of the points agreed upon, and

21    only those points.

22    **344.**    Defendants continued the deception for many years, providing false information

23    and withholding information from Plaintiff again and again. This deception, false

1    information, and withholding of information included but is not limited to: Defendants

2    falsely informed Plaintiff that she was required to maintain insurance at limits that were

3    above the appraised value of the home, and Plaintiff complied. Defendants falsely

4    informed Plaintiff that they did not have proof of insurance, and Plaintiff provided such

5    proof over and over again.  Defendants falsely informed Plaintiff that they had not

6    received mortgage payments that were automatically paid and confirmed paid by BOA

7    BILLPAY through Plaintiff's checking account. Defendants falsified Plaintiff's

8    mortgage transaction statements, and manufactured a default. Defendants falsely asserted

9    that all discrepancies in their performance were the result of errors. Defendants falsely

10   asserted that they had made complete corrections. Defendants failed to notify Plaintiff

11   when the mortgage and/or note changed hands, as required by TILA. Defendants

12   manufactured default and falsely reported to credit bureaus that Plaintiff was delinquent.

13   **345.**    Defendants have now fraudulently claimed that Plaintiff is in default and intend

14   to sell her property, based on a fraudulent default and a fraudulent Deed of Trust and

15   note execution of which was secured by deception.

16   **346.**    Plaintiff relied on Defendants, and Defendants' fraud by misrepresentation and

17   nondisclosure was a proximate cause of injury and damages to Plaintiff.

18   **347.**    Plaintiff seeks damages and injunctive relief.

19                 **COUNT  5   BREACH OF FIDUCIARY DUTY**

20   **348.**     Plaintiff repeats and realleges and incorporates by reference the allegations in

21   paragraphs 1 through 347 above with the same force and effect as if herein set forth.

22   **349.**    There was a double fiduciary relationship between Defendants and Plaintiff.

23   Defendants, as servicers, owed a fiduciary duty to Plaintiff as borrower as specified

1    under Fannie Mae servicing contracts, and further, a separate fiduciary relationship

2    existed between Plaintiff and Defendants BOA/Countrywide by virtue of the special

3    relationship of trust Defendants deliberately established with Plaintiff, who maintained

4    significant business and personal accounts with Defendants and had a long-term

5    relationship with BOA, beginning with Nations Bank which acquired BankAmerica in

6    1998 and merged to become Bank of America NA.

7    **350.**    This fiduciary relationship was established first by Bank of America prior to

8    inducing Plaintiff to purchase a house and mortgage it, then BOA extended the

9    relationship to include Countrywide Home Loans, Inc.(CHL), by inducing Plaintiff to

10    seek a mortgage from CHL, and vouching for their reliability and suitability to the need

11    Defendant BOA convinced Plaintiff that she had, i.e. to establish a credit record to match

12    that of her business in order to qualify for accounts receivable financing from BOA.

13    **351.**    By engaging in their pattern of practices to increase their profits, all actions that

14    benefited themselves and not the Plaintiff, and acting against Plaintiff's interests,

15    Defendants breached their fiduciary duty.

16    **352.**    In Plaintiff's case as in almost every case filed against bank/servicers, Plaintiff

17    relied on the bank for accurate, truthful information and good faith and fair dealing,

18    because in part of Defendants' unrelenting efforts to invoke that reliance through

19    misrepresentation and withholding of significant, material facts.

20    **353.**    Plaintiff entrusted her financial affairs involving the mortgage to Defendants and

21    depended upon them to perform as they represented they would. Defendants induced

22    Plaintiff to rely on them, with misrepresentations and failure to provide material facts,

23    and acted to her harm.

354. Defendants executed transactions that benefitted themselves and not the Plaintiff, and acted in a way that undermined Plaintiff's stated expectations and goals, agreed to and, in some cases, created by Defendants. Taking full advantage of the trusting relationship Defendants established with Plaintiff, Defendants exerted undue influence to secure Plaintiff's execution of the mortgage contract and note. Defendants assured Plaintiff that the mortgage documents complied with the terms of her verbal understanding created by Defendants. In faxed memos before closing, Defendants confirmed "escrow was waived."

355. Defendants induced Plaintiff to acquire the mortgage, set up and make automatic mortgage payments in order to create a positive personal credit record, then deliberately manufactured defaults by fraudulent entries on the mortgage transaction, including showing late payments when the BILLPAY records show all payments timely made, and thereafter deliberately, repeatedly made false reports to credit bureaus to damage her credit.

356. Defendants, using their manufactured defaults, declared Plaintiff's regular mortgage payments as "partial payments," refused to apply them properly to principal and interest, and applied the payments to "escrow," for their financial gain.

357. Defendants created false charges which they posted as due under escrow and attempted to compel Plaintiff to pay these charges.

358. Defendants instituted a program of harassing telephone calls, letters, and emails, which they knew or should have known would prevent Plaintiff from carrying out her normal daily activities, and with which they damaged her health, with full knowledge of

1    the disabilities and how they affected performance when Plaintiff was distracted or

2    pressured.

3    **359.**    Absent the influence exerted by Defendants in their fiduciary relationship,

4    Plaintiff would not have signed the mortgage documents [note, deed of trust, etc.] to

5    begin with.

6    **360.**    Defendants were fully aware of Plaintiff's disabilities from stroke and TIA's,

7    knew that Plaintiff could not read the closing documents, and deliberately lied to her not

8    only about the document contents, but about the entire status of the loan: Defendants

9    knew that they were not the mortgagee, knew that they were intent on being servicers,

10    knew that their financial interests were opposed to Plaintiff's, and knew about the pattern

11    of practices they intended to continue after Plaintiff entered the mortgage agreements.

12    Further, Defendants carefully made sure that Plaintiff did not know these material facts.

13    **361.**    Plaintiff had a right to expect good faith, fair and honest dealing from

14    Defendants, and Defendants breached their fiduciary duty to Plaintiff.

15    **362.**    Defendants' breach of fiduciary duty to Plaintiff caused both injury to the

16    Plaintiff and benefit in the form of profits to the Defendants.

17    **363.**    Defendants' breach of fiduciary duty was a proximate cause of injury to Plaintiff,

18    and Plaintiff seeks damages and other relief.

19                      **COUNT 6  MISAPPLICATION OF FIDUCIARY PROPERTY**

20    **364.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

21    paragraphs 1 through 363 above with the same force and effect as if herein set forth.

22    **365.**    The mortgage payments Defendants received from Plaintiff are fiduciary

23    property.

1    **366.**   Defendants BOA/Seterus, fiduciaries to Thomas, misapplied Thomas' timely,

2    accurate mortgage payments to the fraudulent charges Defendants created to create a

3    manufactured default.

4    **367.**   Defendants' misapplication of Plaintiff's mortgage payments amounts to theft.

5    **368.**   Defendants intentionally, knowingly, or recklessly misapplied property held as a

6    fiduciary or property of a financial institution in a manner that involved and continues to

7    involve substantial risk of loss to Plaintiff, the owner of the property, or to a person for

8    whose benefit the property is held [Sec. 32.45 Texas Penal Code].

9    **369.**   The fraudulent lien is held as a fiduciary. The posting of fraudulent fees and

10    penalties to Thomas' fraudulent escrow account also represents misapplication of

11    fiduciary property.

12    **370.**   As a result of their misapplication of fiduciary property and subsequent actions,

13    Defendants damaged Plaintiff's credit standing, cost her time and money dealing with

14    their depredations, injured her health, and threaten the loss of her property through

15    fraudulent foreclosure and sale.

16    **371.**   Defendants' misapplication of fiduciary property is a proximate cause of injury

17    to Plaintiff, and Plaintiff seeks damages and all other appropriate relief.

18                        **COUNT 7   COMMERCIAL BRIBERY**

19    **372.**   Plaintiff repeats and realleges and incorporates by reference the allegations in

20    paragraphs 1 through 371 above with the same force and effect as if herein set forth.

21    **373.**   BOA/Seterus, fiduciaries to Thomas, without consent of Thomas, intentionally

22    or knowingly solicited, accepted, or agreed to accept benefits from another person on

23    agreement or understanding that the benefit would influence the conduct of the fiduciary

1     in relation to the affairs of his beneficiary; and offered, conferred, or agreed to confer

2     benefits the acceptance of which is an offense under Subsection (b) [Sec. 32.43 Texas

3     Penal Code] [SEE ALSO Subchapter E, Sec. 12.51, Authorized Punishments for

4     Corporations and Associations].

5     **374.**    The now publicly known kickback arrangements for forced placed insurance and

6     the exclusive monopolistic contracts from which Defendants profited, against the

7     interests of Plaintiff, are violations of the Commercial Bribery statutes.

8     **375.**    Further, the services provided to Defendants BOA/Seterus by the insurer,

9     including their access to financial and other confidential records of Thomas and other

10    mortgagors, are a significant factor in not only the financial benefits to the parties, but to

11    their ability to carry out their criminal activities.

12    **376.**    BOA/Seterus' conduct as fiduciaries was substantially influenced by their

13    intended financial gains and significantly negatively affected Thomas' affairs and

14    Thomas personally.

15    **377.**    Defendants' violation of the commercial bribery statutes are a proximate cause

16    of injury to Plaintiff; therefore Plaintiff seeks damages and all other appropriate relief.

17    <u>**COUNT 8  BREACH OF CONTRACT, ORAL AND WRITTEN**</u>

18    **378.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

19    paragraphs 1 through 377 above with the same force and effect as if herein set forth.

20    **379.**    Thomas agreed to secure a mortgage to purchase the home in order to secure a

21    personal credit reference to match her business credit references so Defendant BOA could

22    sell her company A/R financing, and Defendants agreed to provide a care-free mortgage

1     period, with automatic payments and nothing to distract Plaintiff or to expend her valuable

2     time – no worries, no hassle. Thomas made a 20% down payment and increased her

3     corporate business with Defendant BOA.

4     **380.**     The written contract lacked the promised consideration. Under Texas law, a

5     contract that lacks consideration is unenforceable. Federal Sign v. Texas S. Univ., 951

6     S.W.2d 401, 409 (Tex. 1997), superseded on other grounds by Tex. Gov't Code §§

7     2260.001-008. Consideration is a bargained-for exchange of promises that involves

8     benefits and detriments to both parties to the contract. Id. Lack of consideration occurs

9     when the contract, at its inception, does not impose obligations on both parties. See City

10     of the Colony v. North Tex. Mun. Water Dist., 272 S.W.3d 699, 733 (Tex. App.—Fort

11     Worth 2008).

12     **381.**     At its inception, the written contract imposed obligations on Plaintiff that were

13     exactly the opposite of those to which she agreed. Further, the consideration promised by

14     Defendants was lacking in that the written agreement contained specific items that were

15     promised to be absent, and that created an onerous burden on Plaintiff in opposition to the

16     promises made by Defendants, upon which Plaintiff relied.

17     **382.**     Plaintiff provided the consideration she promised, as is demonstrated in her

18     BILLPAY records of monthly mortgage payments. Defendants did not intend to uphold

19     their promises and did not thereafter uphold those promises, except that Countrywide

20     Home Loans, Inc., did not engage in the specific practices of BOA and Seterus for the first

21     7 years, although CHL did fail to book the double payments, or BOA altered the mortgage

22     transaction reports to remove them.

1    **383.**    Defendants' failures are the proximate cause of injury to Plaintiff, and Plaintiff

2    seeks damages and other appropriate relief.

3    **COUNT 9 UNREASONABLE COLLECTION EFFORTS**

4    **384.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

5    paragraphs 1 through 383 above with the same force and effect as if herein set forth.

6    **385.**    Plaintiff does not owe the debt asserted by Defendants. Plaintiff has made all

7    mortgage payments timely and in full, and has overpaid the mortgage as a result of double

8    payments in the first two years. Defendants owe Plaintiff the overpayments.

9    **386.**    In efforts to compel Plaintiff to pay the fraudulent charges manufactured by

10    Defendants which Plaintiff did not owe, Defendants engaged in a course of harassment

11    that was willful, wanton, malicious, and intended to inflict mental anguish and bodily

12    harm. Plaintiff found Defendant BOA's collection activities so unreasonable that she

13    notified BOA and began billing for the time and trouble involved in trying to resolve these

14    problems. Exhibit 23-C documents 36 collection calls, for example, with 5 of those calls

15    between 8:20 AM and 3:27 PM on 2/11/11. These frequent interruptions prevented

16    Plaintiff from completing tasks, because of her handicaps and inability to recapture work

17    in progress at the interruption point.

18    **387.**    Among the most egregious of these unreasonable collection efforts has been

19    Defendants' cyclic repeated threats of foreclosure and sale of the property, each time

20    forcing Plaintiff to sustained, intensive effort resulting in inability to complete her usual

21    and customary tasks because of the responses and action required by Defendants' attempts

22    to collect the fraudulent debt they have manufactured.

388.    Defendants most egregious unreasonable collection effort is the current foreclosure and notice of sale of Plaintiff's property, have caused Plaintiff to concentrate exclusively on preparing this suit to prevent Defendants from succeeding in their criminal activities since Plaintiff received notice. Plaintiff continues to invoice Defendants and will ask payment of all invoices as part of the damages proximately caused by Defendants' actions.

389.    Defendants have caused proximate damages to Plaintiff by their actions, and Plaintiff seeks damages and all other appropriate relief.

## COUNT 10 FRAUDULENT DESTRUCTION, REMOVAL, OR CONCEALMENT OF WRITING

390.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 389 above with the same force and effect as if herein set forth.

391.    Texas Penal Code 32.47 (a) "A person commits an offense if, with intent to defraud or harm another, he destroys, removes, conceals, alters, substitutes, or otherwise impairs the verity, legibility, or availability of a writing, other than a governmental record. (b) For purposes of this section, "writing" includes: (1) printing or any other method of recording information."

392.    Defendants, with intent to defraud or harm Plaintiff, destroyed, removed, concealed, altered, substituted, or otherwise impaired the verity, legibility, or availability of a writing, including Plaintiff's mortgage transaction records and other records relating to the mortgage and or payments of the mortgage, to the insurance proofs and other such documents, and the mortgage history, including ownership of Deed of Trust and Note.

393.    Defendants' actions were the proximate cause of injury to Plaintiff as herein set forth, and Plaintiff seeks damages, and all other appropriate relief.

## COUNT 11 DECEPTIVE BUSINESS PRACTICES

**394.**    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 393 above with the same force and effect as if herein set forth.

**395.**    Texas Penal Code 32.42 – Deceptive Business Practices  "(b) A person commits an offense if in the course of business he intentionally, knowingly, recklessly, or with criminal negligence commits one or more of the following deceptive business practices: (12) making a materially false or misleading statement: (B) otherwise in connection with the purchase or sale of property or service."

**396.**    Defendants intentionally, knowingly, recklessly, or with criminal negligence made materially false or misleading statements in connection with the purchase or sale of property and services, when Defendants induced Plaintiff to execute the mortgage documents; when Defendants indicated that Defendants were mortgagees rather than servicers, and when Defendants falsely identified the owners of Plaintiff's note and/or deed of trust.

**397.**    Defendants made materially false or misleading statements in Assignment of Deed of Trust and in Appointment of Substitute Trustee.

**398.**    Defendants made materially false or misleading statements in Plaintiff's documents, during the servicing period, and when asserting Plaintiff was in default, in nonjudicial foreclosure, and noticed Sale of Plaintiff's property.

**399.**    Defendants have violated Texas Penal Code 32.42; Defendants' deceptive business practices are the proximate cause of injury to Plaintiff, and Plaintiff seeks appropriate relief.

## COUNT 12 FORGERY

1    **400.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

2    paragraphs 1 through 399 above with the same force and effect as if herein set forth.

3    **401.**    Texas Penal Code 32.21 – Forgery  (a) For purposes of this section:

4    (1) "Forge" means: (A) to alter, make, complete, execute, or authenticate any writing so

5    that it purports: (i) to be the act of another who did not authorize that act;

6    (ii) *to have been executed at a time or place or in a numbered sequence other than was in*

7    *fact the case; or (B) to issue, transfer, register the transfer of, pass, publish, or otherwise*

8    *utter a writing that is forged within the meaning of Paragraph (A); or (C) to possess a*

9    writing that is forged within the meaning of Paragraph (A) with intent to utter it in a

10    manner specified in Paragraph (B). (2) "Writing" includes: (A) *printing or any other*

11    *method of recording information.* **(b) A person commits an offense if he forges a**

12    **writing with intent to defraud or harm another.**

13    **402.**    Defendants forged mortgage transactions and passed them to each other for use

14    in defrauding Plaintiff, with the intent to defraud or harm Plaintiff.

15    **403.**    Upon information and belief, within the meaning of this chapter, Defendants

16    forged assignments and other documents purporting to prove or demonstrate ownership of

17    Plaintiff's Deed of Trust and Note, and used those forged documents to declare Plaintiff in

18    default, to execute a nonjudicial foreclosure and seize to sell Plaintiff's property.

19    **404.**    Defendants' actions are the proximate cause of injury to Plaintiff, and Plaintiff

20    seeks appropriate relief.

21    <u>**COUNT 13 THEFT**</u>

22    **405.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

23    paragraphs 1 through 404 above with the same force and effect as if herein set forth.

1   **406.**   Texas Penal Code 31.03 – Theft (a) A person commits an offense if he

2   unlawfully appropriates property with intent to deprive the owner of property.

3   **407.**   (b) Appropriation of property is unlawful if: (1) it is without the owner's

4   effective consent   Consent is not effective if: (A) induced by deception or coercion; (4)

5   "Appropriate" means: (A) to bring about a transfer or purported transfer of title to or other

6   nonpossessory interest in property, whether to the actor or another

7   **408.**   Defendants unlawfully appropriated Plaintiff's property in the form of her

8   mortgage payments and converted them to their use by misapplying the payments to

9   fraudulent escrow charges to Defendants' benefit.

10   **409.**   Defendants unlawfully appropriated Plaintiff's home by fraudulent nonjudicial

11   foreclosure based on a false, manufactured default created by Defendants, brought about a

12   purported transfer of title, and intend to deprive Plaintiff of her property by selling it on

13   June 6, 2017.

14   **410.**   Defendants' actions are the proximate cause of injury to Plaintiff, and Plaintiff

15   seeks appropriate relief.

16   **COUNT 14 THEFT OF SERVICE**

17   **411.**   Plaintiff repeats and realleges and incorporates by reference the allegations in

18   paragraphs 1 through 410 above with the same force and effect as if herein set forth.

19   **412.**   **Texas Penal Code 31.04 – Theft of Service** (a) A person commits theft of

20   service if, with intent to avoid payment for service that the actor knows is provided only

21   for compensation: (1) the actor intentionally or knowingly secures performance of the

22   service by deception, threat, or false token

413.     Defendants by their actions have compelled Plaintiff to provide services for which Plaintiff charges billable time. Defendants' pattern of practices were intended, in part, to expend Plaintiff's and others' time, energy, and resources and frustrate borrowers to the point that Plaintiff and others would finally just give in. They intended to waste Plaintiff's resources, acted egregiously to do so, and as actually knowingly stole usable, workable time from Plaintiff.

414.     Defendants were noticed that their actions caused Plaintiff to expend the time on services related to Defendants' intransigency and deliberate wrongdoing, and that they would be billed for the services at Plaintiff's usual and customary rates. Defendants knew that Plaintiff's services required by Defendants' actions would be provided only for compensation.

415.     Defendants continued their actions; Plaintiff expended the required billable hours, and invoiced Defendants. Plaintiff's billable hours service performance was secured by Defendants repeated threats and deception.

416.     Defendants refused to pay for the services expended as a result of Defendants' intransigency.

417.     Because Defendants usurped the time, Plaintiff was unable to effectively use that time for other billable work. Time is a valuable commodity, particularly when a disabled individual is required to continue functioning at a high level in reduced circumstances. Further, time is not replaceable, particularly when one approaches old age.

418.     Defendants theft of services was the proximate cause of injury to Plaintiff, and Plaintiff seeks damages in the form of payment for Plaintiff's invoices for the work caused by Defendants' deception and threats, and for other appropriate relief.

## COUNT 15 TEXAS CIVIL PRACTICE AND REMEDIES
## CODE § 12.002. LIABILITY

**419.**     Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 418 above with the same force and effect as if herein set forth.

**420.**     (a) A person may not make, present, or use a document or other record with: (1)  knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property; (2)  intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property;  and (3)  intent to cause another person to suffer: (A)  physical injury; (B)financial injury;  or (C)  mental anguish or emotional distress.

**421.**     Defendants have made, presented, and used documents with knowledge that the Note and Deed of Trust are a fraudulent lien against Plaintiff's real property, woth intent that the documents evidence a valid lien or claim against Plaintiff's real property, and with intent to cause Plaintiff to suffer financial injury and mental anguish or emotional distress.

**422.**     In the case of a fraudulent lien or claim against real or personal property or an interest in real or personal property, the obligor or debtor, or a person who owns an interest in the real or personal property may bring an action to enjoin violation of this chapter or to recover damages under this chapter.

**423.**     Defendants' action are the proximate cause of injury to Plaintiff, and Plaintiff seeks to enjoin Defendants from actions to sell Plaintiff's property, and for damages for

1    financial injury and for mental anguish and emotional distress, and for any other

2    appropriate relief.

3    **COUNT 16  DUTY OF GOOD FAITH AND FAIR DEALING**

4    **424.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

5    paragraphs 1 through 423 above with the same force and effect as if herein set forth.

6    **425.**    The Texas Supreme Court has recognized certain "special relationships" that give

7    rise to the duty of good faith and fair dealing. Aranda v. Insurance Co. of North America,

8    748 S.W.2d 210, 212, 213 (Tex. 1988); Arnold v. National County Mut. Fire Ins. Co., 725

9    S.W.2d 165, 167 (Tex. 1987). This duty may arise from the express language of a contract

10    or from the nature of the relationship between the parties, **where it entails unequal**

11    **bargaining power and the likelihood of abuse by the more powerful party.** Lovell v.

12    Western Nat'l Life Ins. Co., 754 S.W.2d 298, 302 (Tex. App.--Amarillo 1988,writ denied).

13    **426.**    The fiduciary relationship between Defendants and Plaintiff created a duty of

14    good faith and fair dealing.

15    **427.**    The relationship between servicers and mortgagors is such that it entails unequal

16    bargaining power and the likelihood of abuse by the more powerful party, particularly

17    with the financial incentives for abuse and the total control servicers exert over the entire

18    mortgage process, accounting, and file maintenance.

19    **428.**    Texas finds as a matter of law that no duty of good faith and fair dealing exists

20    between mortgagors and mortgagees, but the relationship between servicers and

21    mortgagors is not the same relationship as that between mortgagors and mortgagees.

22    **429.**    Defendants owed Plaintiff a duty of good faith and fair dealing, and materially

23    breached that duty by their actions as incorporated herein.

1    **430.**    Defendants' breach of the duty of good faith and fair dealing is the proximate

2    cause of injury to Plaintiff, and Plaintiff seeks damages and all other available relief.

3                             **COUNT 17 DEFAMATION**

4    **431.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

5    paragraphs 1 through 430 above with the same force and effect as if herein set forth.

6    **432.**    Knowing the information was false or acting with reckless disregard for the

7    statements' truth or falsity, Defendants knowingly and willfully published to credit

8    reporting agencies false and defamatory information when they stated that Plaintiff was in

9    default on her loan.

10   **433.**    Further, when Defendants published or caused to be published notice of

11   Acceleration of Maturity and Notice of Non-Judicial Foreclosure Sale, including posting

12   at the courthouse door of Brazoria County, TX, Defendants knew or should have known

13   such information in various public accessible locations, Defendants knew that Plaintiff

14   was not in default.

15   **434.**    These falsehoods unambiguously created the false impression that Plaintiff failed

16   to comply with contractual obligations; that Plaintiff's financial status was impaired; and

17   impaired Plaintiff's credit and financial standing as well as her personal reputation for

18   honesty and fair dealing; injured Plaintiff's business and professional standing and

19   impaired her ability to adequately perform and to maintain positive relationships in the

20   business world.

21   **435.**    Further, Defendant's publication of these falsehoods subjected Plaintiff to

22   interruptions, inappropriate contacts, embarrassment and humiliation from third parties

23   whose business interests relate to those who are unable to pay mortgages. Plaintiff has

1    been subjected to numerous unwanted cell phone calls from these parties, causing a waste

2    of Plaintiff's time and resources.

3    **436.**    Defendants caused the false and defamatory information to be published in a

4    further attempt to extort payment of the fraudulent charges from Plaintiff, as Defendants

5    previously threatened, before June 6, 2017, as stated in Marinosci Law Group PC's

6    certified letter of 4/21/17 to Plaintiff ("This is an attempt to collect a debt." P. 2).

7    **437.**    Defendants' actions are the proximate cause of injuries to Plaintiff, and Plaintiff

8    seeks damages and all other appropriate relief.

9    <u>**COUNT 18  INSURANCE FRAUD**</u>

10    **438.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

11    paragraphs 1 through 437 above with the same force and effect as if herein set forth.

12    **439.**    Defendants' alleged purchases of lender or force placed insurance were

13    fraudulent, because they knowingly duplicated Plaintiff's coverages while falsely

14    claiming Plaintiff was uninsured; because Defendants misrepresented to Plaintiff the

15    amount of coverage she was required to maintain; because Defendants required Plaintiff

16    to purchase insurance at limits higher than the insurable interest; because Defendants'

17    exclusive contractor, the insurer, claimed not to have proof of insurance after Plaintiff had

18    just previously received a new face sheet showing Defendant as mortgagee.

19    **440.**    Defendants converted Plaintiff's mortgage payments and applied them against

20    this fraudulent insurance.

21    **441.**    A lender's insurable interest is limited to the amount of the outstanding loan at

22    the time insurance is purchased. Defendants consistently force placed insurance with

23    limits that exceeded the lender's insurable interest, and charged the premium in whole to

1  Plaintiff, while having in their possession proof of adequate insurance.

2  **442.**    Then Defendants attempted by threats and harassment to compel Plaintiff to pay

3  for fraudulent insurance, since by law the lender could not collect more than the insurable

4  interest. Specifically, Defendant BOA fraudulently attempted to compel Plaintiff to

5  purchase insurance coverage in the amount of $250,000 or more, when the total loan

6  amount was $110,400 *at inception*, and at times when the insurable interest was much less

7  than the original loan. Defendants purchased lender insurance in these excessive amounts

8  while at the same time Plaintiff maintained insurance coverage on the property.

9  **443.**    Plaintiff at all times maintained insurance on the property, and refused to pay

10  Defendants the fraudulent charges.

11  **444.**    When Plaintiff complied with Defendants' demands for excessive coverage, and

12  increased the limits on her own policies, Plaintiff paid insurance costs over what she

13  should have paid because of their fraud and misrepresentations. Because of Plaintiff's

14  disabilities and Defendants' misrepresentations, she did not realize that the coverage was

15  excessive.

16  **445.**    Defendants have previously referenced Fannie Mae agreements as requiring

17  replacement value insurance by contract with servicers; however, a contractual provision

18  that is contrary to law is invalid, and Defendants, with their experience in the insurance

19  industry, knew or should have known that insurable interest rulings trump contractual

20  provisions.

21  **446.**    Defendants applied fraudulent insurance charges to a fraudulent escrow, then

22  used these charges to attempt to increase Plaintiff's mortgage payments, and

23  manufactured a fraudulent default.

1    **447.**    Defendants then used these defaults to place Plaintiff's property in a high risk

2    rating, because of Plaintiff's alleged default, deliberately causing an increase in rating and

3    premiums, not only in Plaintiff's insurance for the mortgaged property, but for all of

4    Plaintiff's other insurance.

5    **448.**    That Defendants received kickbacks for force placed insurance is a matter of

6    common knowledge after various class actions involving Defendants. Because of those

7    suits and settlements, after 2012 Defendants should have received no kickbacks. However,

8    the monetary kickbacks for Plaintiff's alleged lender placed insurance may not be relevant,

9    because Plaintiff has seen no proof of Defendants' alleged payments for such insurance

10   that they have from time to time billed Plaintiff.

11   **449.**    Although Defendants may not at this time be receiving money as insurance

12   kickbacks, exclusive contracts with insurance providers such as QBE allegedly provide

13   that QBE provides administrative services at reduced rates, which is a form of exchange

14   of monetary value.

15   **450.**    While requiring insurance at limits above the insurable interest is fraudulent,

16   Defendants' usual and customary practice of backdating insurance, allegedly to cover

17   their violations of their servicing contracts, is a more serious fraud, involving either

18   attempts for Defendants to collect for damages incurred during an insurance lapse, a

19   hidden source of income if Defendants and insurors collaborate, or deliberate efforts to

20   compel Plaintiff and others to pay for services not rendered, and at excessively high rates.

21   **451.**    An act that is illegal for an individual cannot be legal for a corporation or other

22   entity, including the RICO enterprise Plaintiff alleges Defendants are involved in. Plaintiff

23   has seen no reports on investigations into insurance claims and payments Defendants may

1    have received under force placed insurance, but the opportunity for abuse is apparent.

2    **452.**    Defendants' actions re insurance and insurance fraud are a proximate cause of

3    injury to Plaintiff, and Plaintiff seeks damages and all other appropriate relief.

4    <u>**COUNT 19 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

5    **453.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

6    paragraphs 1 through 452 above with the same force and effect as if herein set forth.

7    **454.**    Defendants in their conduct of their enterprise and activities acted intentionally to

8    inflict emotional distress on Plaintiff. Their conduct, and the conduct of their employees,

9    contractors, agents and assigns, was extreme and outrageous, repetitive, cyclic, and

10    specifically designed to create massive stress and disruption in the lives of Plaintiff and

11    others, as part of their scheme to increase their profits by compelling Plaintiff to pay their

12    fraudulent charges.

13    **455.**    Their deliberate creation of confusion, errors, denials, nonsensical responses and

14    other tactics and practices was designed to inflict emotional distress, and they succeeded.

15    **456.**    Their pattern of practices, creation of "errors," "correcting" errors, leaving errors

16    and repeating; their constant pressure and harassment, threats and interruptions; their actions

17    in fraudulently falsifying Plaintiff's mortgage transactions; and other such tactics inflicted

18    extreme emotional distress on Plaintiff.

19    **457.**    Because of Plaintiff's disabilities and the difficulties of her life dealing with a

20    critically, chronically ill child, Defendants' actions caused Plaintiff to suffer extreme, severe

21    emotional distress, such that Plaintiff developed an anxiety disorder, required medication,

22    and at one point was hospitalized with high blood pressure as a direct result of Defendants'

23    actions.

1    **458.**    Defendants' actions are a proximate cause of injuries to Plaintiff, and Plaintiff seeks

2    damages and all other appropriate relief.

3    **COUNT 20 COMMON LAW CONSPIRACY**

4    **459.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

5    paragraphs 1 through 458 above with the same force and effect as if herein set forth.

6    **460.**    Defendants engaged in a common law conspiracy against Plaintiff.

7    **461.**    The Defendants (a) had an object to be accomplished (to increase their profits); (b)

8    had an agreement on the object or course of action, to wit, to increase their profits, and in

9    this case to first increase profits by collection of fraudulent charges, then to manufacture

10   mortgage defaults, foreclose and sell/buy the foreclosed properties, thus depriving Thomas

11   of her property rights, (c) performed one or more unlawful overt acts including but not

12   limited to creating and posting fraudulent charges to mortgage transactions, demanding

13   payments, misrepresenting insurance requirements, manufacturing defaults, foreclosing and

14   selling/attempting to sell Plaintiff's property; and (d) caused Plaintiff damages that were a

15   direct result of those acts.

16   **462.**    Defendants' actions are a proximate cause of Plaintiff's injuries, and Plaintiff seeks

17   damages and all other appropriate relief.

18

19   **COUNT 21 FAIR CREDIT REPORTING ACT (FRCA) VIOLATIONS**

20   **463.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

21   paragraphs 1 through 462 above with the same force and effect as if herein set forth.

22   **464.**    Defendants violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 ("**FCRA**").

1    **465.**    Defendants BOA and Seterus are debt collectors. Defendants acknowledged that

2    they are debt collectors on their correspondence to Plaintiff.

3    **466.**    Defendants knowingly supplied false and inaccurate information to CRAs,

4    misstating balances due, reporting late payments when timely payments were made, and

5    reporting that Plaintiff was in default on her mortgage loan.

6    **467.**    Defendants failed to notify every CRA that Plaintiff disputed the debt, failed to

7    submit corrected information, failed to refrain from continuing to submit information

8    Defendants knew or should have known was incorrect, and failed to investigate and inform

9    Plaintiff of the dispute's resolution.

10    **468.**    As a result of Defendants' FRCA violations, Plaintiff's reputation and credit

11    standing was impaired, and Plaintiff was subjected to increased rates for services and goods

12    from those who use credit rating to determine rates and fees, including insurance on

13    Plaintiff's mortgaged property, and all other insurance Plaintiff required.

14    **469.**    Defendants' actions are a proximate cause of injuries to Plaintiff, and Plaintiff seeks

15    damages and all other appropriate relief.

16    ## COUNT 22, TRUTH IN LENDING ACT (TILA)

17    **470.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

18    paragraphs  1 through 469 above with the same force and effect as if herein set forth.

19    **471.**    Section 131(g) of the Truth in Lending Act (TILA) requires that consumers be

20    notified of the sale or transfer of their mortgage loans.

21    **472.**    A purchaser or assignee that acquires a loan is required to provide the disclosures in

22    writing no later than 30 days after the date on which the loan was sold, transferred or

23    assigned.

1     **473.**     The disclosures must state (1) The name, address, and telephone number of the new

2     owner; (2) the transfer date; (3) the name, address, and telephone number of an agent or

3     other party authorized to receive the consumer's rescission notice and resolves issues

4     concerning the consumer's payments on the loan (if other than owner); and (4) where the

5     transfer of ownership is recorded.

6     **474.**     The requirement applies to any person or entity that acquires ownership of an

7     existing consumer mortgage loan.

8     **475.**     MERS as nominee is not the owner of the loan. As a nominee, it serves as a

9     convenient fictional concept for its members and founders. MERSCORP is a private

10    corporation; it is subject to federal law. If members of MERS transferred ownership among

11    themselves while maintaining the fiction of MERS registration, that does not relieve the

12    actual owner of the loan of the responsibility to comply with federal law.

13    **476.**     Defendants failed to provide this notice or notices as required by federal law. As

14    servicers, Defendants act for the owners, handling all communications with the borrowers,

15    providing various notices and meeting other requirements. It was Defendants' duty to ensure

16    that notices of change of ownership were timely provided to Plaintiff.

17    **477.**     As a result, Plaintiff did not know the owner of the mortgage, whether note or Deed

18    of Trust, and cannot proceed against that owner with surety. Nor did Plaintiff have the

19    benefit of seeking assistance from the owner(s).

20    **478.**     Defendants withheld material information that might have lessened Plaintiff's

21    injuries.

22    **479.**     Defendants' actions are a proximate cause of injury to Plaintiff, and Plaintiff seeks

23    damages and all other appropriate relief.

## COUNT 23 FEDERAL VIOLATIONS IN RICO ACTIVITIES

### (Counts grouped for clarity)

**480.**     Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 479 above with the same force and effect as if herein set forth.

**481.**     Plaintiff asserts that the actions of Defendants, individually, jointly and severally, as described herein and above, are flagrant violations of the following federal statutes or, as part of the pattern of Defendants' practices materially contribute to Defendants' flagrant violations of these and other statutes in their RICO enterprise:

**18 U.S. Code § 225 - Continuing financial crimes enterprise;**

**18 U.S. Code § 286 - Conspiracy to defraud the Government with respect to claims;**

**18 U.S. Code § 287 - False, fictitious or fraudulent claims;**

**18 U.S. Code § 371 - Conspiracy to commit offense or to defraud United States;**

**18 U.S. Code § 656 - Theft, embezzlement, or misapplication by bank officer or employee [Willful misapplication];**

**18 U.S. Code § 657 - Lending, credit and insurance institutions [Willful misapplication];**

**18 U.S. Code § 894 - Collection of extensions of credit by extortionate means;**

**18 U.S. Code § 1005 - Bank entries, reports and transactions [false entries];**

**18 U.S. Code § 1018 - Official certificates or writings;**

**18 U.S. Code § 1031 - Major fraud against the United States;**

**18 U.S. Code § 1033 - Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce;**

1    **18 U.S. Code § 1341 – Mail Fraud**

2    **18 U.S. Code § 1343 - Fraud by wire, radio, or television;**

3    **18 U.S.C. § 1962(c),  18 U.S.C. § 1962(d) Prohibited Activities RICO/racketeering**

4

5    **482.**    Plaintiff further asserts that the prosecution of Plaintiff's suit will elicit evidence of

6    these and other violations. Certain of these violations relate more closely to Plaintiff and

7    Defendants' actions against her. These are violations of 18 U.S. Code § 656 - Theft,

8    embezzlement, or misapplication by bank officer or employee [Willful misapplication];

9    18 U.S. Code § 657 - Lending, credit and insurance institutions [Willful misapplication];

10    18 U.S. Code § 894 - Collection of extensions of credit by extortionate means;

11    18 U.S. Code § 1005 - Bank entries, reports and transactions [false entries];

12    **483.**    Pursuant to 18 U.S. Code § 656, Defendants willfully misapplied Plaintiff's

13    moneys, funds, and assets intrusted to the custody of Bank of America, in the form of

14    mortgage payments made to be timely applied to principal and interest, and by converting

15    them to their use, stole them.

16    **484.**    Pursuant to 18 U.S. Code § 657, Defendants willfully misapplied Plaintiff's

17    moneys, funds, and assets intrusted to the care of Bank of America, in the form of mortgage

18    payments made to be timely applied to principal and interest.

19    **485.**    Pursuant to 18 U.S. Code § 894, Defendants knowingly participated and conspired

20    to do so, in the use of extortionate means to collect a fraudulent debt and to punish Plaintiff

21    for alleged nonrepayment of the fraudulent debt, through threats to use criminal means

22    (unlawful seizure; unlawful foreclosure; fraud) to cause harm to Plaintiff through the

23    fraudulent foreclosure and seizure and sale of her property.

486.    Pursuant to 18 U.S. Code § 1005, Defendants made false entries in "any book, report, or statement of such bank" with intent to injure or defraud "any individual person," i.e., Plaintiff, when they falsified Plaintiff's mortgage transaction records and manufactured defaults, altered or falsified Plaintiff's tax documents, and creatively used Plaintiff's and others' data in their creative accounting and in support of their false claims. Exactly how these falsifications figured in the larger aspects of Defendants' accounting and filing requirements is not now known to Plaintiff, but since Defendants are responsible for providing tax documents for filing to IRS, and since one of those documents requires an accurate accounting of interest paid annually by Plaintiff, and others assuredly require interest received by Defendants, Defendants' falsification of records, including mortgage transaction reports, had to have had other repercussions in the accounting systems.

487.    Plaintiff's damages are a small chip off an iceberg of money moved by Defendants and their RICO enterprise. That the financial returns must be enormous is made clearly evident by consideration of the vast, to Plaintiff, sums Defendants have already paid out in settlements, fines, and other costs associated with Defendants' activities in the loan industry. (See Exhibit , A Partial List of BOA Payouts approximating $86 billion Oct. 2008- March 2014). Considering that payout and the fact that Defendants and their RICO associates *continue* to operate in the same fashion for the same goals regardless leads a logical person to believe that the financial rewards Defendants are reaping outweigh the costs. For this "game" to be worth it, there must be other rewards than fees, charges, or even the resale value of the properties involved. That those rewards lie somewhere in the banking records of the RICO actors and in the entities with which they are associated is apparent.

1    **488.**    Defendants' actions are the proximate cause of injuries to Plaintiff, and Plaintiff

2    seeks damages, and all other appropriate relief.

3

4    **COUNT 24 VIOLATION OF RACKETEER INFLUENCED AND**

5    **CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962 (c) and (d)**

6

7    **489.**    Plaintiff repeats and realleges and incorporates by reference the allegations in

8    paragraphs 1 through 488 above with the same force and effect as if herein set forth.

9    **490.**    Defendants violated RICO statutes. The RICO enterprise, which engaged in the

10    pattern of practices and the activities of which affected interstate commerce, was comprised

11    of an association in fact of entities and individuals that included the Defendants and other as

12    yet unnamed entities and individuals, and operated as a continuing financial crimes

13    enterprise.

14    **491.**    The members of the RICO enterprise had a common purpose: to increase and

15    maximize their revenues, and they engaged in a pattern of practices in the financial and

16    mortgage and mortgage servicing industries to accomplish that goal, controlling every aspect

17    from the money-lending to start a mortgage to securitizing, to manufacturing defaults to

18    foreclose on the properties.

19    **492.**    At all relevant times, Defendants were associated with the enterprise and agreed and

20    conspired to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). Defendants agreed to

21    conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise

22    through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

23    **493.**    Defendants' association included exceptionally profitable exclusive relationships,

24    collusive activities, and circular arrangements among the banks, mortgage lenders and

1      servicers, their affiliates, and their cooperating insurers, as well as "sales" of affiliates,

2      together with retention of all employees, to divert suspicion and provide a façade of innocent

3      errors rather than deliberate criminal action.

4      **494.**      Racketeering activity is defined to include any act which is indictable under any of

5      the following provisions of title 18, United States Code: Section 1341 (relating to mail

6      fraud), Section 1343 (relating to wire fraud), Section 1344 (relating to financial institution

7      fraud), among others.

8      **495.**      Defendants committed and caused to be committed a series of overt acts in

9      furtherance of the conspiracy and to affect the objects thereof, including but not limited to

10      the acts set forth above.

11      **496.**      For the purpose of executing the scheme to defraud, Defendants sent, mailed and

12      transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce

13      numerous materials, including but not limited to the notices and letters described above

14      informing Plaintiff that she was behind in her payments, that she owed additional sums, that

15      they could increase Plaintiff's policy limits above insurable interest and charge Plaintiff

16      unreasonably high force-placed insurance premiums, that Plaintiff had to increase the

17      insurance limits on her property, that Plaintiff was required to pay a higher mortgage

18      payment, that Plaintiff was in default.

19      **497.**      Defendants instructed Plaintiff to set up automatic mortgage payments by wire, and

20      Plaintiff's mortgage payments  were made by wire transfer. Defendants also communicated

21      with Plaintiff via telephone and computer messaging. Defendants also transferred sums

22      among themselves, including but not limited to kickbacks, in furtherance of their scheme to

23      defraud Plaintiff, in violation of the wire fraud statutes.

**498.**    The relationships, including sales, exclusive contracts, and other sweetheart deals, between Defendants and others in the mortgage servicing industry, can be clearly defined. The exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers have become common knowledge. Defendants and their cohorts engage in a pattern of practices that are virtually the same, even when no visible connections between the parties are seen, often even using the same patterns of speech.

**499.**    A diagram of the movements in what is basically a world-wide controlled group of RICO operators resembles a massive shell game activity. Those movements have obscured the perpetrators of the outrages in the mortgage industry. "It wasn't me!" they say. "It's not my fault. I'm just following the rules/the regulations/the orders." Further, the shell game operating in the mortgage industry is designed to keep mortgagors from being able to compel corrections in the mortgage transaction records. Servicers transfer servicing when a mortgagor becomes obstreperous.

**500.**    That is what has happened to Plaintiff. When Plaintiff created enough noise, Defendant BOA transferred Plaintiff's mortgage servicing to Defendant Seterus, with Fannie Mae approval, which is required. When Defendant BOA transferred servicing, BOA also transferred the falsified, fraudulent mortgage transaction records to Defendant Seterus. When Plaintiff complained to Seterus, Seterus informed Plaintiff that Defendant Seterus could do nothing to correct the records, and that Plaintiff should just pay the outstanding amounts. When Plaintiff complained to Fannie Mae, Fannie Mae's customer representative told Plaintiff that Fannie Mae could not access Plaintiff BOA's mortgage transaction data because BOA was no longer the servicer. This, in spite of the fact that

1    Fannie Mae contracts require servicers to maintain loan records even after they stop

2    servicing.

3    **501.**    However, regardless of the celerity with which the RICO actors move mortgages,

4    subsidiaries, employees, agents, and assigns, when the relationships and actions between

5    the perpetrators, including Defendants, are graphed with the various class action suits,

6    regulatory actions, and other official moves, the pattern becomes clearer.

7    **502.**    Members of the RICO enterprise conspired to defraud the government with respect

8    to claims, and made false, fictitious or fraudulent claims, some of which were related to

9    fraudulent servicers charges which Defendants withheld from the proceeds of foreclosure

10   sales. Defendants as servicers are not required to forward to Fannie Mae partial payments

11   that are posted to escrow, for example. Plaintiff saw false charges such as PIP and MIP on

12   mortgage transactions; Plaintiff did not have those payables, but the "errors" could have

13   more than one function, and another function is to support false claims.

14   **503.**    The RICO enterprise functioned over a period of years as a continuing unit and

15   maintained an ascertainable structure separate and distinct from the pattern of racketeering

16   activity. The Defendants conducted and participated in the affairs of this RICO enterprise

17   through a pattern of racketeering activity that lasted more than one year, at a minimum,

18   and that consisted of numerous and repeated violations of federal mail and wire fraud

19   statutes, which prohibit the use of any interstate or foreign wire or mail facility for the

20   purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

21   **504.**    As part of and in furtherance of the scheme to defraud, Defendants made

22   numerous material omissions and misrepresentations, including false and unrelated

1   charges to Plaintiff's mortgage account with the intent to defraud and deceive Plaintiff,

2   and statements that the false charges were "mistakes" that would be corrected.

3   **505.**    The members of the RICO enterprise had a common purpose: to increase and

4   maximize their revenues by creating a "manufactured" default or defaults resulting directly

5   not from non-payment of the mortgage or failure to secure adequate insurance but from

6   Defendants' own creative bookkeeping; attempting to force borrowers to pay various fees,

7   charges, and penalties created by Defendants' fraudulent, false entries in mortgage records;

8   falsely notifying borrowers Defendants did not have proof of insurance or that borrowers did

9   not carry the minimum insurance limits required by the mortgage; misrepresenting

10   Defendants' insurable interest; using the false information to justify purchase of lenders'

11   insurance from which they received kickbacks or other  benefits; creating and charging a

12   fraudulent higher monthly mortgage payment; failing to timely book mortgage payments

13   thus making false entries in the records showing payments late; labeling the regular

14   mortgage payments as "partial" when borrowers paid the correctly owed amount; failing to

15   apply those payments timely received to principal and interest; applying those regular

16   mortgage payments to an unauthorized escrow account and thus converting them to their

17   use; labeling the borrowers as behind in payments; pressuring borrowers to pay the

18   fraudulent increases; engaging in unfair collection practices; knowingly making false reports

19   to credit bureaus; using manufactured, forged paper trails to underline the fictional default;

20   foreclosing on the property; creating fraudulent transfers/assignments to falsely show

21   ownership and right to foreclose. When the property is sold, Defendants first collect the

22   unreasonable and false charges they built up on the mortgage account, and pay the

1  mortgagee what is left, if anything. If Defendants or their associates buy the foreclosed

2  house and sell it again, their profits are further increased.

3  **506.**    As part of their pattern of practices, Defendants routinely made false entries in

4  reports and statements with intent to injure or defraud Plaintiff, an individual person.

5  **507.**    The pattern of practices included but is not limited to acting to create

6  "manufactured" defaults resulting directly not from non-payment of the mortgage or failure

7  to secure adequate insurance but from Defendants' own creative bookkeeping;  attempting to

8  force borrowers to pay various fees, charges, and penalties created by Defendants'

9  fraudulent; making false entries in mortgage records; misapplying funds; falsely notifying

10  borrowers via mail and wire that Defendants did not have proof of insurance or that

11  borrowers did not carry the minimum insurance limits required by the mortgage;

12  misrepresenting Defendants' insurable interest; using the false information to justify

13  purchase of lenders' insurance from which they received kickbacks or other  benefits

14  including free or low-cost "services;" creating and charging a fraudulent higher monthly

15  mortgage payment; failing to timely book mortgage payments thus making false entries in

16  the records showing payments late; labeling the regular mortgage payments as "partial"

17  when borrowers paid the correctly owed amount but not the inflated mortgage payment;

18  failing to apply those payments timely received to principal and interest; booking fraudulent

19  charges and fees; applying those regular mortgage payments to an unauthorized escrow

20  account and thus converting them to their use; labeling the borrowers as behind in payments;

21  reporting false information to credit bureaus; using the fraudulent default status and credit

22  bureau reports to place properties in "high risk" categories that created higher insurance rates

23  and premiums; pressuring borrowers to pay the fraudulent increases; engaging in unfair

1   collection practices; using manufactured, forged paper trails to underline the fictional

2   default; foreclosing on the property; creating fraudulent transfers/assignments to falsely

3   show ownership and right to foreclose.

4   **508.**   When the property is sold, Defendants first collect the unreasonable and false

5   charges they built up on the mortgage account, and pay the mortgagee what is left, if

6   anything. If Defendants or their associates buy the foreclosed house and sell it again, their

7   profits are further increased.

8   **509.**   Defendants created a monopolistic enterprise, whereby they controlled all aspects of

9   the mortgage and services for the mortgage and the property. They made all decisions, were

10  the sole point of control for all purchases and payments. They moved title and ownership

11  through a privately held corporation of which they were founding members and through

12  which they could adjust the files as they pleased, without supervision. The degree of

13  complicity involving those whose duty it is to monitor and supervise the activities of

14  Defendants and their RICO associates is currently unknown, but the arrogance and

15  willfulness demonstrated by Defendants in their hardheaded continuance of their illegal

16  activities leads Plaintiff to belief that said complicity is more than just minimal.

17  **510.**   Defendants used false charges to increase escrow and unilaterally increase the

18  agreed mortgage payment. Upon information and belief, borrowers were then artificially

19  priced out of their homes, as Defendants' manipulations increased mortgage payments from

20  amounts which borrowers could have made to amounts they could not pay.

21  **511.**   In order to "comply" with various regulations, contractual obligations, and

22  settlements of earlier suits and actions, Defendants offered lip service to their duty to

23  refinance troubled loans. However, without adequate supervisor, nothing prevented

1    Defendants from making unreasonable offers which they knew borrowers would refuse, as

2    they offered to Plaintiff.

3    **512.**    Plaintiff is fortunate in that she was fully capable of making the mortgage

4    payments, or of purchasing the property outright.

5    **513.**    But although Plaintiff made 15 payments more than she was required to make,

6    significantly overpaying the mortgage, Defendants implemented their assembly line process

7    to seize Plaintiff's property, using a fraudulent lien with an inadequate chain of assignments,

8    and filing a notarized Appointment of Substitute Trustee containing false statements, and

9    intend to sell Plaintiff's property on June 6, 2017.

10    **514.**    From bank/mortgagee to middle man seller to "servicer" to insurance sales to

11    conversion of both federal and private funds, all through an infinitely complex creative

12    bookkeeping system and a network of RICO actors, Defendants are making money hand

13    over fist, piling up the profits. And some of that profit derives from Defendants predation on

14    Plaintiff.

15    **515.**    By reason and as a result of Defendants' conduct and participation in the

16    racketeering activity alleged herein, Defendants have caused damages to Plaintiff in the form

17    of increased costs of insurance, increased costs of other goods and services as charged by

18    those who use credit information to determine rates and fees, loss of time from her business,

19    time billed to Defendants for activities involved in complaints and lengthy, frustrating

20    resolution of Defendants' repeated violations, and damage to her health and property

21    suffered as a result of Defendants' RICO activities.

**516.**     Defendants' RICO activities are a proximate cause of injury to Plaintiff, wherefore, Plaintiff seeks compensatory and triple damages, attorneys' fees and costs, and all other available and appropriate relief.

## DEFENDANTS' EGREGIOUS, UNCONSIONABLE CONTINUING CONDUCT REQUIRES PUNITIVE DAMAGES.

**517.**     Defendants' egregious, unconscionable continuing conduct requires punitive damages, without cap. Texas caps punitive damages, but Article IV, US Constitution, provides that the citizens of each state shall be entitled the same privileges of all others.

**518.**     Defendants willfully deprived Plaintiff of much more than the mortgage payments they converted to their use. Defendants' "servicing" practices are designed to put the maximum pressure on the mortgagors, in order to confuse, depress, and stress them, to expend their time on senseless and ineffective activities [administrative exhaustion] responding to Defendants, and to delay and/or avoid the thwarting of their activities. As in other forms of extortion, the object is to induce the mortgagor to submit to Defendants' demands for additional money, on pain of negative credit reporting, of foreclosure and loss of homes, and of unending, continuing debt for "unpaid balances."

**519.**     Defendants' actions against Plaintiff are particularly unconscionable, given the existing fiduciary relationship, and are made heinous by their knowledge of and exploitation of Plaintiff's disabilities.

**520.**     Plaintiff Thomas suffers disabilities from stroke and traumatic brain injury. She has memory problems, organizational problems, aphasia [written and verbal], Riddock's [a visual perception problem], concentration/distractibility problems, and limited effective time, and although her IQ is significantly over normal, these disabilities mean that

1    Thomas can only complete 2 or 3 tasks in a given day, when she is undisturbed. When she

2    is stressed or interrupted in her work, she cannot complete tasks.

3    **521.**    The more stress to which she is subjected, the fewer tasks she can effectively

4    handle. Yet, Plaintiff is by unavoidable circumstances in the position of providing life-

5    saving care for her granddaughter, who has a chronic, life-threatening condition which

6    requires constant high-level attention and responses. In spite of her other activities,

7    Plaintiff was able to do so without the debilitation caused by Defendants' deliberate

8    actions after they induced her to acquire a mortgage on a property which she could have

9    purchased outright, and in her usual practice, would have purchased outright, absent

10    Defendants' self-serving actions.

11    **522.**    Because of Defendants' persecution of Plaintiff, Plaintiff was frequently reduced

12    to being able to handle that task alone. And, although she maintained her granddaughter's

13    life and reasonable health, there were many necessary tasks she could not complete – or

14    remember – because of Defendants' unrelenting pressure and unconscionable acts.

15    **523.**    As Defendants continued and increased their nefarious pattern and practices,

16    Plaintiff's life was made increasingly miserable. Her increasing anger and pain are clearly

17    visible in her communications to Defendants, and in her actual billing, with billing rates

18    increasing as Defendants maintained their intransigency. She developed an anxiety

19    disorder, which further negatively impacted her life. Plaintiff suffered from high blood

20    pressure spikes as a result of Defendants' actions and continued intransigency, and was

21    hospitalized after a particularly trying episode with Defendants. Plaintiff's stress resulted

22    in teeth grinding, and her permanent bridges were broken and continue to chip. Repair

1     will require surgical intervention and significant time down, and costs are estimated to be

2     in the range of $35,000 to $45,000.

3     **524.**    Defendants deprived Plaintiff of peace and quiet, and ensured that she suffered

4     nine years of their egregious, unconscionable actions. Plaintiff had specific plans for those

5     nine years, including the establishment of business interests that were planned to provide

6     for her granddaughter, who is unable to work, after Plaintiff's death. Because of

7     Defendants, Plaintiff was unable to do the work that had to have been done.

8     **525.**    Because Plaintiff lives from crisis to crisis dealing with the potential of sudden

9     death at any time, she could not carry out the continuing activities necessary to completely

10    end Defendants' depredations; she could only fight until the more important crises related

11    to healthcare and maintaining her granddaughter's life intervened. Frequently, while

12    dealing with necessary health tasks, Plaintiff was interrupted by Defendants starting up

13    again. There was never time to end Defendants' egregious activities – and Defendants

14    made ending those activities as difficult as possible. But throughout, Plaintiff made sure

15    that her obligation to pay the mortgage payments was carried out, and in fact Plaintiff

16    continued paying the mortgage for 15 months after the last required payment was made.

17    **526.**    Plaintiff's life has been made miserable by Defendants. Defendants have stolen

18    that most valuable commodity of all – time – which they cannot replace; however, they

19    can pay her damages sufficient to remove future anxieties for herself and her family.

20    Aside from the actual mortgage depredations, Defendants with their external actions, such

21    as bad credit reporting, managed to affect Plaintiff's entire financial life.

22    **527.**    Plaintiff has at various times billed Defendants for their nefarious activities. As a

23    consultant, her last billing rate to Defendants was $1550/hour, which would total in excess

1    of $28,000,000. The concept of billing for time is well-known and accepted; individuals

2    base their rates on expertise, difficulty, outcome, etc. Plaintiff is the person who best

3    knows what her time is worth, and how much difficulty she has experienced at

4    Defendants' hands.

5    **528.**    Time becomes more valuable as one reaches end stage. If one were told that one

6    had 10 hours to live, but could purchase 10 additional hours, what would be the price that

7    anyone would be willing, if not able, to pay? Time cannot be replaced, but with money,

8    one can hire others to expend the time one no longer enjoys. Duty can be passed to others.

9    **529.**    Defendants have jointly and severally paid settlements over a period of years, but

10    those settlements have failed to cure the problems and Defendants have continued in their

11    unconscionable acts. Plaintiff requests damages sufficient to curb Defendants' activities.

12    **530.**    BANK OF AMERICA assets March 31, 2017 were $2.248 Trillion. The bank

13    reported 2016 earnings of $17.9 billion, up 13% from 2015, the second-highest income

14    reported in the company's history. Named BOA president and CEO in 2010, in 2016

15    Brian Moynihan's total compensation was $20 million (over $9,000/hr based on 2040

16    annual hours); the bank's board said that 92.5% of Moynihan's pay was "variable and

17    directly linked to company performance," according to an SEC filing.

18    **531.**    Plaintiff requests the Court to grant punitive damages in the amount of $1.79

19    Billion, one-tenth of Bank of America's reported 2016 earnings, part of the award to come

20    directly from the assets of the John/Jane Does to be named as identified.

21    **PRAYER FOR RELIEF**

22    Plaintiff prays for all available and appropriate relief, including

1     Injunctive relief (prospective, retroactive or both), to rescind foreclosure and to prevent

2     sale of Plaintiff's property on June 6, 2017;   Declaratory relief, on determination of

3     ownership, monies owed, and an accurate accounting; Quiet title;  Compensatory

4     damages, Punitive damages, Pain and suffering damages, Statutory damages, such as

5     treble damages or fines, as they apply; Reimbursement of funds paid or lost through

6     misapplication and other acts of Defendants, including overpayment of mortgage loan

7     ($14,086.35); Payment of Invoiced amounts; Attorneys' fees; Costs; and such other and

8     further relief as this court may deem just and proper.

9         Signed under penalties of perjury:

10                         Kathleen Thomas /s/

11                         Kathleen Thomas, Pro Se Plaintiff

12                         10001 Overbrook Drive Conroe TX 77304

13     **VERIFICATION**

14     I, Kathleen Thomas, Pro Se Plainiff, verify that to the best of the my knowledge,

15     information, and belief, formed after an inquiry reasonable under the circumstances, the

16     material presented is true and correct, not filed for an improper purpose, and has the

17     requisite degree of evidentiary and legal support.   Kathleen Thomas /s/

18

19     ACKNOWLEDGMENT

20

21     STATE OF TEXAS

22

23     County of Montgomery

24

25     On June 1, 2017, before me, Eric M Sireuer       , a Notary Public, personally

1    appeared Kathleen Thomas who proved to me on the basis of satisfactory evidence to be

2    the person whose name is subscribed to the within instrument and acknowledged to me

3    that she executed the same in her authorized capacity, and that by her signature on the

4    instrument the person executed the instrument.

5    I certify under PENALTY OF PERJURY under the laws of the State of Texas that the

6    foregoing paragraph is true and correct.

7

8    WITNESS my hand and official seal. 

9

10

ERIC MANUEL JIMENEZ
Notary Public, State of Texas
Comm. Expires 04-16-2021
Notary ID 125916053